

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OLIVERIO MARTINEZ, Derivatively on Behalf of TOLL BROTHERS, INC., | ) ) ) | Case No. _____ 09       937 |
| | ) | VERIFIED SHAREHOLDER DERIVATIVE |
| Plaintiff, | ) ) | COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, |
| | ) | UNJUST ENRICHMENT, EQUITABLE |
| vs. | ) ) | IDEMNIFICATION, AND FOR DECLARATORY RELIEF |
| ROBERT I. TOLL, BRUCE E. TOLL, ZVI BARZILAY, JOEL H. RASSMAN, JOSEPH R. SICREE, PAUL E. SHAPIRO, CARL B. MARBACH, ROBERT S. BLANK, RICHARD J. BRAEMER, ROGER S. HILLAS, EDWARD G. BOEHNE, and STEPHEN A. NOVICK, | ) ) ) ) ) ) ) ) ) | **FILED** MAR   4 2009 **MICHAEL E KUNZ, Clerk** By_____Dep. Clerk |
| Defendants, | ) ) | |
| -and- | ) ) | |
| TOLL BROTHERS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | DEMAND FOR JURY TRIAL |

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Toll Brothers, Inc., ("Toll Brothers" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of Delaware law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that occurred between February 2005 and November 2006 (the "Relevant Period") and that have caused substantial losses, write downs, and other damages to Toll Brothers, such as to its reputation and goodwill. This action also brings a claim for equitable indemnity for costs and expenses incurred by the Company in connection with addressing defendants' wrongdoing, (including costs and expenses incurred defending a securities class action filed against the Company) and a claim for declaratory relief.

2.      Throughout 2005, evidence mounted and a consensus developed among respected academics, professional economists, and industry experts, including Federal Reserve Chairman Alan Greenspan, that the record levels of demand and price appreciation in the U.S. housing market had

- 1 -

become unsustainable and a severe correction in the housing markets was imminent. The cost of home ownership as a percentage of income had reached historic levels. Much of the demand and price appreciation in the years leading up to 2005 had been driven by an unprecedented increase in the use of adjustable rate mortgages, interest only loans, and undocumented Alternative A-Paper ("Alt-A") and subprime loans, with a correlative decline in lending standards. These trends accelerated through 2004 and 2005, and, while defendants pumped up Toll Brothers' earnings projections during those years, they also foreshadowed a disastrous collapse in the housing and credit markets. Stable demand from good credits risks purchasing primary residences had been exhausted. Savvy home building industry participants knew full well that they were riding the late stages of a bubble driven by real estate speculators and bad credit risks who, unlike prime credit owner-occupiers, would exit the market at the first sign of rising interest rates, weakening demand and softening prices.

3.      This was no secret to veterans of the real estate industry, like defendant Robert I. Toll ("R. Toll"), who spoke regularly with economics professors and students at the Wharton School, University of Pennsylvania. Moreover, R. Toll had witnessed first-hand the collapse of the real estate markets in the late 1980s. In fact, the risks of a major collapse were far greater in 2005 than in 1988. The difference this time was that so many buyers, including speculative investors, had been able to take advantage of easy credit and adjustable rate loans to stretch their buying power and drive up home prices. As the Federal Reserve began to raise interest rates in 2005, these loans, many of which had been made to speculators and poor credit risks, began to reset at higher rates that were not as attractive to speculative investors. The result was broadly reduced buying power, vanishing speculator demand, and an avalanche of defaults and foreclosures. As 2005 turned into 2006, demand evaporated, inventories of new and existing homes skyrocketed, and prices collapsed in a matter of months.

4.      Despite these extraordinary risks, defendants, including Toll Brothers' Board of Directors (the "Board"), permitted senior management to publish reckless forecasts that the Company would post record results in 2006 and 2007, beating the record earnings achieved in 2005, by 20% in 2006, and by another 20% in 2007. Toll Brothers' officers, including Chief Executive

Officer ("CEO") R. Toll and defendant Chief Financial Officer ("CFO") Joel H. Rassman ("Rassman"), affirmatively misled investors by telling them that the increasing interest rates and rampant level of speculative investing in the real estate market would not affect Toll Brothers' business. R. Toll claimed that Toll Brothers' target market —the affluent—would simply shrug off the higher interest rates.

5.     R. Toll failed to honestly address the broader evidence that stable prime credit demand had long ago been exhausted, and that the recent record levels of demand had been driven largely by speculators, who relied on easy access to cheap credit, and would therefore be unsustainable over the next 12 to 24 months. Instead, R. Toll explained to investors that over 30% of Toll Brothers' closings involved interest only loans because sophisticated buyers were simply using those loans to get the best mortgage rates. According to R. Toll, those buyers *were not* using interest only loans to flip Toll Brothers' property back onto the market. This is because, as he also explained, the Company's sales contracts forbid buyers from engaging in house flipping. He also told shareholders not to worry about cancellations eating into Toll Brothers backlog of home orders because of the large nonrefundable deposits Toll Brothers required. At the same time he withheld, until August 2006, the true nature and extent of the fact that purchase contract cancellations had been increasing rapidly since late 2005.

6.     More fundamentally, senior management failed to tell investors about extraordinary risks they had taken with Toll Brothers' capital by saddling the Company with billions of dollars of bubble-priced land, home sites, and finished home inventories in their reckless attempt to mask the true state of the deteriorating real estate market and appear to be driving the Company to achieve record earnings again in 2006 and 2007. Simply put, defendants betrayed shareholders' trust by failing forthrightly to disclose that the Company was on the verge of a major decline in earnings as the entire real estate market braced for downward correction. And defendants did not come clean about how the downward correction would lead to a sharp increase in contract cancellations until August 2006. Moreover, until November 2006, defendants concealed that speculative buyers were driving those contract cancellations. The ongoing cascade of write downs totaling over $1.4 billion was the consequence.

- 3 -

7.      Defendants succeeded in their effort to convince investors that Toll Brothers would continue to increase profits at record levels, despite an imminent and inevitable major market correction. The stock price rose to over $50 per share during July 2005 from approximately $35 per share at the beginning of the Relevant Period.

8.      Defendants' actions with their own money told a very different story from the story spun for Toll Brothers shareholders. They took advantage of the artificial inflation in Toll Brothers' stock price to sell 14.77 million shares of their personal holdings for over $600 million in proceeds at the height of the real estate market. When asked about the magnitude and timing of his sales, R. Toll said that he "needed to buy groceries," revealing his disdain for ordinary investors and the Company he founded.

9.      Throughout the second half of 2005, defendants received information about Toll Brothers' own operations confirming that the real estate bubble was collapsing and demand for luxury homes was evaporating. But they withheld that information from the public until August 2006, when the force of the numbers left them no choice but to disclose that Toll Brothers' cancellation rate, once the lowest in the industry, had more than doubled and that the Company's inventory write-downs were vastly exceeding the Company's budget. Although, R. Toll belatedly admitted that demand had softened substantially and that foot traffic at the Company's selling communities had fallen, he refused to acknowledge that it was the result of a real estate collapse, choosing instead to blame hurricanes that ravaged the Gulf Coast during the fall of 2005. Inventories mounted and prices collapsed in the market that Toll Brothers had claimed would be invulnerable, as speculators caught with resetting mortgages saturated the market with cut-priced homes. Thus, R. Toll continued to attempt to mask the true nature of Toll Brothers' problems until he could no longer conceal the truth in August 2006 as to the true collapse Toll Brothers was facing. Incredibly, R. Toll admitted during a November 7, 2006 conference call that not only were speculative buyers driving up Toll Brothers' cancellation rate, but also the problem "should [have been] easy to discern by looking at the qualification questionnaires ... and by talking to sales people."

10.     These disclosures devastated Toll Brothers' credibility in the capital markets. The Company's market capitalization declined by over 40%, as the stock price fell from over $50 per share to less than $17 per share during the Relevant Period. A class of investors sued Toll Brothers for securities fraud. Shortly after that filing, and consistent with their use of Toll Brothers as a vehicle to shield themselves from liability, the defendants directed Toll Brothers to issue the statement that "[w]e believe that [the securities class action] is without merit and intend to vigorously defend against it." Yet, the class action survived a motion to dismiss, exposing the Company to substantial costs to mount its so-called "vigorous defense," as well as potentially billions of dollars worth of liability.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This Court also has jurisdiction arising under Article III of the United States Constitution and 28 U.S.C. §1331 because plaintiff's claim for equitable indemnification raises a federal question as to Toll Brothers' liability under section 10(b) of the Securities Exchange Act of 1934. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Pennsylvania so as to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District, Toll Brothers is headquartered here, many

of the witnesses reside in this District and defendants conduct substantial business activities in this District.

## THE PARTIES

14.     Plaintiff Oliverio Martinez ("Plaintiff") is, and was at times relevant hereto, an owner and holder of Toll Brothers common stock.  Plaintiff is a citizen of California.

15.     Nominal defendant Toll Brothers is a corporation organized and existing under the laws of the state of Delaware, with its headquarters located at 250 Gibraltar Road, Horsham, Pennsylvania 19044. Toll Brothers engages in the development, construction, and sale of residential homes. It designs, builds, markets, and arranges finance for single-family detached and attached homes in luxury residential communities.

16.     Defendant R. Toll is Toll Brothers' Chairman of the Board and CEO and has been since May 1986. R. Toll was a member of Toll Brothers' Compensation Committee from at least 1994 to 2001. R. Toll co-founded the Company's predecessor operations in 1967. Defendant R. Toll knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, R. Toll participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and U.S. Securities & Exchange Commission ("SEC") filings up through November 2006.  Toll Brothers paid R. Toll the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2006 | $1,300,000 | $17,531,042 | 250,000 | $404,721 |
| 2005 | $1,300,000 | $27,322,547 | 500,000 | $416,575 |

While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, R. Toll sold 7,477,400 shares of his personally held stock for $323,375,029.06 in proceeds.  Defendant R. Toll's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant R. Toll is a citizen of Pennsylvania.

17.     Defendant Bruce E. Toll ("B. Toll") is a Toll Brothers director and has been since May 1986. B. Toll was Toll Brothers' Chief Operating Officer ("COO") from May 1986 to May 1998; President from May 1986 to November 1998; and Secretary from at least January 1994 to at least March 2002. Toll was a member of Toll Brothers' Compensation Committee from at least 1994 to 1999. B. Toll co-founded the Company's predecessor operations in 1967. Defendant B. Toll knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93 that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, B. Toll participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, B. Toll sold 5,062,000 shares of his personally held stock for $216,696,088.26 in proceeds. Defendant B. Toll's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant B. Toll is a citizen of Pennsylvania.

18.     Defendant Zvi Barzilay ("Barzilay") is Toll Brothers' COO and has been since May 1998; Toll Brothers' President and has been since November 1998; and a Toll Brothers director and has been since June 1994. Barzilay held executive positions at Toll Brothers since 1983, including Executive Vice President of Operations, and was a Toll Brothers project manager from 1980 to 1983. Barzilay was also a member of Toll Brothers' Compensation Committee from 1999 to 2001. Defendant Barzilay knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93 that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.  Moreover, during the Relevant Period, Barzilay participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006. Toll Brothers paid Barzilay the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2006 | $1,000,000 | $1,520,000 | 120,000 | $873,873 |
| 2005 | $1,000,000 | $1,400,000 | 240,000 | $847,950 |

While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements Barzilay sold 1,027,048 shares of his personally held stock for $46,040,134.84 in proceeds. Defendant Barzilay's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Toll Brothers, Inc. (Indexed vs. S&P 500 Homebuilders Index)
Zvi Barzilay - Insider Sales Proceeds
January 9, 2003 to October 7, 2008

Pre-Relevant Period Sales:
Shares Sold:       240,864
Proceeds:      $4,829,020.31

Relevant Period Sales:
Shares Sold:     1,027,048
Proceeds:    $46,040,134.84

Post-Relevant Period Sales:
Shares Sold:       402,330
Proceeds:    $10,286,372.10

Defendant Barzilay is a citizen of Pennsylvania.

19.    Defendant Rassman is Toll Brothers' Executive Vice President and has been since May 2002 and Toll Brothers' CFO and Treasurer and has been since 1984. Rassman is also a Toll Brothers director and has been since September 1996. Rassman was Toll Brothers' Senior Vice President from 1984 to May 2002. Defendant Rassman knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Rassman participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006. Toll Brothers paid Rassman the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2006 | $1,000,000 | $1,220,000 | 60,000 | $1,108,883 |
| 2005 | $1,000,000 | $1,000,000 | 116,000 | $1,094,164 |

While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Rassman sold 371,200 shares of his personally held stock for $16,124,895.78 in proceeds. Defendant Rassman's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant Rassman is a citizen of New Jersey.

20.     Defendant Joseph R. Sicree ("Sicree") is Toll Brothers' Chief Accounting Officer and has been since October 1992. Sicree is also Toll Brothers' Senior Vice President and has been since at least January 2006. Sicree was Toll Brothers' Director of Investor Relations from October 1992 until at least February 2003 and Vice President from at least March 1994 to at least December 2005. Defendant Sicree knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects

and declining demand for its luxury homes.   Moreover during the Relevant Period, Sicree

participated in the issuance of false and/or misleading statements including the preparation of false

and/or misleading press releases and SEC filings up through November 2006.  While in possession

of material non-public information concerning Toll Brothers' issuance of false and/or misleading

public statements, Sicree sold 49,956 shares of his personally held stock for $2,237,073.45 in

proceeds.  Defendant Sicree's sales during the Relevant Period were highly suspicious as illustrated

by the following graph:



Defendant Sicree is a citizen of Pennsylvania.

      21.     Paul E. Shapiro ("Shapiro") is a Toll Brothers director and has been since December

1993.  Shapiro was Chairman of Toll Brothers' Audit Committee from 2003 to at least February

2007; a member of the Audit Committee from 1994 to 2002; and a member of the Compensation

Committee for Key Executives & Non-Employee Directors from 1997 to 2003.  Defendant Shapiro

knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through

93, that would have alerted him to Toll Brothers' declining business prospects and declining demand

for its luxury homes. Moreover, during the Relevant Period, Shapiro participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up to November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Shapiro sold 220,000 shares of his personally held stock for $10,124,090 in proceeds. Defendant Shapiro's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant Shapiro is a citizen of Florida.

22.     Defendant Carl B. Marbach ("Marbach") is a Toll Brothers director and has been since December 1991. Marbach is also Chairman of Toll Brothers' Compensation Committee for Key Executives & Non-Employee Directors and has been since 2004; a member of Toll Brothers' Compensation Committee for Key Executives & Non-Employee Directors and has been since 1997; and a member of Toll Brothers' Audit Committee and has been since at least 1994. Marbach was a member of Toll Brothers' Compensation Committee from at least 1994 to 2001. Defendant Marbach knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through

93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Marbach participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up to November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements Marbach sold 169,340 shares of his personally held stock for $8,148,608.65 in proceeds. Defendant Marbach's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant Marbach is a citizen of Florida.

23.     Defendant Robert S. Blank ("Blank") is a Toll Brothers director and has been since September 1986. Defendant Blank knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Blank participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up to November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public

statements, Blank sold 240,000 shares of his personally held stock for $10,489,918 in proceeds. Defendant Blank's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant Blank is a citizen of Colorado.

24.     Defendant Richard J. Braemer ("Braemer") is a Toll Brothers director and has been since September 1986. Defendant Braemer knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Braemer participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Braemer sold 70,000 shares of his personally held stock for $2,676,794.50 in proceeds. Defendant Braemer's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Toll Brothers, Inc. (Indexed vs. S&P 500 Homebuilders Index)
Richard Braemer - Insider Sales Proceeds
January 9, 2003 to October 7, 2008

Defendant Braemer is a citizen of New Jersey.

25.     Defendant Roger S. Hillas ("Hillas") is a Toll Brothers director and has been since April 1988. Hillas is also a member of Toll Brothers' Audit Committee and has been since 1999. Defendant Hillas knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.  Moreover, during the Relevant Period, Hillas participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.  While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Hillas sold 84,000 shares of his personally held stock for $3,075,711 in proceeds. Defendant Hillas' sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Toll Brothers, Inc. (Indexed vs. S&P 500 Homebuilders Index)
Roger Hillas - Insider Sales Proceeds
January 9, 2003 to October 7, 2008

Defendant Hillas is a citizen of Pennsylvania.

26.     Defendant Edward G. Boehne ("Boehne") is a Toll Brothers director and has been since July 2000.  Boehne is also a member of Toll Brothers' Audit Committee and has been since 2000.  Defendant Boehne knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.   Moreover, during the Relevant Period, Boehne participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.  Defendant Boehne is a citizen of Pennsylvania.

27.     Defendant Stephen A. Novick ("Novick") is a Toll Brothers director and has been since January 2003.  Novick is also a member of Toll Brothers' Compensation Committee for Key Executives & Non-Employee Directors and has been since 2003.  Defendant Novick knew or consciously and recklessly disregarded red flags, alleged below in 76 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury

homes. Moreover, during the Relevant Period, Novick participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings. Defendant Novick is a citizen of New York.

28.     The defendants identified in ¶¶ 16-19, 21-27 are referred to herein as the "Director Defendants." The defendants identified in ¶¶ 16-20 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶ 16-25 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants, and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors and/or fiduciaries of Toll Brothers and because of their ability to control the business and corporate affairs of Toll Brothers, the Individual Defendants owed Toll Brothers and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Toll Brothers in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Toll Brothers and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to Toll Brothers and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Toll Brothers, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial

positions with Toll Brothers, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Toll Brothers.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Toll Brothers, and was at all times acting within the course and scope of such agency.

33.     To discharge their duties, the officers and directors of Toll Brothers were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Toll Brothers were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, purchase contract cancellations, and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Toll Brothers conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

34.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Toll Brothers, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Toll Brothers' Board during the Relevant Period.

35.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company has been required to expend extraordinary amounts addressing the consequences of defendants' misconduct, including investigative costs and defending several class action law suits that allege violations of federal securities laws. As a result, Toll Brothers has expended, and will continue to expend, significant sums of money.

36.     Moreover, these actions have irreparably damaged Toll Brothers' corporate image and goodwill. Toll Brothers' Board has misled the investing public, such that Toll Brothers' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Toll Brothers and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Toll Brothers, regarding the Individual Defendants' management of Toll Brothers' operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

39.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal the true fact that Toll Brothers was misrepresenting its financial results. In addition, defendants also made other specific, false statements about Toll Brothers' financial performance and future business prospects, as alleged herein.

40.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment and illicit insider trading; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Toll Brothers' common stock so they could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or grossly negligently misrepresent its financial results and release misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

42.      Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FALSE AND MISLEADING STATEMENTS

### Statements that Falsely Portrayed the Demand for Toll Brothers' Luxury Homes

43.      The scheme perpetrated by the Individual Defendants revealed in November 2006 stretched back to 2005.  Throughout Toll Brothers' fiscal year 2005, the Individual Defendants directed Toll Brothers to issue public statements that emphasized strong projected demand.  In particular, these statements proclaimed record results based upon the peak housing demand that characterized the summer of 2005.  Toll Brothers' public statements also cited to the record housing demand as a sign of the success of Toll Brothers' "unique" business model focused on the sale of luxury homes.  On the basis of Toll Brothers' "record" results, the Company issued 20% earnings growth projections for fiscal 2006 and 2007.

44.      The housing demand upon which Toll Brothers' 20% earnings growth projection relied upon was a farce, however.  This is because a substantial factor contributing to the housing demand surge during the summer of 2005 was the speculative investor.  The speculative investor seeks to buy up available properties and then immediately re-sell to the market, which in turn artificially drives up demand as other speculative investors enter the market.  This speculative market ended abruptly, however, during the later half of 2005, when the Federal Reserve raised interest rates.  This is because the increasing interest rates eventually made speculative real estate investment unprofitable.

45.      Analysts who were aware of this relationship questioned whether or not Toll Brothers' 20% projected growth was actually sustainable given an environment of increasing interest rates.  R. Toll and Toll Brother's public statements, however, dismissed such concerns with references to the

- 21 -

Company's outstanding performance during the previous interest rate hikes of the 1990s. In effect, R. Toll invited analysts and investors to view the interest rate hikes in a vacuum. In doing so, he omitted any discussion of the combined effect that rampant speculation and increasing interest rates would have on housing demand. That effect would prove disastrous because the increasing interest rate hikes would eventually drive speculative investors out of the market. Without the speculative investors supporting the market, housing demand and, as a consequence, housing prices and Toll Brothers' margins, would enter into a long-term dramatic decline. And, importantly, Toll Brothers' unique business model of focusing on luxury homes would not shelter the Company from the eventual market collapse.

46.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases maintained the false position that Toll Brothers effectively marched to a different beat from the rest of the real estate market due to the Company's focus on luxury homes. These statements were false because, during the summer of 2005, interest rates would eventually drive speculative investors, who were driving up the demand for Toll Brothers' properties, out of the market.

**February 3, 2005, First Quarter 2005 Preliminary Earnings Press Release**

> "Our record backlog and contracts indicate that *demand for our luxury homes remains very healthy.* In addition, our non-binding reservation deposits, which are preliminary to contracts and then to revenues ten to twelve months thereafter, have also been strong. In 9 of the 13 weeks in our first quarter 2005, these deposits were either the highest or second highest on a per community (same store) basis for that quarter since 1987. The other four weeks, two of which had Christmas and New Year fall on the weekend and one of which had a major weekend snow storm, well exceeded our five-year per-community average since 2000."

> "We have a national brand name and offer a wide range of products, including move-up, empty-nester, active-adult, resort-style golf and lake communities, urban in-fill, high-density suburban, beach tower and urban tower residences. With multiple product lines and numerous price points within the luxury niche, we are broadening our base of potential buyers. We enjoy access to well-priced and abundant capital to fund our operations. And we can purchase materials in high-volumes and at low cost, which means we can provide great value for our customers."

**February 8, 2005 First Quarter Preliminary Earnings Conference Call**

> **R. Toll:** Our record first quarter contracts, backlog, and reservation deposits confirm that *demand for our luxury homes remains very strong.* Deposits are preliminary to contracts and then revenues 10 to 12 months out. In 9 of the 13 weeks in our first quarter our reservation deposits were either the highest or second highest on a per community same-store basis since '87. 1987.

* * *

- 22 -

**Dennis McGill - Credit Suisse First Boston – Analyst:** If you kind of look at the pace at which you're selling homes -- Bob, you referenced several times ***the rate is at a level you haven't really experienced in your history***, is there anything in particular that you can point to as what's driving that outside of just the health of the market and overall demand?

**R. Toll:** I think that it's our good fortune to ***have lots in the right place***. We've tried very hard to establish a brand name for building luxury homes in the most sought after markets, and the fact that we've been able to achieve, as time rolls on, more and more of these very difficult to procure home sites enabled, entitled home sites in the tight in, close in markets I think is the reason why we're doing so well. Just the fact that we have the product.

*   *   *

**R. Toll:** I think it's just got to do with the demographics. We are by far ***the luxury homebuilder***. Our average home price is almost double what the other homebuilder's average home price is, and the growth of wealth in the nation, the polarization, and we won't get into the politics of that, but the polarization that's been taking place for the last 20 years is accelerating, not decelerating, so you just have tremendous growth in households with wealth compared to the average growth in populations. So I think that's why we have such strong demand and such strong statistics.

## February 23, 2005, First Quarter 2005 Earnings Press Release:

Robert I. Toll, chairman and chief executive officer, stated: "We are enjoying strong pricing power and increasing profit margins as demand for luxury homes continues to outpace supply."

*   *   *

Robert Toll continued: "***Continuing strong demand***, a recovering economy, our diversified offerings in the luxury move-up, active-adult, and empty-nester urban and suburban niches, and our growing portfolio of well-positioned communities in upscale markets all bode well for our future prospects: Based on these factors, as we have previously discussed, we believe fiscal 2006 will be another record year.

## February 23, 2005 First Quarter 2005 Earnings Conference Call

**R. Toll:** We are enjoying strong pricing power and increasing profit margins as demand for luxury homes continues to outpace supply. Due to this demand, a recovering economy and our growing portfolio of well-positioned communities in affluent markets, we believe ***fiscal 2006 will be another record year***. Increasing numbers of high-income households are competing for a constrained supply of homesites.

## March 8, 2005, Press Release

Robert I. Toll stated: "For each of the five weeks since the end of our record breaking first quarter, non-binding deposits, a precursor to contracts, have been the highest or second highest per community (same store) in those five weeks in the last ten years. With community count now at a record 225 compared to last year's 205, we are well ahead of last year."

**May 10, 2005 Second Quarter 2005 Preliminary Earnings Press Release**

> Robert I. Toll, chairman and chief executive officer, stated: *"Demand for luxury homes remains strong,* and we continue to enjoy solid pricing power. Based on the pace of current demand and our record backlog, which now includes many deliveries stretching into the second quarter of FY 2006, we remain on track for what we believe will be approximately 60% net income growth in FY 2005 and approximately *20% net income growth in FY 2006."*

47.    In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases maintained the false position that demand from Toll Brothers' luxury buyers would be unaffected by increasing interest rates. After all, according to R. Toll, Toll Brothers had "seen this movie before" and nevertheless posted strong financial results. These statements were false and misleading because the rising interest rates would eventually drive speculative buyers out of the real estate market as it became less profitable.

**May 10, 2005 Second Quarter 2005 Preliminary Outlook Conference Call**

> **R. Toll:** Demand for luxury homes remains strong, and we continued to enjoy strong pricing power. Based on the pace of current demand and our all-time record backlog, which now includes many deliveries stretching into the second quarter of fiscal year '06, we remain on track for what we believe will be approximately 60% net income growth in fiscal year '05, and approximately *20% net income growth in fiscal year '06.*
>
> * * *
>
> The housing market *has remained strong through 8 consecutive interest rate hikes from the Federal Reserve*. Long-term rates have remained low, although shorter rates, of course, have risen. Some are positive that as mortgage rates rise housing demand will be curtailed - *not big builders* must prove themselves in a rising rate environment.
>
> I will take the opportunity to point out that *we've seen this movie before*. We had to prove ourselves in 1995, 1997 and 2000 when mortgage rates rose. In those years, our revenues rose 28% 95, 28% 97 and 23% in 2000 even as national single-family housing starts decline.
>
> So, *we will prove it once again*. I'm not sure that will make a difference, but sooner or later, I believe that we and the other major homebuilding companies will make believers out of the investing public.
>
> We believe Toll Brothers *marches to a different beat* in the housing market, in general, due to our luxury market rates and the land we control in some of the most desired locations.
>
> We believe *luxury buyers are less impacted by interest rate hikes* than less affluent buyers are affected. And, again, we go back to '95 when the interest rate went up to 8.5 and 1997, 8.25, and 2000, 8.5, and did well.

**August 25, 2005 Third Quarter 2005 Earnings Press Release**

"In recent weeks, it appears that bubble mania and reports of a strengthening employment picture with associated interest rate fears have rattled investors. We believe strong job numbers and an improving economy are positive factors for the housing industry, in general, and our luxury niche in particular. *Mortgage rates remain low and the projected Fed Funds target of about 4.5% is below its peak in 1994, 1995, 1996, 1997, 1998, 1999 and 2000, which were all years of record home sales for Toll Brothers.*"

"We believe *our success is determined more by our brand name and our well-located communities than by fluctuations in the mortgage market.* In the past decade, there have been several periods of mortgage rate hikes, three years in which national housing starts dropped, a recession, and a major stock market decline. None of these have stifled our ability to expand and produce record results."

"We've watched some markets go from overheated to warm and back to hot. It appears to us that the basic fundamentals of wealth accumulation, constrained lot supplies and growing demand should continue to support our business model. With approximately 79,500 lots under control, we believe we can continue on a path of growth for many years to come."

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

**R. Toll:** Few Fortune 500 companies have both provided their shareholders with such a consistent string of record earnings and *can also look toward projected 20% net income growth in each of the next two years.* We believe that our size and financial strength, our consistent record of performance, our record backlog, and our continuing community growth should give confidence to investors that our results and prospects are not as cyclical as the market seems to be anticipating. In recent weeks, bubble-mania and reports of a strengthening employment picture with associated interest rate fears have rattled investors. We believe strong job numbers and an improving economy are positive factors for the housing industry in general and for our luxury niche in particular. Mortgage rates remain low, and the projected fed funds target of about 4.5% is below its peak in 1994, '95, '96, '97, '98, '99, and 2000, *which were all years of record home sales for Toll Brothers.* We believe our success is determined more by our brand name and our well located communities than by fluctuations in the mortgage market. In the past decade, there have been several periods of mortgage rate hikes, three years in which national housing starts dropped, a recession, a major stock market decline. None of these have stifled our ability to expand and produce record results. We've watched some markets go from overheated to warm and back to hot.

\*   \*   \*

**Rassman:** Could you please address the issue -- this comes from Amar Maita. Could you please address the issues of *why your earnings growth is not only more sustainable relative to your competitors,* but also the fact that *your business is not as highly correlated to interest rates* as the mark appears to be brainwashed into believing. Furthermore, could you also provide more color on your superior margins and their achievement and the fact that your guidance appears to be conservative.

**R. Toll:** I'd like to thank Mr. Maita very much. It appears as though he's already a shareholder and *I take those as advertisements rather than questions* and I do appreciate it. I don't think I have a whole lot to say other than the obvious about the price range that we're in. In the past, it's been *less impacted by an increase in*

*mortgage rates* than the other price ranges because people are less constrained by budgets for the year. So we do believe we're a little more protected in that regard.

48.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases projected 20% growth in fiscal 2006 and again in fiscal 2007 based in part upon Toll Brothers' $5.87 billion backlog. These statements were false and misleading because speculative investors comprised a large portion of Toll Brothers' backlog and would eventually cancel their orders. This fact was hidden until the third quarter of 2006 when Toll Brothers' cancellation rate more than doubled.

**May 26, 2005 Second Quarter 2005 Earnings Press Release**

Joel H. Rassman, chief financial officer, stated: "Our record earnings, contracts and backlog reflect the strong demand and accompanying pricing power we have enjoyed over the past twelve months. Based on these results and our record $5.87 billion backlog of homes under contract, we are increasing our earnings expectations for FY 2005. We now believe net income will grow approximately 70% in FY 2005 compared to FY 2004. Based on our backlog and expected community growth, even with this increased projection, *we still believe net income will rise approximately 20% in FY 2006 over FY 2005*."

**May 26, 2005 Second Quarter 2005 Earnings Conference Call**

**Rassman:**  We will start to give you quarter-by-quarter guidance in the next conference call, but at the present time, we are comfortable to give you year guidance, which is that net income will go up approximately 20%, and as we go through and analyze the backlog and the timing of that backlog, we will update that guidance.

**August 4, 2005 Third Quarter 2005 Preliminary Earnings Press Release**

Robert I. Toll, chairman and chief executive officer, stated: "With revenues at nine months running 57% ahead of last year's record total, we remain on track with our previous projection of approximately 70% net income growth in FY 2005. With more than 60% of FY 2006's projected deliveries already in our backlog, *we continue to believe that net income in FY 2006 should be approximately 20% higher than in FY 2005.*"

"We ended this quarter with 230 selling communities and expect to end fiscal 2005 with approximately 237 compared to 220 at FYE 2004. We project we'll reach about 265 selling communities by FYE 2006: Assuming continued healthy demand, we believe *this should put us on track for approximately 20% net income growth in FY 2007 over FY 2006.*"

*"Demand for our luxury homes remains strong.* Since FY 2000 we have more than tripled our contracts, as tremendous demographics, increasing affluence, product diversification and geographic expansion continue to fuel our growth."

"With buyer appetite so healthy, approximately one-third of our communities now have backlogs stretching out twelve months. Therefore, in a number of communities, we've chosen to hold off taking new home sale contracts rather than

lock in sales prices today for deliveries more than a year away. Instead of selling out communities too quickly, we've chosen to ration our supply to maximize profit."

**August 4, 2005 Third Quarter 2005 Preliminary Outlook Conference Call**

**R. Toll: *Demand for our luxury homes remains strong*.** Since fiscal year 2000 we have more than tripled our contracts as tremendous demographics, increasing effluence, product diversification and geographic expansion continue to fuel our growth. With buyer appetite so healthy approximately one-third of our communities now have backlog stretching out 12 months. Therefore in a number of communities we've chosen to hold off taking new home sale contracts rather than lock in sales prices today for deliveries more than a year away. Instead of selling out communities too quickly we've chosen to ration our supply to maximize profit.

**False Statements Speculative Investing in Toll Brothers' Property and Regarding Sustained Growth Predictions Based Upon Toll Brother's Access to Constricted Markets**

49.     Toll Brothers also issued false and misleading public statements that projected sustained growth based upon the Company's ability to obtain property despite a constricted supply of available new home sites in luxury communities.   These statements were false and misleading because a substantial percentage of the Company's home buyers were speculative investors.  During the real estate peak, these investors typically would purchase homes and then immediately re-sell— or flip—for a profit.  The immediate effect of the house flipping is to decrease the supply of available houses because new homes being built are immediately purchased by speculative investors looking to flip for profit. This—not Toll Brothers' access to constricted home sites—was the cause of the tight supply that Toll Brothers took credit for in its public statements.

50.     The Individual Defendants and, in particular, defendants R. Toll and Rassman were well aware of the relationship between housing supply and speculative investors.  This is shown by R. Toll and Rassman's repeated attempts, described below, to assure analysts that Toll Brothers had adequate policies and procedures in place to discourage house flippers from entering the Company's selling communities.  These policies and procedures were ineffective, however, as shown by the increasing percentage of Toll Brothers' home buyers who sought interest-only loans.

51.     Interest-only loans primarily attract two types of buyers: the subprime buyer and the speculative investor.  The subprime buyer seeks an interest only mortgage to obtain the lowest mortgage payment possible in the hopes that the buyer can eventually re-finance the home at a later date for continued low mortgage payments before the loan adjusts.  The speculative investor also wants an interest only loan for the same reason—to obtain a low mortgage payment.  But the

- 27 -

speculative investor is not planning to refinance before the loan adjustment. Instead, the speculative investor is merely seeking to reduce his costs so that he can maximize his profits when he flips the house back onto the market.

52.     The Individual Defendants were well aware that the percentage of Toll Brothers home buyers seeking interest-only loans was increasing during fiscal 2005. In fact, Rassman admitted during Toll Brothers' Third Quarter 2005 earnings conference call that over 38% of Toll Brothers' closings involved interest only loans. The Individual Defendants, however, directed Toll Brothers to issue false and misleading statements that attributed the increasing use of interest-only loans to its financially savvy clientele, who simply sought the biggest home for the lowest mortgage payment. The Individual Defendants intended for these statements to mislead shareholders and mask the speculative nature of Toll Brothers' customer base.

53.     The Individual Defendants were also well aware of the obvious effects that increasing interest rates would have on their speculative buyers. The increasing interest rates would eventually cut into the speculative investors' profits, thus driving them out of the real estate market and away from Toll Brothers. As the speculative investors fled Toll Brothers and the market, they immediately put their homes up for sale, which greatly increased supply and reduced demand for Toll Brothers' properties. This in turn led to a severe decrease in home prices and Toll Brothers sales.

54.     Nevertheless, despite their knowledge that demand for Toll Brothers' homes was supported by the speculative investor, the Individual Defendants directed Toll Brothers to continue buying billions of dollars worth of expensive properties in constrained markets. These property acquisitions would eventually be written down to the tune of $1.4 billion as real estate values declined drastically beginning in 2006.

55.     The eventual flight of the speculative investors, prompted by increasing interest rates during 2005, resulted in a sharp increase in buyer cancellation rates beginning in the third quarter of fiscal 2006, as the speculative investors the defendants tried so hard to understate, fled Toll Brothers.

56.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases falsely asserted that Toll Brothers' growth prospects were strong based upon the Company's

ability to obtain new home sites in constrained markets. These statements were false and misleading because speculative investors would eventually unload their properties upon the market as interest rates increased. Accordingly, Toll Brothers' acquisition of high priced properties in constrained markets would eventually mean losses rather than growth when the Company eventually wrote-down over a billion dollars worth of that property.

### February 8, 2005 First Quarter 2005 Preliminary Earnings Conference Call

**Dennis McGill, Credit Suisse First Boston, Analyst:** And while you're getting that, just have one other question. If you kind of look at the pace at which you're selling homes -- Bob, you referenced several times the rate is at a level you haven't really experienced in your history, is there anything in particular that you can point to as what's driving that outside of just the health of the market and overall demand?

**R. Toll:** I think that it's our good fortune to have lots in the right place. We've tried very hard to establish a brand name for building luxury homes in the most sought after markets, and the fact that we've been able to achieve, as time rolls on, more and more of these *very difficult to procure home sites enabled, entitled home sites in the tight in, close in markets I think is the reason why we're doing so well.* Just the fact that we have the product.

### February 23, 2005 First Quarter 2005 Earnings Press Release

"Increasing numbers of high-income households are *competing for a constrained supply of home sites*; gaining approvals to build in affluent, well-located neighborhoods is a complex, expensive and lengthy undertaking. In response to the widening *gap between tight supply and growing demand*, we continue to expand our pipeline of land under development. We now control over 63,000 home sites - a five-to-six year supply based on our historic pace of expansion. With this land, attractive demographics, our diversity of products and our highly respected brand name in the luxury market, we believe we are *well-positioned for continued growth* in the years ahead."

### May 26, 2005 Second Quarter 2005 Earnings Press Release

"We expect to end fiscal 2005 with approximately 240 selling communities compared to 220 at FYE 2004. We believe our *expertise in securing land* and opening communities in highly-regulated, upscale markets gives us a competitive advantage, both today and in the future. We now control approximately 68,000 home sites, compared to 58,000 one year ago. These sites, which are in communities currently open for sale or wending their way through the approval process, represent a five-to-six year supply based on our historic pace of growth."

### August 25, 2005 Third Quarter 2005 Earnings Press Release

"We attribute these tremendous results to our team's diligence, our strong land position and the pricing power we enjoy in our affluent markets. While the supply of buildable lots seems increasingly to be constrained by governmental regulation, demographics-driven demand continues to grow."

57.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases falsely asserted that Toll Brothers had policies and procedures in place that were effectively discouraging speculative investors from purchasing Toll Brothers properties.  These statements were proven false and misleading during the third quarter of 2006 when Toll Brothers' cancellation rates, once the lowest in the industry, more than doubled.  Further, the Individual Defendants knew these statements were false because over 30% of Toll Brothers buyers were using interest only loans—a blatant red flag that those buyers were speculative investors looking to minimize their mortgage payments in order to maximize their profits.

**February 8, 2005 First Quarter 2005 Preliminary Earnings Conference Call**

> **Alex Baron, JMP Securities, Analyst:**  Did you experience severe cancellations [in the Vegas market]?

> **R. Toll:**  No, we don't, because *we don't sell to the kind of client that would cancel.* In order to buy one you have to sign a contract that specifically states I am not an investor, *I am not a flipper,* I'm not a speculator, in effect, because we ask it one way or another that you must hold the home for a year after you settle it. Not from contract, but from settlement. You've got keep the home for a year. If you don't, there are penalties. If you want to buy the home and rent it, which is very rare in the single detached, and more common in the attached, you may, but we're not going to sell more than one to you, and, again, you can't sell it within a year after taking -- going to settlement on it. So we don't have a cancellations. And we have the high deposit rate, so you're walking away from some very serious money if you're going to cancel.

**May 10, 2005 Second Quarter 2005 Preliminary Earnings Conference Call**

> **R. Toll:**  So, it appears that the fundamentals of supply and demand driven by the demographics are driving our business in general, *not interest rates and not a speculative investor.*

>          \*   \*   \*

> We try not to sell speculators. *We train our sales associates how to spot them.* We have a questionnaire that one must fill out before we go to the trouble of creating an agreement of sale and the qualification questionnaire generally in bold print says, basically if your an investor, do not go any further, stop, you made a mistake, go visit somebody else.

>     We have that clause basically in our agreement of sale, as well. Some places we point out that it basically state that if you sell the house within the year, any of your profits go to Toll Brothers. We think it has the desired effect and then we get very few investors buying our product. But we cannot guarantee that, of course.

>     Wall Street journal ran a story-- sale of Neiman Marcus--latest sign of luxury hello. The article highlighted the resilience of the consumer of luxury goods, we're happy to see that. It pleases us because we believe that's our market.

**August 4, 2005 Third Quarter 2005 Preliminary Earnings Conference Call**

**R. Toll:** I think, and that's because the industry is better governed or managed and I think almost every CEO knows to watch out and not be led over the cliff by the speculative investor who will pay 10,000 more this week than he paid last week and 10,000 more the next week over this week, etc., etc., and then all of a sudden you find a property priced -- a $700,000 product selling for 950 and then when the music stops you roll back pretty rapidly. I don't think that's going to happen again which is what I've been saying all along which is just another way of saying that I don't think the bubble is out there that everybody else has been talking about and waiting to pop. I don't think it's going to happen.

**Stephen Kim, Smith Barney, Analyst:** So essentially what you're arguing -- and I'm not saying I disagree with you -- but essentially what you're arguing is that the *Company's policy of not selling to speculators* means that you are not raising your prices and benefiting in your margin as much as if you had decided to sell to speculators.

**R. Toll:** That's correct. But you don't necessarily collect on the decision to sell to speculators if they don't show up at the settlement table. Remember, a sale in our business is descriptive of an event that generally takes place ten months before sell in the other businesses which means collect the money. We call that settlement and closings. And so when we sell we haven't collected the money and you want to look out and make sure that when you do sell you're going to collect ten months down the road.

**Stephen Kim, Smith Barney, Analyst:** The follow-on of course would be that people suspect that the speculator is not completely foiled by your judicious acts and so instead goes out and buys something else.

**R. Toll:** Absolutely right and we are still misled to a certain percent by the speculator because *he drives the price of the guy next door up*, or the woman next door up, and when that happens you go out and comp your home to the market and you go, hey, our homes are 20,000 or 50,000 less than a guy next door or down the road or in the neighborhood, we certainly want to be able to sell for as much as they sell, even more so because we've got the brand, etc., so should we raise are [sic] price? And then what we do very purposefully is we go and we look at the price appreciation that has taken place on that comp community.

We very carefully analyze how many homestead that builders sell, at what time period what one date did he raise his price and then how many did he sell. So that if he's recently, like in the last month or two, raised his price $50,000 -- it's better to talk in percent -- 10%, in the last month or two if he's up 10% then that's a pretty good indication you're being misled by his pricing and we don't want to go there either. Because we definitely want to protect the back door more than the front door.

It's not how much money can you make, it's much more important to view how much money can you lose. And you don't want to be selling all this product at a price that's inflated more than the market will stand if the speculator leaves. That is like musical chairs, when the music stops you want to make sure that you have someplace to go back to. We tried to comp it accurately as we can but we are still misled by pricing on the show next door for sure to some degree.

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

> **Douglass Kass, Seabreaze Partners, Analyst:** Very well. Thank you. Two-parter. Can you describe your current anti-flipping policies? For example, are your flipping prohibitions included in every single contract, every region that you serve? Secondly, how many of these anti-flipping infractions have you enforced to date?

> **R. Toll:** Describe them? *The latest addition is a two-page addendum or exhibit to the agreement of sale where we've asked the buyers to sign in about 8 different places to emphasize that thou shalt not flip. With respect to enforcement, we have not taken anybody to court.* This is pretty much like the doom's day bomb. There's no point in taking it to court to prove its enforcement potential. We believe, rather, its primary goal is to discourage. After someone signs eight different times, if they want to flip, and we've found that to be rare, so be it. We don't want to test the weapon to see whether it actually works. Rather it's very existence is its purpose.

58.    In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases falsely asserted that the Toll Brothers buyers using interest only loans were merely savvy customers. The Individual Defendants intended for these statements to mask the numbers of speculative buyers who were driving up demand for Toll Brothers' properties. These statements were eventually proven false and misleading when the 38% of Toll Brothers buyers using interest only loans translated into a 35.9% cancellation rate during the fourth quarter of 2007.

**May 10, 2005 Second Quarter 2005 Preliminary Earnings Conference Call**

> **R. Toll:** Yes sure. The LTV's are about the same. *More and more buyers are going for interest only loans* . Buying more home for the same payments. Apparently without regard to their old age. Because they're not paying down the mortgage, obviously.

> AARMS account for majority of our loans and have for a long time. *We actually push them because we think they are just a better buy for client*, who on average stay in a home for 5 to 7 years, so why take the 30 year mortgage when you can save as much as a point, going from a 30 down to a 5, for instance. -- you could save half a point to year going from 30 down to 5. We can debate whether that is a good buy or not.

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

> **Tom Marisco, Marisco Capital, Analyst:** Hi. I had a question. You made reference to interest-only mortgages as a percent of your total.

> **R. Toll:** Right.

> **Tom Marisco, Marisco Capital, Analyst:** Can you tell us how those figures have moved over the last several quarters? I thought you said that the most recent was 31%.

> **Rassman:** *38% of our buyers in this quarter that closed had interest-only mortgages*, and a year ago that number was a little -- 34%.

> **Tom Marisco, Marisco Capital, Analyst:** Right. 34%. Are you primarily seeing –

**Rassman:** Remember, *our buyer is significantly over qualified to buy the house* and it's not a reflection of their need to stretch to buy the house, but probably more a reflection of the fact that they view the interest rates as being inexpensive, and, therefore, why reduce the amount of the principal of the loan as compared to –

**R. Toll:** Excuse me –

**Tom Marisco, Marisco Capital, Analyst:** They're more financially savvy than your other buyers?

**R. Toll:** Yes, and no. I honestly think it's a reflection on the skill of the mortgage originator. I think he first takes a guy with a straight 30 year, then he works them to an ARM, then he takes them to an interest-only because every time he takes one of those steps, he gets cheaper, so he gets them to take more mortgage so that the payment remains the same, it helps us in that it steps up the purchase of the home, he buys a bigger and more expensive home. So I think it the's [sic] primarily due to just a guess to, not primarily, but quite a bit due to mortgage origination skills on the part of the people pushing the stuff out there in the market. I think our interest-only buyers have the same percentage, but I'm not sure that a LTV, which about 70% -- Joel, do you have any number?

\* \* \*

**Tom Marisco, Marisco Capital, Analyst:** But you're kind of making an argument about getting into a bigger home and a more expensive home based upon a cheaper payment.

**R. Toll:** That's right.

**Tom Marisco, Marisco Capital, Analyst:** If the interest rate changes, then his ability, given his income level, becomes stretched, if rates move.

**Rassman:** Tom, I don't think that that's our buyer, our typical buyer.

### False Statements That Attributed Softening Demand to Hurricane Katrina

59.     By August 2005, the interest rate hikes had begun to drive speculators out of the real estate market and, as a consequence, housing demand had softened.  R. Toll even admitted during the Third Quarter 2005 earnings conference call, quoted below, that foot traffic, the number of potential buyers visiting Toll Brother's selling communities, was "down 10% to 20% per community going back for almost a quarter and a half."  Rassman, however, was quick to point out that this decline in foot traffic was the result of Toll Brothers' restrictive waiting lists, not speculative buyers leaving Toll Brothers.

### August 25, 2005 Third Quarter 2005 Earnings Conference Call

**Lorraine Maikis, Merrill Lynch, Analyst:** Okay. Then finally can you just comment on traffic levels overall or on a regional basis?

**R. Toll**: Sure. I have the old traffic sheet right here. With respect to traffic, on a per-community basis, traffic has been down from last year, and on average, it just -- just eye-balling this, it seems to me as *though it has been down 10% to 20% per community going back for almost a quarter and a half*. With respect to sales, however, that being non-binding reservation deposits, it pretty much looks like we're setting records for the last month and a half, with a couple of weeks excepted. Maybe a little longer than that.

**Rassman**: Bob, wouldn't the traffic be affected by the fact that *we have a lot of communities with waiting lists*? And people don't really --

**R. Toll**: I hadn't thought of that. *You're absolutely right*. I thought it was surprising compared to what we've been doing. That's a well taken point. A lot of our communities are now on an *invitation-only basis*. You phone in your interest, and send in a deposit, a reservation deposit, and then we call you within which -- within the order that we receive the reservation deposits. So the community is basically closed, and we'll open it up, bring in five people only by appointment, sell them, then it's closed again, so that's probably a good explanation as to the imbalance between traffic and deposits. Thanks, Joel.

60.     Because of the softening demand, Toll Brothers was forced to abandon its 20% earnings projections for fiscal 2006 and 2007. The Individual Defendants and, in particular, defendant R. Toll, however, refused to admit to the softening demand and expanding supply as primarily the result of interest rate increases and investor speculation, because to do so would be to admit a long-term decline in Toll Brothers' business prospects; and that the Company's disclosed plan to acquire all available lucrative property would eventually backfire to the tune of over $1.4 billion in write-downs. Although Toll Brothers admitted that interest rates and investor speculation may have tanked the wider real-estate market, Toll Brothers' public statements claimed that the Company remained insulated due to its unique business model and that the Company was well positioned to recover once "consumer confidence" in luxury properties was restored. Moreover, R. Toll and the Individual Defendants blamed this decline on a loss of "consumer confidence" resulting from hurricanes Katrina and Rita, which devastated the Gulf Coast during August and September 2005. They also blamed high gas prices. The Individual Defendants continued to conceal the true known cause.

61.     The following public statements issued by Toll Brothers from third quarter 2005 to first quarter 2006, were false and misleading because Toll Brothers' declining home sales were not the result of lost consumer confidence over hurricanes. In particular, these statements claimed that Toll Brothers would quickly recover and 2006 would "either be the best or the second best year in

- 34 -