UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OLIVERIO MARTINEZ and WILLIAM HALL, Derivatively on Behalf of TOLL BROTHERS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Lead Civil Action No. 2:09-cv-00937-CDJ |
| ROBERT I. TOLL, BRUCE E. TOLL, ZVI BARZILAY, JOEL H. RASSMAN, JOSEPH R. SICREE, PAUL E. SHAPIRO, CARL B. MARBACH, ROBERT S. BLANK, RICHARD J. BRAEMER, ROGER S. HILLAS, EDWARD G. BOEHNE, and STEPHEN A. NOVICK | ) ) ) ) ) ) ) ) | Honorable C. Darnell Jones II |
| Defendants, | ) ) | |
| and | ) ) | |
| TOLL BROTHERS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | DEMAND FOR JURY TRIAL |

**CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, AND UNJUST ENRICHMENT**

## I.   NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiffs Oliverio Martinez and William Hall ("Plaintiffs") shareholders of Toll Brothers, Inc., ("Toll Brothers" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of Delaware law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that occurred between February 2005 and November 2006 (the "Relevant Period") and that have caused substantial losses, write downs, and other damages to Toll Brothers, such as to its reputation and goodwill.

2.      Throughout 2005, evidence mounted and a consensus developed among respected academics, professional economists, and industry experts, including Federal Reserve Chairman Alan Greenspan that the record levels of demand and price appreciation in the U.S. housing

market had become unsustainable and a severe correction in the housing market was imminent. The cost of home ownership as a percentage of income had reached historic levels.  Much of the demand and price appreciation in the years leading up to 2005 had been driven by an unprecedented increase in the use of adjustable rate mortgages, interest only loans, and undocumented Alternative A-Paper ("Alt-A") and subprime loans, with a correlative decline in lending standards.  These trends accelerated through 2004 and 2005, and, while defendants pumped up Toll Brothers' earnings projections during those years, they also foreshadowed a disastrous collapse in the housing and credit markets.  Stable demand from good credits risks purchasing primary residences had been exhausted.  Savvy home building industry participants knew full well that they were riding the late stages of a bubble driven by real estate speculators and bad credit risks who, unlike prime credit owner-occupiers, would exit the market at the first sign of rising interest rates, weakening demand and softening prices.

3.     This was no secret to veterans of the real estate industry, like defendant Robert I. Toll ("R. Toll"), who spoke regularly with economics professors and students at the Wharton School, University of Pennsylvania.  Moreover, R. Toll had witnessed first-hand the collapse of the real estate market in the late 1980s.   In fact, the risks of a major collapse were far greater in 2005 than in 1988.  The difference this time was that so many buyers, including speculative investors, had been able to take advantage of easy credit and adjustable rate loans to stretch their buying power and drive up home prices.  As the Federal Reserve began to raise interest rates in 2005, these loans, many of which had been made to speculators and poor credit risks, began to reset at higher rates that were not as attractive to speculative investors.  The result was broadly reduced buying power, vanishing speculator demand, and an avalanche of defaults and foreclosures.  As 2005 turned into 2006, demand evaporated, inventories of new and existing homes skyrocketed, and prices collapsed in a matter of months.

4.     Despite these extraordinary risks, defendants, including Toll Brothers' Board of Directors (the "Board"), permitted senior management to publish reckless forecasts that the Company would post record results in 2006 and 2007, beating the record earnings achieved in 2005, by 20% in 2006, and by another 20% in 2007.  Toll Brothers' officers, including Chief

Executive Officer ("CEO") R. Toll and defendant Chief Financial Officer ("CFO") Joel H. Rassman ("Rassman"), affirmatively misled investors by telling them that the increasing interest rates and rampant level of speculative investing in the real estate market would not affect Toll Brothers' business.  R. Toll claimed that Toll Brothers' target market—the affluent—would simply shrug off the higher interest rates.

5.      R. Toll failed to honestly address the broader evidence that stable prime credit demand had long ago been exhausted, and that the recent record levels of demand had been driven largely by speculators, who relied on easy access to cheap credit, and would therefore be unsustainable over the next 12 to 24 months.  Instead, R. Toll explained to investors that over 30% of Toll Brothers' closings involved interest only loans because sophisticated buyers were simply using those loans to get the best mortgage rates.  According to R. Toll, those buyers ***were not*** using interest only loans to flip Toll Brothers' property back onto the market.  This is because, as he also explained, the Company's sales contracts forbid buyers from engaging in house flipping.  He also told shareholders not to worry about cancellations eating into Toll Brothers' backlog of home orders because of the large nonrefundable deposits Toll Brothers required.  At the same time he withheld, until August 2006, the true nature and extent of the fact that purchase contract cancellations had been increasing rapidly since late 2005.

6.      More fundamentally, senior management failed to tell investors about extraordinary risks they had taken with Toll Brothers' capital by saddling the Company with billions of dollars of bubble-priced land, home sites, and finished home inventories in their reckless attempt to mask the true state of the deteriorating real estate market and appear to be driving the Company to achieve record earnings again in 2006 and 2007.  Simply put, defendants betrayed shareholders' trust by failing forthrightly to disclose that the Company was on the verge of a major decline in earnings as the entire real estate market braced for downward correction.  And defendants did not come clean about how the downward correction would lead to a sharp increase in contract cancellations until August 2006.  Moreover, until November 2006, defendants concealed that speculative buyers were driving those contract cancellations.  The ongoing cascade of write-downs totaling over $1.7 billion was the consequence.

7.     Defendants succeeded in their effort to convince investors that Toll Brothers would continue to increase profits at record levels, despite an imminent and inevitable major market correction.   The stock price rose to over $50 per share during July 2005 from approximately $35 per share at the beginning of the Relevant Period.

8.     Defendants' actions with their own money told a very different story from the story spun for Toll Brothers shareholders.  They took advantage of the artificial inflation in Toll Brothers' stock price to sell 14.77 million shares of their personal holdings for over $600 million in proceeds at the height of the real estate market.  When asked about the magnitude and timing of his sales, R. Toll said that he "needed to buy groceries," revealing his disdain for ordinary investors and the Company he founded.

9.     Throughout the second half of 2005, defendants received information about Toll Brothers' own operations confirming that the real estate bubble was collapsing and demand for luxury homes was evaporating.  But they withheld that information from the public until August 2006, when the force of the numbers left them no choice but to disclose that Toll Brothers' cancellation rate, once the lowest in the industry, had more than doubled and that the Company's inventory write-downs were vastly exceeding the Company's budget.   Although, R. Toll belatedly admitted that demand had softened substantially and that foot traffic at the Company's selling communities had fallen, he refused to acknowledge that it was the result of a real estate collapse, choosing instead to blame hurricanes that ravaged the Gulf Coast during the fall of 2005.  Inventories mounted and prices collapsed in the market that Toll Brothers had claimed would be invulnerable, as speculators caught with resetting mortgages saturated the market with cut-priced homes.  Thus, R. Toll continued to attempt to mask the true nature of Toll Brothers' problems until he could no longer conceal the truth in August 2006 as to the true collapse Toll Brothers was facing.  Incredibly, R. Toll admitted during a November 7, 2006 conference call that not only were speculative buyers driving up Toll Brothers' cancellation rate, but also the problem "should [have been] fairly easy to discern by looking at the qualification questionnaires … and by talking to the salespeople."

10.     These disclosures devastated Toll Brothers' credibility in the capital markets.  The Company's market capitalization declined by over 40%, as the stock price fell from over $50 per share to less than $17 per share during the Relevant Period.  A class of investors sued Toll Brothers for securities fraud.  Shortly after that filing, and consistent with their use of Toll Brothers as a vehicle to shield themselves from liability, the defendants directed Toll Brothers to issue the statement that "[w]e believe that [the securities class action] is without merit and intend to vigorously defend against it."  Yet, the class action survived a motion to dismiss, exposing the Company to substantial costs to mount the defendants' so-called "vigorous defense," as well as potentially billions of dollars worth of liability.

11.     Despite the fact that Toll Brothers faces overwhelming liability and knowing that the Company had valuable claims against the defendants, the Board has taken no action to assert or preserve their claims.  Instead, the Board has consciously decided not to take action to preserve the Company's rights.  Instead, they have consciously sat on their hands while the claims and legal theories of recovery otherwise available to the Company have been compromised by the passage of time.  This action seeks to require the defendants answer for their misdeeds and for their failure to act.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Pennsylvania so as to render the exercise of jurisdiction by this District permissible under the traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District, Toll Brothers is headquartered here, many of the witnesses reside in this District, and defendants conduct substantial business activities in this District.

## THE PARTIES

15.     Plaintiff Oliverio Martinez was a shareholder at the time of the wrongdoing complained of and remains a Toll Brothers shareholder.  Mr. Martinez is a citizen of California.

16.     Plaintiff William Hall was a shareholder at the time of the wrongdoing complained of and remains a Toll Brothers shareholder.  Mr. Hall is a citizen of California.

17.     Nominal defendant Toll Brothers is a corporation organized and existing under the laws of the state of Delaware, with its headquarters located at 250 Gibraltar Road, Horsham, Pennsylvania 19044. Toll Brothers engages in the development, construction, and sale of residential homes. It designs, builds, markets, and arranges finance for single-family detached and attached homes in luxury residential communities.

18.     Defendant R. Toll is Toll Brothers' Chairman of the Board and CEO and has been since May 1986.  R. Toll was a member of Toll Brothers' Compensation Committee from at least 1994 to 2001.  R. Toll co-founded the Company's predecessor operations in 1967.  Defendant R. Toll knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.   Moreover, during the Relevant Period, R. Toll participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and U.S. Securities & Exchange Commission ("SEC") filings up through November 2006.  Toll Brothers paid R. Toll the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2006 | $1,300,000 | $17,531,042 | 250,000 | $404,721 |
| 2005 | $1,300,000 | $27,322,547 | 500,000 | $416,575 |

While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, R. Toll sold 7,477,400 shares of his personally held stock for $323,375,029.06 in proceeds.  Defendant R. Toll's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, R. Toll has consciously decided not to take action to preserve the Company's rights. Instead, R. Toll has allowed the passage of time to compromise Toll Brothers' claims.  Defendant R. Toll is a citizen of Pennsylvania.

19.     Defendant Bruce E. Toll ("B. Toll") is a Toll Brothers director and has been since May 1986.  B. Toll was Toll Brothers' Chief Operating Officer ("COO") from May 1986 to May 1998; President from May 1986 to November 1998; and Secretary from at least January 1994 to at least March 2002.  Toll was a member of Toll Brothers' Compensation Committee from at least 1994 to 1999.  B. Toll co-founded the Company's predecessor operations in 1967. Defendant B. Toll knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business

- 7 -

prospects and declining demand for its luxury homes.  Moreover, during the Relevant Period, B. Toll participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.  While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, B. Toll sold 5,062,000 shares of his personally held stock for $216,696,088.26 in proceeds.  Defendant B. Toll's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, B. Toll has consciously decided not to take action to preserve the Company's rights. Instead B. Toll has allowed the passage of time to compromise Toll Brothers' claims.  Defendant B. Toll is a citizen of Pennsylvania.

20.     Defendant Zvi Barzilay ("Barzilay") is Toll Brothers' COO and has been since May 1998; Toll Brothers' President and has been since November 1998; and a Toll Brothers director and has been since June 1994.  Barzilay held executive positions at Toll Brothers since

1983, including Executive Vice President of Operations, and was a Toll Brothers project manager from 1980 to 1983.   Barzilay was also a member of Toll Brothers' Compensation Committee from 1999 to 2001.   Defendant Barzilay knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Barzilay participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.   Toll Brothers paid Barzilay the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2006 | $1,000,000 | $1,520,000 | 120,000 | $873,873 |
| 2005 | $1,000,000 | $1,400,000 | 240,000 | $847,950 |

While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements Barzilay sold 1,027,048 shares of his personally held stock for $46,040,134.84 in proceeds.   Defendant Barzilay's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Barzilay has consciously decided not to take action to preserve the Company's rights. Instead Barzilay has allowed the passage of time to compromise Toll Brothers' claims. Defendant Barzilay is a citizen of Pennsylvania.

21.     Defendant Rassman is Toll Brothers' Executive Vice President and has been since May 2002 and Toll Brothers' CFO and Treasurer and has been since 1984.  Rassman is also a Toll Brothers director and has been since September 1996.  Rassman was Toll Brothers' Senior Vice President from 1984 to May 2002.  Defendant Rassman knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Rassman participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.   Toll Brothers paid Rassman the following compensation:

| Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| 2006 | $1,000,000 | $1,220,000 | 60,000 | $1,108,883 |
| 2005 | $1,000,000 | $1,000,000 | 116,000 | $1,094,164 |

While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Rassman sold 371,200 shares of his personally held stock for $16,124,895.78 in proceeds.  Defendant Rassman's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Rassman has consciously decided not to take action to preserve the Company's rights. Instead Rassman has allowed the passage of time to compromise Toll Brothers' claims. Defendant Rassman is a citizen of New Jersey.

      22.     Defendant Joseph R. Sicree ("Sicree") is Toll Brothers' Chief Accounting Officer and has been since October 1992.  Sicree is also Toll Brothers' Senior Vice President and has been since at least January 2006.  Sicree was Toll Brothers' Director of Investor Relations from October 1992 until at least February 2003 and Vice President from at least March 1994 to at least

December 2005.  Defendant Sicree knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.  Moreover during the Relevant Period, Sicree participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.  While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Sicree sold 49,956 shares of his personally held stock for $2,237,073.45 in proceeds.  Defendant Sicree's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Defendant Sicree is a citizen of Pennsylvania.

      23.    Paul E. Shapiro ("Shapiro") is a Toll Brothers director and has been since December 1993.  Shapiro was Chairman of Toll Brothers' Audit Committee from 2003 to at least February 2007; a member of the Audit Committee from 1994 to 2002; and a member of the

Compensation Committee for Key Executives & Non-Employee Directors from 1997 to 2003. Defendant Shapiro knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Shapiro participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up to November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Shapiro sold 220,000 shares of his personally held stock for $10,124,090 in proceeds. Defendant Shapiro's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Shapiro has consciously decided not to take action to preserve the Company's rights. Instead Shapiro has allowed the passage of time to compromise Toll Brothers' claims. Defendant Shapiro is a citizen of Florida.

24.     Defendant Carl B. Marbach ("Marbach") is a Toll Brothers director and has been since December 1991.  Marbach is also Chairman of Toll Brothers' Compensation Committee for Key Executives & Non-Employee Directors and has been since 2004; a member of Toll Brothers' Compensation Committee for Key Executives & Non-Employee Directors and has been since 1997; and a member of Toll Brothers' Audit Committee and has been since at least 1994.  Marbach was a member of Toll Brothers' Compensation Committee from at least 1994 to 2001.  Defendant Marbach knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.  Moreover, during the Relevant Period, Marbach participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up to November 2006.  While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements Marbach sold 169,340 shares of his personally held stock for $8,148,608.65 in proceeds.  Defendant Marbach's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Marbach has consciously decided not to take action to preserve the Company's rights. Instead Marbach has allowed the passage of time to compromise Toll Brothers' claims. Defendant Marbach is a citizen of Florida.

25.     Defendant Robert S. Blank ("Blank") is a Toll Brothers director and has been since September 1986.  Defendant Blank knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.  Moreover, during the Relevant Period, Blank participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up to November 2006.   While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Blank sold 240,000 shares of his personally held stock for $10,489,918 in proceeds.  Defendant Blank's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Blank has consciously decided not to take action to preserve the Company's rights. Instead Blank has allowed the passage of time to compromise Toll Brothers' claims. Defendant Blank is a citizen of Colorado.

26.     Defendant Richard J. Braemer ("Braemer") is a Toll Brothers director and has been since September 1986. Defendant Braemer knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Braemer participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006. While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Braemer sold 70,000 shares of his personally held stock for $2,676,794.50 in proceeds. Defendant Braemer's sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Braemer has consciously decided not to take action to preserve the Company's rights. Instead Braemer has allowed the passage of time to compromise Toll Brothers' claims. Defendant Braemer is a citizen of New Jersey.

27.　　Defendant Roger S. Hillas ("Hillas") is a Toll Brothers director and has been since April 1988.  Hillas is also a member of Toll Brothers' Audit Committee and has been since 1999. Defendant Hillas knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes.  Moreover, during the Relevant Period, Hillas participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006.  While in possession of material non-public information concerning Toll Brothers' issuance of false and/or misleading public statements, Hillas sold 84,000 shares of his personally held stock for $3,075,711 in proceeds.  Defendant Hillas' sales during the Relevant Period were highly suspicious as illustrated by the following graph:



Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Hillas has consciously decided not to take action to preserve the Company's rights. Instead Hillas has allowed the passage of time to compromise Toll Brothers' claims. Defendant Hillas is a citizen of Pennsylvania.

28.     Defendant Edward G. Boehne ("Boehne") is a Toll Brothers director and has been since July 2000. Boehne is also a member of Toll Brothers' Audit Committee and has been since 2000. Defendant Boehne knew or consciously and recklessly disregarded red flags, alleged below in paragraphs 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Boehne participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings up through November 2006. Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Boehne has consciously decided not to take action to preserve the Company's rights. Instead Boehne has allowed the passage of time to compromise Toll Brothers' claims. Defendant Boehne is a citizen of Pennsylvania.

29.     Defendant Stephen A. Novick ("Novick") is a Toll Brothers director and has been since January 2003. Novick is also a member of Toll Brothers' Compensation Committee for Key Executives & Non-Employee Directors and has been since 2003. Defendant Novick knew or consciously and recklessly disregarded red flags, alleged below in 77 through 93, that would have alerted him to Toll Brothers' declining business prospects and declining demand for its luxury homes. Moreover, during the Relevant Period, Novick participated in the issuance of false and/or misleading statements including the preparation of false and/or misleading press releases and SEC filings. Despite knowing that the Company has valuable claims against the wrongdoers as explained herein, Novick has consciously decided not to take action to preserve the Company's rights. Instead Novick has allowed the passage of time to compromise Toll Brothers' claims. Defendant Novick is a citizen of New York.

30.     The defendants identified in ¶¶18-21, 23-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18-22 are referred to herein as the "Officer

Defendants." The defendants identified in ¶¶18-27 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants, and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31. By reason of their positions as officers, directors and/or fiduciaries of Toll Brothers and because of their ability to control the business and corporate affairs of Toll Brothers, the Individual Defendants owed Toll Brothers and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Toll Brothers in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Toll Brothers and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

32. Each director and officer of the Company owes to Toll Brothers and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

33. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Toll Brothers, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Toll Brothers, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of Toll Brothers.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Toll Brothers, and was at all times acting within the course and scope of such agency.

35.     To discharge their duties, the officers and directors of Toll Brothers were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Toll Brothers were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, purchase contract cancellations, and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Toll Brothers conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

36.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the

exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Toll Brothers, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of Toll Brothers' Board during the Relevant Period.

37.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company has been required to expend extraordinary amounts addressing the consequences of defendants' misconduct, including investigative costs and defending several class action law suits that allege violations of federal securities laws.  As a result, Toll Brothers has expended, and will continue to expend, significant sums of money.  The Board's failure to take corrective action to limit the damages to the Company or assert known viable claims against the Individual Defendants is an additional breach of their duties of loyalty and good faith.

38.    Moreover, these actions have irreparably damaged Toll Brothers' corporate image and goodwill.  Toll Brothers' Board has misled the investing public, such that Toll Brothers' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## II.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Toll Brothers and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of Toll Brothers, regarding the Individual Defendants' management of Toll Brothers' operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

41.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal the true fact that Toll Brothers was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Toll Brothers' financial performance and future business prospects, as alleged herein.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and illicit insider trading; to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to artificially inflate the price of Toll Brothers' common stock so they could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

grossly negligently misrepresent its financial results and release misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

### FALSE AND MISLEADING STATEMENTS

**Statements that Falsely Portrayed the Demand for Toll Brothers' Luxury Homes**

45.     The scheme perpetrated by the Individual Defendants revealed in November 2006 stretched back to 2005. Throughout Toll Brothers' fiscal year 2005, the Individual Defendants directed Toll Brothers to issue public statements that emphasized strong projected demand. In particular, these statements proclaimed record results based upon the peak housing demand that characterized the summer of 2005. Toll Brothers' public statements also cited to the record housing demand as a sign of the success of Toll Brothers' "unique" business model focused on the sale of luxury homes. On the basis of Toll Brothers' "record" results, the Company issued 20% earnings growth projections for fiscal 2006 and 2007.

46.     The housing demand upon which Toll Brothers' 20% earnings growth projection relied upon was a farce, however. This is because a substantial factor contributing to the housing demand surge during the summer of 2005 was the speculative investor. The speculative investor seeks to buy up available properties and then immediately re-sell to the market, which in turn artificially drives up demand as other speculative investors enter the market. This speculative market ended abruptly, however, during the later half of 2005, when the Federal Reserve raised interest rates. This is because the increasing interest rates eventually made speculative real estate investment unprofitable.

47.     Analysts who were aware of this relationship questioned whether or not Toll Brothers' 20% projected growth was actually sustainable given an environment of increasing interest rates.  R. Toll and Toll Brother's public statements, however, dismissed such concerns with references to the Company's outstanding performance during the previous interest rate hikes of the 1990s.  In effect, R. Toll invited analysts and investors to view the interest rate hikes in a vacuum.  In doing so, he omitted any discussion of the combined effect that rampant speculation and increasing interest rates would have on housing demand.  That effect would prove disastrous because the increasing interest rate hikes would eventually drive speculative investors out of the market.  Without the speculative investors supporting the market, housing demand and, as a consequence, housing prices and Toll Brothers' margins, would enter into a long-term dramatic decline.  And, importantly, Toll Brothers' unique business model of focusing on luxury homes would not shelter the Company from the eventual market collapse.

48.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases maintained the false position that Toll Brothers effectively marched to a different beat from the rest of the real estate market due to the Company's focus on luxury homes.  These statements were false because, during the summer of 2005, interest rates would eventually drive speculative investors, who were driving up the demand for Toll Brothers' properties, out of the market.

**February 3, 2005 First Quarter 2005 Preliminary Earnings Press Release**

> "Our record backlog and contracts indicate that ***demand for our luxury homes remains very healthy***. In addition, our non-binding reservation deposits, which are preliminary to contracts and then to revenues ten to twelve months thereafter, have also been strong. In 9 of the 13 weeks in our first quarter 2005, these deposits were either the highest or second highest on a per community (same store) basis for that quarter since 1987. The other four weeks, two of which had Christmas and New Year fall on the weekend and one of which had a major weekend snow storm, well exceeded our five-year per-community average since 2000."

> "We have a national brand name and offer a wide range of products, including move-up, empty-nester, active-adult, resort-style golf and lake communities, urban in-fill, high-density suburban, beach tower and urban tower residences. With multiple product lines and numerous price points within the luxury niche, we are broadening our base of potential buyers. We enjoy access to well-priced

and abundant capital to fund our operations. And we can purchase materials in high-volumes and at low cost, which means we can provide great value for our customers." (Emphasis added.)

**February 8, 2005 First Quarter Preliminary Earnings Conference Call**

> **R. Toll:** Our record first quarter contracts, backlog, and reservation deposits confirm that ***demand for our luxury homes remains very strong***. Deposits are preliminary to contracts and then revenues 10 to 12 months out. In 9 of the 13 weeks in our first quarter our reservation deposits were either the highest or second highest on a per community same-store basis since '87. 1987.

* * *

> **Dennis McGill - Credit Suisse First Boston – Analyst:** If you kind of look at the pace at which you're selling homes -- Bob, you referenced several times ***the rate is at a level you haven't really experienced in your history***, is there anything in particular that you can point to as what's driving that outside of just the health of the market and overall demand?

> **R. Toll:** I think that it's our good fortune to ***have lots in the right place***. We've tried very hard to establish a brand name for building luxury homes in the most sought after markets, and the fact that we've been able to achieve, as time rolls on, more and more of these very difficult to procure home sites enabled, entitled home sites in the tight in, close in markets I think is the reason why we're doing so well. Just the fact that we have the product.

* * *

> **R. Toll:** I think it's just got to do with the demographics. We are by far ***the luxury homebuilder***. Our average home price is almost double what the other homebuilder's average home price is, and the growth of wealth in the nation, the polarization, and we won't get into the politics of that, but the polarization that's been taking place for the last 20 years is accelerating, not decelerating, so you just have tremendous growth in households with wealth compared to the average growth in populations. So I think that's why we have such strong demand and such strong statistics. (Emphasis added.)

**February 23, 2005 First Quarter 2005 Earnings Press Release:**

> **Robert I. Toll,** chairman and chief executive officer, stated: "We are enjoying strong pricing power and increasing profit margins as demand for luxury homes continues to outpace supply."

* * *

Robert Toll continued: "***Continuing strong demand***, a recovering economy, our diversified offerings in the luxury move-up, active-adult, and empty-nester urban and suburban niches, and our growing portfolio of well-positioned communities in upscale markets all bode well for our future prospects: Based on these factors,

- 25 -

as we have previously discussed, we believe fiscal 2006 will be another record year.  (Emphasis added.)

**February 23, 2005 First Quarter 2005 Earnings Conference Call**

> **R. Toll:**  We are enjoying strong pricing power and increasing profit margins as demand for luxury homes continues to outpace supply. Due to this demand, a recovering economy and our growing portfolio of well-positioned communities in affluent markets, we believe *fiscal 2006 will be another record year*. Increasing numbers of high-income households are competing for a constrained supply of homesites.  (Emphasis added.)

**March 8, 2005 Press Release**

> Robert I. Toll stated: "For each of the five weeks since the end of our record breaking first quarter, non-binding deposits, a precursor to contracts, have been the highest or second highest per community (same store) in those five weeks in the last ten years.  With community count now at a record 225 compared to last year's 205, we are well ahead of last year."

**May 10, 2005 Second Quarter 2005 Preliminary Earnings Press Release**

> **Robert I. Toll**, chairman and chief executive officer, stated: "***Demand for luxury homes remains strong***, and we continue to enjoy solid pricing power. Based on the pace of current demand and our record backlog, which now includes many deliveries stretching into the second quarter of FY 2006, we remain on track for what we believe will be approximately 60% net income growth in FY 2005 and approximately *20% net income growth in FY 2006*."  (Emphasis added.)

49.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases maintained the false position that demand from Toll Brothers' luxury home buyers would be unaffected by increasing interest rates.  After all, according to R. Toll, Toll Brothers had "seen this movie before" and nevertheless posted strong financial results.  These statements were false and misleading because the rising interest rates would eventually drive speculative buyers out of the real estate market as it became less profitable.

**May 10, 2005 Second Quarter 2005 Preliminary Outlook Conference Call**

> **R. Toll:**  Demand for luxury homes remains strong, and we continued to enjoy strong pricing power. Based on the pace of current demand and our all-time record backlog, which now includes many deliveries stretching into the second quarter of fiscal year '06, we remain on track for what we believe will be approximately 60% net income growth in fiscal year '05, and approximately *20% net income growth in fiscal year '06*.

* * *

The housing market has remained strong through 8 consecutive interest rate hikes from the Federal Reserve. Long-term rates have remained low, although shorter rates, of course, have risen. Some are positive that as mortgage rates rise housing demand will be curtailed - not big builders must prove themselves in a rising rate environment.

I will take the opportunity to point out that we've seen this movie before. We had to prove ourselves in 1995, 1997 and 2000 when mortgage rates rose. In those years, our revenues rose 28% 95, 28% 97 and 23% in 2000 even as national single-family housing starts decline.

So, we will prove it once again. I'm not sure that will make a difference, but sooner or later, I believe that we and the other major homebuilding companies will make believers out of the investing public.

We believe Toll Brothers marches to a different beat in the housing market, in general, due to our luxury market rates and the land we control in some of the most desired locations.

We believe luxury buyers are less impacted by interest rate hikes than less affluent buyers are affected. And, again, we go back to '95 when the interest rate went up to 8.5 and 1997, 8.25, and 2000, 8.5, and did well.  (Emphasis added.)

**August 25, 2005 Third Quarter 2005 Earnings Press Release**

"In recent weeks, it appears that bubble mania and reports of a strengthening employment picture with associated interest rate fears have rattled investors. We believe strong job numbers and an improving economy are positive factors for the housing industry, in general, and our luxury niche in particular. *Mortgage rates remain low and the projected Fed Funds target of about 4.5% is below its peak in 1994, 1995, 1996, 1997, 1998, 1999 and 2000, which were all years of record home sales for Toll Brothers*."

"We believe *our success is determined more by our brand name and our well-located communities than by fluctuations in the mortgage market*. In the past decade, there have been several periods of mortgage rate hikes, three years in which national housing starts dropped, a recession, and a major stock market decline. None of these have stifled our ability to expand and produce record results."

"We've watched some markets go from overheated to warm and back to hot. It appears to us that the basic fundamentals of wealth accumulation, constrained lot supplies and growing demand should continue to support our business model. With approximately 79,500 lots under control, we believe we can continue on a path of growth for many years to come."  (Emphasis added.)

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

**R. Toll:** Few Fortune 500 companies have both provided their shareholders with such a consistent string of record earnings and *can also look toward projected 20% net income growth in each of the next two years*. We believe that our size and financial strength, our consistent record of performance, our record backlog, and our continuing community growth should give confidence to investors that our results and prospects are not as cyclical as the market seems to be anticipating. In recent weeks, bubble-mania and reports of a strengthening employment picture with associated interest rate fears have rattled investors. We believe strong job numbers and an improving economy are positive factors for the housing industry in general and for our luxury niche in particular. Mortgage rates remain low, and the projected fed funds target of about 4.5% is below its peak in 1994, '95, '96, '97, '98, '99, and 2000, *which were all years of record home sales for Toll Brothers*. We believe our success is determined more by our brand name and our well located communities than by fluctuations in the mortgage market. In the past decade, there have been several periods of mortgage rate hikes, three years in which national housing starts dropped, a recession, a major stock market decline. None of these have stifled our ability to expand and produce record results. We've watched some markets go from overheated to warm and back to hot.

\* \* \*

**Rassman:** Could you please address the issue -- this comes from Amar Maita. Could you please address the issues of *why* your *earnings growth is not only more sustainable relative to your competitors*, but also the fact that *your business is not as highly correlated to interest rates* as the mark appears to be brainwashed into believing. Furthermore, could you also provide more color on your superior margins and their achievement and the fact that your guidance appears to be conservative.

**R. Toll:** I'd like to thank Mr. Maita very much. It appears as though he's already a shareholder and *I take those as advertisements rather than questions* and I do appreciate it. I don't think I have a whole lot to say other than the obvious about the price range that we're in. In the past, it's been *less impacted by an increase in* mortgage *rates* than the other price ranges because people are less constrained by budgets for the year. So we do believe we're a little more protected in that regard. (Emphasis added.)

50.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases projected 20% growth in fiscal 2006 and again in fiscal 2007 based in part upon Toll Brothers' $5.87 billion backlog.  These statements were false and misleading because speculative investors comprised a large portion of Toll Brothers' backlog and would eventually cancel their orders.  This fact was hidden until the third quarter of 2006 when Toll Brothers' cancellation rate more than doubled.

**May 26, 2005 Second Quarter 2005 Earnings Press Release**

**Joel H. Rassman**, chief financial officer, stated: "Our record earnings, contracts and backlog reflect the strong demand and accompanying pricing power we have enjoyed over the past twelve months. Based on these results and our record $5.87 billion backlog of homes under contract, we are increasing our earnings expectations for FY 2005. We now believe net income will grow approximately 70% in FY 2005 compared to FY 2004. Based on our backlog and expected community growth, even with this increased projection, *we still believe net income will rise approximately 20% in FY 2006 over FY 2005*." (Emphasis added.)

### May 26, 2005 Second Quarter 2005 Earnings Conference Call

**Rassman:** We will start to give you quarter-by-quarter guidance in the next conference call, but at the present time, we are comfortable to give you year guidance, which is that net income will go up approximately 20%, and as we go through and analyze the backlog and the timing of that backlog, we will update that guidance.

### August 4, 2005 Third Quarter 2005 Preliminary Earnings Press Release

**Robert I. Toll**, chairman and chief executive officer, stated: "With revenues at nine months running 57% ahead of last year's record total, we remain on track with our previous projection of approximately 70% net income growth in FY 2005. With more than 60% of FY 2006's projected deliveries already in our backlog, *we continue to believe that net income in FY 2006 should be approximately 20% higher than in FY 2005.*"

"We ended this quarter with 230 selling communities and expect to end fiscal 2005 with approximately 237 compared to 220 at FYE 2004. We project we'll reach about 265 selling communities by FYE 2006. Assuming continued healthy demand, we believe *this should put us on track for approximately 20% net income growth in FY 2007 over FY 2006*."

*"Demand for our luxury homes remains strong*. Since FY 2000 we have more than tripled our contracts, as tremendous demographics, increasing affluence, product diversification and geographic expansion continue to fuel our growth."

"With buyer appetite so healthy, approximately one-third of our communities now have backlogs stretching out twelve months. Therefore, in a number of communities, we've chosen to hold off taking new home sale contracts rather than lock in sales prices today for deliveries more than a year away. Instead of selling out communities too quickly, we've chosen to ration our supply to maximize profit." (Emphasis added.)

### August 4, 2005 Third Quarter 2005 Preliminary Outlook Conference Call

**R. Toll:** *Demand for our luxury homes remains strong*. Since fiscal year 2000 we have more than tripled our contracts as tremendous demographics, increasing effluence, product diversification and geographic expansion continue to fuel our growth. With buyer appetite so healthy approximately one-third of our

communities now have backlog stretching out 12 months. Therefore in a number of communities we've chosen to hold off taking new home sale contracts rather than lock in sales prices today for deliveries more than a year away. Instead of selling out communities too quickly we've chosen to ration our supply to maximize profit.  (Emphasis added.)

### False Statements Speculative Investing in Toll Brothers' Property and Regarding Sustained Growth Predictions Based upon Toll Brother's Access to Constricted Markets

51.     Toll Brothers also issued false and misleading public statements that projected sustained growth based upon the Company's ability to obtain property despite a constricted supply of available new home sites in luxury communities.   These statements were false and misleading because a substantial percentage of the Company's home buyers were speculative investors.  During the real estate peak, these investors typically would purchase homes and then immediately re-sell—or flip—for a profit.  The immediate effect of the house flipping is to decrease the supply of available houses because new homes being built are immediately purchased by speculative investors looking to flip for profit.  This—not Toll Brothers' access to constricted home sites—was the cause of the tight supply that Toll Brothers took credit for in its public statements.

52.     The Individual Defendants and, in particular, defendants R. Toll and Rassman were well aware of the relationship between housing supply and speculative investors.  This is shown by R. Toll and Rassman's repeated attempts, described below, to assure analysts that Toll Brothers had adequate policies and procedures in place to discourage house flippers from entering the Company's selling communities.  These policies and procedures were ineffective, however, as shown by the increasing percentage of Toll Brothers' home buyers who sought interest-only loans.

Interest-only loans primarily attract two types of buyers: the subprime buyer and the speculative investor.  The subprime buyer seeks an interest only mortgage to obtain the lowest mortgage payment possible in the hopes that the buyer can eventually re-finance the home at a later date for continued low mortgage payments before the loan adjusts.  The speculative investor also wants an interest only loan for the same reason—to obtain a low mortgage payment.  But the speculative investor is not planning to refinance before the loan adjustment.  Instead, the speculative investor is merely seeking to reduce his costs so that he can maximize his profits when he flips the house back onto the market.

- 30 -

53.     The Individual Defendants were well aware that the percentage of Toll Brothers' home buyers seeking interest-only loans was increasing during fiscal 2005.  In fact, Rassman admitted during Toll Brothers' Third Quarter 2005 earnings conference call that over 38% of Toll Brothers' closings involved interest only loans.  The Individual Defendants, however, directed Toll Brothers to issue false and misleading statements that attributed the increasing use of interest-only loans to its financially savvy clientele, who simply sought the biggest home for the lowest mortgage payment.  The Individual Defendants intended for these statements to mislead shareholders and mask the speculative nature of Toll Brothers' customer base.

54.     The Individual Defendants were also well aware of the obvious effects that increasing interest rates would have on their speculative buyers.  The increasing interest rates would eventually cut into the speculative investors' profits, thus driving them out of the real estate market and away from Toll Brothers.  As the speculative investors fled Toll Brothers and the market, they immediately put their homes up for sale, which greatly increased supply and reduced demand for Toll Brothers' properties.  This in turn led to a severe decrease in home prices and Toll Brothers sales.

55.     Nevertheless, despite their knowledge that demand for Toll Brothers' homes was supported by the speculative investor, the Individual Defendants directed Toll Brothers to continue buying billions of dollars worth of expensive properties in constrained markets.  These property acquisitions would eventually be written-down to the tune of $1.7 billion as real estate values declined drastically beginning in 2006.

56.     The eventual flight of the speculative investors, prompted by increasing interest rates during 2005, resulted in a sharp increase in buyer cancellation rates beginning in the third quarter of fiscal 2006, as the speculative investors the defendants tried so hard to understate, fled Toll Brothers.

57.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases falsely asserted that Toll Brothers' growth prospects were strong based upon the Company's ability to obtain new home sites in constrained markets.  These statements were false and misleading because speculative investors would eventually unload their properties upon the

market as interest rates increased.   Accordingly, Toll Brothers' acquisition of high priced properties in constrained markets would eventually mean losses rather than growth when the Company eventually wrote-down over a billion dollars worth of that property.

**February 8, 2005 First Quarter 2005 Preliminary Earnings Conference Call**

> **Dennis McGill, Credit Suisse First Boston, Analyst:** And while you're getting that, just have one other question. If you kind of look at the pace at which you're selling homes -- Bob, you referenced several times the rate is at a level you haven't really experienced in your history, is there anything in particular that you can point to as what's driving that outside of just the health of the market and overall demand?

> **R. Toll**: I think that it's our good fortune to have lots in the right place. We've tried very hard to establish a brand name for building luxury homes in the most sought after markets, and the fact that we've been able to achieve, as time rolls on, more and more of these *very difficult to procure home sites enabled, entitled home sites in the tight in, close in markets I think is the reason why we're doing so well*. Just the fact that we have the product.  (Emphasis added.)

**February 23, 2005 First Quarter 2005 Earnings Press Release**

> "Increasing numbers of high-income households are *competing for a constrained supply of home sites*; gaining approvals to build in affluent, well-located neighborhoods is a complex, expensive and lengthy undertaking. In response to the widening *gap between tight supply and growing demand*, we continue to expand our pipeline of land under development. We now control over 63,000 home sites - a five-to-six year supply based on our historic pace of expansion. With this land, attractive demographics, our diversity of products and our highly respected brand name in the luxury market, we believe we are *well-positioned for continued growth* in the years ahead."  (Emphasis added.)

**May 26, 2005 Second Quarter 2005 Earnings Press Release**

> "We expect to end fiscal 2005 with approximately 240 selling communities compared to 220 at FYE 2004. We believe our *expertise in securing land* and opening communities in highly-regulated, upscale markets gives us a competitive advantage, both today and in the future. We now control approximately 68,000 home sites, compared to 58,000 one year ago. These sites, which are in communities currently open for sale or wending their way through the approval process, represent a five-to-six year supply based on our historic pace of growth."

**August 25, 2005 Third Quarter 2005 Earnings Press Release**

> "We attribute these tremendous results to our team's diligence, our strong land position and the pricing power we enjoy in our affluent markets. While the supply of buildable lots seems increasingly to be constrained by governmental regulation, demographics-driven demand continues to grow."

58.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases falsely asserted that Toll Brothers had policies and procedures in place that were effectively discouraging speculative investors from purchasing Toll Brothers properties.  These statements were proven false and misleading during the third quarter of 2006 when Toll Brothers' cancellation rates, once the lowest in the industry, more than doubled.  Further, the Individual Defendants knew these statements were false because over 30% of Toll Brothers buyers were using interest only loans—a blatant red flag that those buyers were speculative investors looking to minimize their mortgage payments in order to maximize their profits.

**February 8, 2005 First Quarter 2005 Preliminary Earnings Conference Call**

> **Alex Baron, JMP** Securities**, Analyst:**  Did you experience severe cancellations [in the Vegas market]?
>
> **R. Toll**:  No, we don't, because ***we don't sell to the kind of client that would cancel***. In order to buy one you have to sign a contract that specifically states I am not an investor, ***I am not a flipper***, I'm not a speculator, in effect, because we ask it one way or another that you must hold the home for a year after you settle it. Not from contract, but from settlement. You've got keep the home for a year. If you don't, there are penalties. If you want to buy the home and rent it, which is very rare in the single detached, and more common in the attached, you may, but we're not going to sell more than one to you, and, again, you can't sell it within a year after taking -- going to settlement on it. So we don't have a cancellations. And we have the high deposit rate, so you're walking away from some very serious money if you're going to cancel.  (Emphasis added.)

**May 10, 2005 Second Quarter 2005 Preliminary Earnings Conference Call**

> **R. Toll:**  So, it appears that the fundamentals of supply and demand driven by the demographics are driving our business in general, ***not interest rates and not a speculative investor***.
>
> * * *
>
> We try not to sell speculators. ***We train our sales associates how to spot them***. We have a questionnaire that one must fill out before we go to the trouble of creating an agreement of sale and the qualification questionnaire generally in bold print says, basically if your an investor, do not go any further, stop, you made a mistake, go visit somebody else.
>
> We have that clause basically in our agreement of sale, as well. Some places we point out that it basically state that if you sell the house within the year, any of your profits go to Toll Brothers. We think it has the desired effect and then we get very few investors buying our product. But we cannot guarantee that, of course.

Wall Street journal ran a story-- sale of Neiman Marcus--latest sign of luxury hello. The article highlighted the resilience of the consumer of luxury goods, we're happy to see that. It pleases us because we believe that's our market. (Emphasis added.)

**August 4, 2005 Third Quarter 2005 Preliminary Earnings Conference Call**

**R. Toll:** I think, and that's because the industry is better governed or managed and I think almost every CEO knows to watch out and not be led over the cliff by the speculative investor who will pay 10,000 more this week than he paid last week and 10,000 more the next week over this week, etc., etc., and then all of a sudden you find a property priced -- a $700,000 product selling for 950 and then when the music stops you roll back pretty rapidly. I don't think that's going to happen again which is what I've been saying all along which is just another way of saying that I don't think the bubble is out there that everybody else has been talking about and waiting to pop. I don't think it's going to happen.

**Stephen Kim, Smith Barney, Analyst**: So essentially what you're arguing -- and I'm not saying I disagree with you -- but essentially what you're arguing is that the Company's ***policy of not selling to speculators*** means that you are not raising your prices and benefiting in your margin as much as if you had decided to sell to speculators.

**R. Toll**:  That's correct. But you don't necessarily collect on the decision to sell to speculators if they don't show up at the settlement table. Remember, a sale in our business is descriptive of an event that generally takes place ten months before sell in the other businesses which means collect the money. We call that settlement and closings. And so when we sell we haven't collected the money and you want to look out and make sure that when you do sell you're going to collect ten months down the road.

**Stephen Kim,** Smith **Barney, Analyst**:  The follow-on of course would be that people suspect that the speculator is not completely foiled by your judicious acts and so instead goes out and buys something else.

**R. Toll**:  Absolutely right and we are still misled to a certain percent by the speculator because ***he drives the price of the guy next door up***, or the woman next door up, and when that happens you go out and comp your home to the market and you go, hey, our homes are 20,000 or 50,000 less than a guy next door or down the road or in the neighborhood, we certainly want to be able to sell for as much as they sell, even more so because we've got the brand, etc., so should we raise are [sic] price? And then what we do very purposefully is we go and we look at the price appreciation that has taken place on that comp community.

We very carefully analyze how many homestead that builders sell, at what time period what one date did he raise his price and then how many did he sell. So that if he's recently, like in the last month or two, raised his price $50,000 -- it's better to talk in percent -- 10%, in the last month or two if he's up 10% then that's a pretty good indication you're being misled by his pricing and we don't want to

go there either. Because we definitely want to protect the back door more than the front door.

It's not how much money can you make, it's much more important to view how much money can you lose. And you don't want to be selling all this product at a price that's inflated more than the market will stand if the speculator leaves. That is like musical chairs, when the music stops you want to make sure that you have someplace to go back to. We tried to comp it accurately as we can but we are still misled by pricing on the show next door for sure to some degree.  (Emphasis added.)

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

**Douglass Kass, Seabreaze Partners, Analyst:**  Very well. Thank you. Two-parter. Can you describe your current anti-flipping policies? For example, are your flipping prohibitions included in every single contract, every region that you serve? Secondly, how many of these anti-flipping infractions have you enforced to date?

**R. Toll**:  Describe them? *The latest addition is a two-page addendum or exhibit to the agreement of sale where we've asked the buyers to sign in about 8 different places to emphasize that thou shalt not flip. With respect to* enforcement*, we have not taken anybody to court.* This is pretty much like the doom's day bomb. There's no point in taking it to court to prove its enforcement potential. We believe, rather, its primary goal is to discourage. After someone signs eight different times, if they want to flip, and we've found that to be rare, so be it. We don't want to test the weapon to see whether it actually works. Rather it's very existence is its purpose.  (Emphasis added.)

59.    In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases falsely asserted that the Toll Brothers buyers using interest only loans were merely savvy customers.  The Individual Defendants intended for these statements to mask the numbers of speculative buyers who were driving up demand for Toll Brothers' properties.   These statements were eventually proven false and misleading when the 38% of Toll Brothers buyers using interest only loans translated into a 35.9% cancellation rate during the fourth quarter of 2007.

**May 10, 2005 Second Quarter 2005 Preliminary Earnings Conference Call**

**R. Toll:**  Yes sure. The LTV's are about the same. *More and more buyers* are *going for interest only loans*. Buying more home for the same payments. Apparently without regard to their old age. Because they're not paying down the mortgage, obviously.

AARMS account for majority of our loans and have for a long time. *We actually push them because we think they are just a better buy for client*, who on average

stay in a home for 5 to 7 years, so why take the 30 year mortgage when you can save as much as a point, going from a 30 down to a 5, for instance. -- you could save half a point to year going from 30 down to 5. We can debate whether that is a good buy or not.  (Emphasis added.)

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

>    **Tom Marisco,** Marisco **Capital, Analyst**:   Hi. I had a question. You made reference to interest-only mortgages as a percent of your total.

>    **R. Toll**: Right.

>    **Tom Marisco, Marisco Capital, Analyst:** Can you tell us how those figures have moved over the last several quarters? I thought you said that the most recent was 31%.

>    **Rassman:**   *38% of our buyers in this quarter that closed had interest*-only mortgages, and a year ago that number was a little -- 34%.

>    **Tom Marisco, Marisco Capital, Analyst**: Right. 34%. Are you primarily seeing -

>    **Rassman**:  Remember, our buyer is significantly over qualified to buy the house and it's not a reflection of their need to stretch to buy the house, but probably more a reflection of the fact that they view the interest rates as being inexpensive, and, therefore, why reduce the amount of the principal of the loan as compared to –

>    R. **Toll:** Excuse me **–**

>    **Tom** Marisco, Marisco Capital, Analyst: They're more financially savvy than your other buyers?

>    **R. Toll**:  Yes, and no. I honestly think it's a reflection on the skill of the mortgage originator. I think he first takes a guy with a straight 30 year, then he works them to an ARM, then he takes them to an interest-only because every time he takes one of those steps, he gets cheaper, so he gets them to take more mortgage so that the payment remains the same, it helps us in that it steps up the purchase of the home, he buys a bigger and more expensive home. So I think it the's [sic] primarily due to just a guess to, not primarily, but quite a bit due to mortgage origination skills on the part of the people pushing the stuff out there in the market. I think our interest-only buyers have the same percentage, but I'm not sure that a LTV, which about 70% -- Joel, do you have any number?

>    *   *   *

>    **Tom Marisco, Marisco Capital, Analyst**:   But you're kind of making an argument about getting into a bigger home and a more expensive home based upon a cheaper payment.

**R. Toll**: That's right.

**Tom Marisco, Marisco Capital, Analyst**: If the interest rate changes, then his ability, given his income level, becomes stretched, if rates move.

**Rassman**: Tom, I don't think that that's our buyer, our typical buyer. (Emphasis added.)

### False Statements that Attributed Softening Demand to Hurricane Katrina

60.     By August 2005, the interest rate hikes had begun to drive speculators out of the real estate market and, as a consequence, housing demand had softened. R. Toll even admitted during the Third Quarter 2005 earnings conference call, quoted below, that foot traffic, the number of potential buyers visiting Toll Brother's selling communities, was "down 10% to 20% per community going back for almost a quarter and a half." Rassman, however, was quick to point out that this decline in foot traffic was the result of Toll Brothers' restrictive waiting lists, not speculative buyers leaving Toll Brothers.

**August 25, 2005 Third Quarter 2005 Earnings Conference Call**

**Lorraine Maikis, Merrill Lynch, Analyst**: Okay. Then finally can you just comment on traffic levels overall or on a regional basis?

**R. Toll**: Sure. I have the old traffic sheet right here. With respect to traffic, on a per-community basis, traffic has been down from last year, and on average, it just -- just eye-balling this, it seems to me as *though it has been down 10% to 20% per community going back for almost a quarter and a half.* With respect to sales, however, that being non-binding reservation deposits, it pretty much looks like we're setting records for the last month and a half, with a couple of weeks excepted. Maybe a little longer than that.

**Rassman**: Bob, wouldn't the traffic be affected by the fact that *we have a lot of communities with waiting lists*? And people don't really –

**R. Toll**: I hadn't thought of that. *You're absolutely right*. I thought it was surprising compared to what we've been doing. That's a well taken point. A lot of our communities are now on an *invitation-only basis*. You phone in your interest, and send in a deposit, a reservation deposit, and then we call you within which -- within the order that we receive the reservation deposits. So the community is basically closed, and we'll open it up, bring in five people only by appointment, sell them, then it's closed again, so that's probably a good explanation as to the imbalance between traffic and deposits. Thanks, Joel. (Emphasis added.)

61.     Because of the softening demand, Toll Brothers was forced to abandon its 20% earnings projections for fiscal 2006 and 2007. The Individual Defendants and, in particular,

defendant R. Toll, however, refused to admit to the softening demand and expanding supply as primarily the result of interest rate increases and investor speculation, because to do so would be to admit a long-term decline in Toll Brothers' business prospects; and that the Company's disclosed plan to acquire all available lucrative property would eventually backfire to the tune of over $1.7 billion in write-downs.   Although Toll Brothers admitted that interest rates and investor speculation may have tanked the wider real-estate market, Toll Brothers' public statements claimed that the Company remained insulated due to its unique business model and that the Company was well positioned to recover once "consumer confidence" in luxury properties was restored.  Moreover, R. Toll and the Individual Defendants blamed this decline on a loss of "consumer confidence" resulting from hurricanes Katrina and Rita, which devastated the Gulf Coast during August and September 2005.  They also blamed high gas prices.  The Individual Defendants continued to conceal the true known cause.

62.    The following public statements issued by Toll Brothers from third quarter 2005 to first quarter 2006, were false and misleading because Toll Brothers' declining home sales were not the result of lost consumer confidence over hurricanes.   In particular, these statements claimed that Toll Brothers would quickly recover and 2006 would "either be the best or the second best year in [Toll Brothers'] history."  The truth, however, was that Toll Brothers' new home sales had dropped off because speculators, which Toll Brothers downplayed as part of its customer base, were no longer purchasing the Company's homes.  Moreover, speculators who had placed orders for homes were now dragging their feet, which in turn dragged out the Company's backlogs.  These speculators would eventually cancel their orders, which would lead to a sharp increase in cancellation rates during the third quarter of 2006.  In turn, as speculators backed out of their contracts and the Company failed to find other buyers, Toll Brothers would find itself saddled with unsold high priced real estate that would eventually be written-down as property values declined.  A spike in the Company's inventory write-downs occurred during the second quarter of 2006 and increased sharply in the following quarters.

**November 8, 2005 Fourth Quarter 2005 Preliminary Earnings Press Release**

**Robert I. Toll**, chairman and chief executive officer, stated: "Thanks to the tremendous efforts of the Toll Brothers team, we have produced our fourteenth consecutive year of record revenues and are on track for FY 2005 to be our thirteenth consecutive year of record profits. Overcoming tight labor markets in many regions and the ***hurricanes' impact in the southeast***, we surpassed our expectations for fourth quarter home deliveries. We produced over $2 billion in revenues this quarter, which exceeded our entire year's production just five years ago."

"Faced with an ***increasingly complex regulatory process***, our new communities are taking longer to come to market. The positive side is that ***once a community is approved, its value greatly increases***. As a result of this lengthening entitlement environment, we ended this quarter with 230 selling communities; our last projection had been 237. We expect to remain at approximately 230 through the first quarter of 2006."

"Because we have fewer selling communities than previously anticipated, and ***because we delivered some homes in FY 2005 that we had projected would be delivered in FY 2006***, we now estimate delivering between 9,500 and 10,200 homes in FY 2006 versus our 8,769 deliveries in FY 2005. This compares to our previous guidance of 10,200 to 10,600 home deliveries in FY 2006."

"In addition to delays in community openings, about twenty-five percent of our communities still have backlogs extending twelve months or more, and, therefore, are not open for sale on a regular basis. Even though we produced record contracts against FY 2004's challenging fourth quarter comparison (FY 2004's fourth quarter contracts were up 51% above FY 2003's fourth quarter), we believe a shortage of selling communities, coupled with some softening of demand in a number of markets, negatively impacted our contract results." (Emphasis added.)

### November 8, 2005 Fourth Quarter 2005 Preliminary Earnings Conference Call

**R. Toll:**  In addition to delays in community openings, about 25% of our communities still have backlogs extending 12 months or more, and therefore are not open for sale on a regular basis. We produced record contracts against fiscal year '04s challenging fourth quarter comparison. In fiscal year '04s fourth quarter contracts, we were up 51% above fiscal year '03s fourth quarter. Although these were record results, we believe a shortage of selling communities coupled with ***some softening of the demand*** in a number of markets, negatively impacted our contract results.

Since Hurricane Katrina, in early September, we have observed buyers taking longer to make their purchasing decisions. We attribute this change to the significant decline in consumer confidence in the last two months that was precipitated by the hurricanes and their aftermath, and to record gas prices. Of course, home prices increases have slowed in most markets, consumers have not felt as pressured to buy immediately.

We believe that *moderate price increases*, which are typical of most of the past decade *will be sustainable*, whereas the outsized price increases of the past two years in a number of markets, were not sustainable. Comparing the current market to the past five years, excluding 2004, which was extraordinary, fiscal year '05s fourth quarter per community nonbinding reservation deposits, exceeded the five year average from '99 to '03, in seven of the last nine weeks. Now that encompasses September and October of fiscal year '05.

\* \* \*

**R. Toll:**  *Traffic has been down for about a year* compared to the prior year. Let me see if traffic has gone down. Yes, traffic to the communities is down to the prior year in the last, hold on please. Let me find the number. In the last couple of months, September, October. Traffic seems to be fairly consistent, and not have dropped.  (Emphasis added.)

### December 8, 2005 Fourth Quarter 2005 Earnings Conference Call

**R. Toll**:  We look to the future with cautious optimism. We believe demand for our luxury homes relies in large measure on consumer confidence which suffered both Katrina.

We also believe that the fundamental imbalance between supply and demand will reassert itself. A strong baby boomer driven demographics and the growth in high income households *should continue to bolster demand for luxury homes.*

The *challenging regulatory process* is exacerbated by anti-growth NIMBY politics *constricts* the land approval pipeline and thus *the supply of available building lots, especially in the affluent markets* where we build. The positive aspect of these restrictions is that with supplies so constrained we are enriched when we finally complete our approvals and get to market.

Given this land-constrained environment we believe we have positioned ourselves to prosper. We now control more than 83,000 lots, 43% of which are owned and 57% of which are optioned compared to 61,000 at fiscal year-end '04.

These home sites represent a five to six-year supply based on our historic 20% annual rate of growth. We have increased our land position without compromising our balance sheet with the profitability standards for land acquisitions that we have maintained for nearly 20 years since we've been public.

\* \* \*

**Dana Richardson, Argus Research, Analyst:** Good afternoon. You've indicated that the consumer confidence *which took a hit as a result of the hurricanes* has negatively impacted your outlook and you also indicated –

**R. Toll:**  Excuse me, it didn't negatively impact our outlook. What I said was it *negatively impacted consumer confidence and that negatively impacts the demand* as people go under the log for protection and aren't as eager to buy as

- 40 -

they were. But *it doesn't negatively influence our outlook because we don't expect the consumer confidence, a lack of consumer confidence to continue for the high priced spread anyway*. I'm sorry, go ahead.

* * *

**Rassman:**  We think *the decline in consumer confidence lowered the number of agreements that got signed* where there was inventory to sell and that rolled over to, and we don't think that's necessarily a permanent lowering, we think that's a delay in many cases, a [sic] elongation of the process, and that will make it such that we have less units being delivered in 2006.

* * *

**Dana Richardson, Argus Research, Analyst:**  And I was wondering why that was the case, *one would assume that the effects of, say, Hurricane Katrina, which increased energy prices, would have a less impact on your affluent clientele than lower income clientele*. I was wondering what your thoughts were on that?

**R. Toll:**  Well, I think it's because our clientele are more affluent, that they're less impacted by those items that are budgetary constraints to a less affluent household.

If you've got larger income then you're, I think, less impacted by a move in interest rates or by a move in gasoline prices. You're *more impacted by what your own emotional and psychological outlook is on the state of affairs or the state of the country* or the state of the economy and on your feeling about the future.

* * *

**Rassman:**  Right. But *the consumer confidence is what got affected when the government didn't respond as well as the public felt that they could have*, it was kind of like the straw that broke the camel's back in terms of consumer confidence for the more affluent.  (Emphasis added.)

**February 7, 2006 First Quarter 2006 Preliminary Earnings Press Release**

"Demand at our communities, which began to soften in early September, now appears to be improving, although demand pressure from speculators has certainly passed."

* * *

"Although demand is not as strong as it was one year ago, most of our markets *remain fundamentally healthy*, based on job and income growth data. Some markets are experiencing the temporary overhang of higher inventory levels as *the past year's speculative buyers in these markets are now becoming sellers*. Once this excess inventory clears the market, *we expect that the fundamentals of constrained lot supplies and demographics-driven demand should return*. Since the number of affluent households continues to increase and we control more than 86,000 home sites in many of the nation's most lot-constrained and affluent

markets, we believe we *are positioned for long-term prosperity*." (Emphasis added.)

**February 7, 2006 First Quarter 2006 Preliminary Earnings Conference Call**

**R. Toll:** We experienced softening demand, to varying degrees, in a number of markets and continue to be constrained by long delivery times at many of our communities. During this first quarter, about 43% of our communities were operating with projected delivery times of 11 months or more. We believe when expectations of home price appreciation are strong, buyers are willing to wait a year or more for their homes; in fact *they even look forward to waiting more*. When their expectations are more modest, they are less willing to commit so far into the future. *Demand in our communities, which began to soften in early September, now appears to be improving. We continue to open new communities and increase our community count, which we believe will help increase contracts as the year progresses*. We ended the quarter with 257 communities, having opened 17 new ones in the last two weeks of our first quarter.

While these new communities opened too late to contribute to first quarter contracts, they are in position to contribute in the second quarter. Last year's second quarter contracts, however, grew 38% versus second quarter '04, so comparisons will remain challenging. Although demand is not as strong as it was one year ago or two, most of our markets remain fundamentally healthy.

Based on job and income growth data, some of these markets are experiencing the temporary overhang of higher inventory levels as the past year's speculative buyers in these markets are now becoming sellers. Once this excess inventory clears the market, we expect that the fundamentals of constrained lot supplies and demographics driven demand should return. Since the number of affluent households continues to increase, and we control more than 86,000 home sites in many of the nation's most lot constrained and affluent markets, we believe we are positioned for long-term prosperity. (Emphasis added.)

**February 23, 2006 First Quarter 2006 Earnings Press Release**

**Robert I. Toll**, chairman and chief executive officer, stated: "Based on strong demographics, restrictive land approval regulations and our supply of 87,000 lots, we believe Toll Brothers is *well-positioned for growth*. Over the next couple of quarters, however, we will continue to face tough comparisons with last year."

"In 2005, demand for new homes in many markets was propelled to unsustainable levels by speculative buying. We are now on the other side of that slope. Speculative demand has ceased and speculators are now putting their homes back on the market. The result has been more supply than demand *in some regions*. Markets such as metro Washington, D.C., which are sound economically and showing healthy job growth, will need to work through their excess supply before the imbalance once again tips in our favor. When that happens, we believe builders such as Toll Brothers, who control the largest share of well-located approved sites, should prosper." (Emphasis added.)

- 42 -

**February 23, 2006 First Quarter 2006 Earnings Conference Call**

> **R. Toll:**  Based on our current projections, *fiscal year '06 should either be the best or the second best year in our history*, with net income of between 790 and $870 million, earnings per share of between $4.77 and $5.26, and return on beginning equity of abut 30%.  (Emphasis added.)

63.    The Individual Defendants directed Toll Brothers to issue the following statement that continued to falsely assert that Toll Brothers was insulated from interest rate increases because of its unique business model that targeted luxury homes.  These statements were false and misleading because by the third quarter of 2005, demand for Toll Brothers' properties driven by speculative buyers had already started to decline as a result of the increasing interest rates.

**December 8, 2005 Fourth Quarter 2005 Earnings Press Release**

> "As we have previously discussed, it appears that the housing market is *not as robust today as it was throughout 2004 and through the summer of 2005*, although there is wide variation in local markets. Many believe the deceleration in price growth was inevitable, as the increases of 2004 and most of 2005 were not sustainable and were fueled, in part, by speculation. Our sales results indicate that *housing demand is returning to the more normalized levels* of the decade from 1994 to mid-2003, before home prices really took off in quite a few markets. *That period from 1994 through 2003 was an excellent one for Toll Brothers*, as our revenues rose five-fold and our earnings grew seven-fold. We grew despite the NASDAQ implosion, a terrorist attack, a national recession, several global financial crises and *three periods of Fed-initiated interest rate hikes*, in 1995, 1997 and 2000, which drove mortgage rates as high as 9.2%, 8.2% and 8.6%, respectively, in those years compared to 6.125% today."

> \* \* \*

> "To some extent, *the temporary slowing in our growth arises from our own success* and the accelerated growth we achieved in FY 2004 and 2005. We delivered 670 more homes in FY 2005 than the mid-point of our projection at the start of that fiscal year, and, with backlogs out twelve months or more, we had shut down sales at 35 communities at the end of the fourth quarter of FY 2005. We also closed out more communities than we had expected during the year and, due to regulatory delays, were not able to open as many new ones in order to grow our sales."

> \* \* \*

> "Based on our projected community count growth and assuming healthy demand, *we anticipate record results in FY 2007*. However, these are uncertain times and results could prove better or worse than the previous guidance we gave of 20% growth for FY 2007. We will defer giving more detailed guidance with respect to fiscal 2007 until later in the year."  (Emphasis added.)

- 43 -

64.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases continued to deny that Toll Brothers sold homes to speculative buyers despite the fact that Toll Brothers' cancellation rate accelerated from 6.5% to 8.8% over two quarters. Nevertheless, the Individual Defendants assured investors that Toll Brothers' cancellation rate had plateaued and in any case was not an issue for shareholders to be concerned about.  These statements were false and misleading because Toll Brothers' cancellation rate had not plateaued—it would soon spike to a staggering 18% during the third quarter of 2006.  And speculative buyers were driving the increase in cancellations.

**December 8, 2005 Fourth Quarter 2005 Earnings Conference Call**

**R. Toll**:  Cindy, I have a Web Internet question from John Kim. He wants to know, what's the cancellation rate for the quarter? I think *it was about 6.5%.*

\* \* \*

**Michael Molnar, Goldman Sachs, Analyst:** And then the second question would be, what markets, if any, are you guys *facing any pressure from investors reselling homes*?

**R. Toll**: I believe there is some pressure in the Northern Virginia, Washington, D.C. market. And I believe there is some pressure against the singles in the Orlando market. But that's just a thought. I don't have much empirical data to back that up with. It's just a thought. Does anybody else have any?

**Rassman**: That's a general area.

**R. Toll**: Well we don't, but it impacts a neighborhood. *We don't sell to speculators*. We have a clause that pretty much chases them away from the agreement but it can impact the market which is what your question was.

**Rassman:** That's right, yeah.

**R. Toll**: I'm trying to think. Mostly the speculators were chased out some time ago in Las Vegas. Excepting from the high-rise *but we're not in that business* in Las Vegas, in the housing market.

And Phoenix, as a matter of fact, we just, we're discussing it this past week and we believe the speculators were chased out of Phoenix pretty much about three or four months ago. *So I don't see it at this point any serious impact on any of the markets except Northern Virginia*.  (Emphasis added.)

**February 7, 2006 First Quarter 2006 Preliminary Earnings Conference Call**

**R. Toll**:  We have a question from John Kim; I don't know whether relation or not, Steven. *What was the cancellation rate for the quarter*, and which region had the highest cancellation rate and what was it? Guys what was the can rate for the quarter?

**Rassman**: 8.8% for the quarter.

**R. Toll**: Which is very high for us.

**Rassman**: It was negatively impacted by three communities in Las Vegas, where, because of -- and one in another state-- where because we had been so long in getting the approvals, we had to return money to customers because –

**R. Toll**: Oh, I remember that, yeah.  (Emphasis added.)

### February 23, 2006 First Quarter 2006 Earnings Conference Call

**Margaret Whelan, UBS, Analyst**: And so it seems like -- thank you for that. If we go back and forth, I know it's kind of squishy, but it seems about the same as the last update you gave us. And so, at what point do you think your cancelation rate is going to plateau?

**R. Toll**: Oh, gee, I hope *it's plateaued now*.

**Margaret Whelan, UBS, Analyst**: But 8.8, do you think that's -- is it coming down a little at all in the last couple of weeks?

**Rassman:** We don't strike it weekly. You can't do that in the way we do things. I would think *it is probably plateaued*. I agree with Bob.

**Margaret Whelan, UBS, Analyst**: Around the, kind of the 8.8 or the 6.5 minus –

**Rassman**: I think the 8.8 may have been a little high because we had cancellations associated with some legal –

**Margaret Whelan, UBS, Analyst**: In Vegas.

**Rassman**: -- issues, yes, in a couple areas.

**R. Toll**: Also the cancelation rate includes for us attorney review periods, so the people have given money and they have the right to rescind for three days or five days, and that's counted within the cancelation rate. So cancelation rate, the reason I can't give you the answer is I don't hear about it. If I had heard about it, I would tell you. So, *I don't think it's an issue*.

*   *   *

**Dan Oppenheim, Banc of America, Analyst**: Thanks very much. I was wondering if you can talk a little bit more about your expectations that the cancelation rate has plateaued, given what we've seen in terms of the inventory of homes for sale up there. It seems to be increasing still. That would suggest that we may see more cancellations from people unable to sell their current homes. ***So what is it that you're looking at to think that it's plateaued at this point?***

**R. Toll**: What we're looking at is our experience of the past month, and ***we don't see an increase***. It's all I can say, Dan. The facts you mentioned may indicate our

future better than the experience we've had in the last month, but I can only speak to our experience. (Emphasis added.)

65. During Toll Brothers' second quarter 2006, the Company's so-called "land impairment" write-downs increased sharply to over $12 million from $1.1 million in the prior quarter. Nevertheless, Toll Brothers, under the Individual Defendants' direction continued to issue false and misleading statements that portrayed the write-downs as mostly limited to properties that the Company held in Detroit, Michigan. Moreover, Toll Brothers issued false and misleading statements that continued to claim that its cancellation rate had stabilized at 8.5%, which R. Toll claimed was "the lowest among the public home builders." In effect, the Individual Defendants continued to falsely assure Toll Brothers' shareholders that despite the write-downs, "the period of Katrina" would blow over quickly.

66. In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases, continued to reiterate claims that the Company's unique business model placed the Company in a unique position to quickly recover once consumer confidence in the real estate market, which had been lost as a result of hurricanes Katrina and Rita, had returned to normal levels. And, according to Toll Brothers' public statements, that recovery was expected in the "short-term." These statements were false and misleading because Toll Brothers' unique business model did not protect the Company from the influence of speculative investors who had driven up demand for the Company's luxury properties.

**May 5, 2006 Second Quarter 2006 Preliminary Earnings Press Release**

"Ordinary demand has also slackened as the typical buyer worries about the direction of home prices. Our cancellation rate was 8.5% in the second quarter, which, although higher than our historic average of approximately 7%, is still, we believe, *the lowest among the major public home builders*."

"We believe the *excess supply on the market is a short-term phenomenon* and that *relatively soon* the imbalance between tight supply and growing demand will return. The demographics of the luxury market remain strong with growing numbers of affluent households. Approval processes are getting tougher and more expensive; this is limiting new lot supply."

"It is quite difficult and *takes years to gain approvals for well-located communities*. The ground that we have optioned is generally located in neighborhoods of influential and active people who do not want more development. We have created substantial value by securing approvals to build

communities in these desirable locations. Our main priority is to prudently preserve and enhance the value of these communities rather than simply focus on revenues. We believe this best serves our homeowners' and shareholders' interests. We currently control approximately 89,000 sites either under development or in the approval pipeline, which we believe give us an increasingly valuable base for growth." (Emphasis added.)

**May 5, 2006 Second Quarter 2006 Preliminary Earnings Conference Call**

**Stephen Kim, Citigroup, Analyst**: One of them is, do you feel that there is a significant risk to underestimating the market? In other words, why not – someone be exceptionally conservative in this period of time, your feeling it's not the beginning of the end, *your feeling is that this is something that's going to blow over relatively quickly.* Is there a risk that you see to putting into practice the opposite view? The view that things really are quite possibly going to weaken significantly, and so we better be prepared for it? Or would you say that you've already been doing that for such a long time and you still are basically doing that?

**R. Toll**: I think *we've always done that*. We've always been admonished to remember that it's a wise man who knows what he doesn't know and if you never lose any money, you've got to die stinking rich. And we're already rich, the idea is not to get poor. There's considerable conservatism that has always been in the culture of Toll Brothers. Is there a risk of being too conservative? My daddy would say, I don't think so. The worst that happens is that you do less business than would have been available for you to do. There's the risk that you don't grow your company as fast as you could have, but so what, that won't ruin you. You have a long time to make up for it. So, no, I can't see the risk of being too conservative. It depends on what your druthers are. I certainly wouldn't be too optimistic. There's always a greater risk of being too optimistic than there is of being too conservative.

**Stephen Kim, Citigroup, Analyst**: I guess what I was getting at, Bob, was if you had the opposite opinion, had the opinion that this was the beginning of something that would be much more severe, what would [sic] be seeing differently from your actions, maybe in terms of your community count, or some other forms of actions. What would [sic] be seeing under that circumstances, that we're not seeing from you today?

**R. Toll**: Well, *our backlog in our hot communities is still 12 months*. What we would be doing is going for a deeper backlog, going for greater volume in the communities where we're not backlog constrained, but believe that we're doing enough business to satisfy us and our infrastructure, our overhead. You would turn up the heat. You'd offer more incentives to go for larger volume. You'd want to off some of the real estate that you have, so that you don't get stuck carrying. But if you haven't got the product up then you're in a much different situation than if you're just looking at lots. If you're just -- if you're just looking at lots, I don't see the great risk in sitting on them as opposed to pushing them out. And I spoke to that in the monologue. They're so very valuable, they're so difficult to come by, I can't see pushing lots out.

* * *

**R. Toll**:  Anybody here remember '95, the first quarter. I can remember the year, but I can't remember the first quarter, specifically. No, everybody is shaking their heads. I think they're difficult -- not difficult, I think they're different because we don't remember '95, and I think we will remember the period of Katrina to the present and how far beyond, I don't know. I've already given you my estimation, not that much further. I think we'll remember this period. '95, we did pretty well--. (Emphasis added.)

## May 23, 2006 Second Quarter 2006 Earnings Press Release

**Robert I. Toll**, chairman and chief executive officer, stated: "Demand, while obviously diminished, has not disappeared. We believe many customers currently feel a lack of urgency to purchase due to their uncertainty over the direction of home prices: This has contributed to keeping many potential buyers on the sidelines."

"While the general economy remains healthy, the new home economy is beset by an oversupply of investor specs, builders' specs and specs created through buyer cancellations. We believe that once this excess inventory is absorbed, ***demand should once again exceed supply***. This should increase customer confidence and improve perceptions of the market's health; then, we believe those buyers who have been on the sidelines will come back into the market and prices should start to rise again."

* * *

**Joel H. Rassman, chief financial officer**, stated: "On May 5, 2006, when we released preliminary second quarter FY 2006 results, we adjusted our range of estimated FY 2006 home deliveries to between 9,000 and 9,700. Based on this modification, as well as our estimate of increased material and labor costs, and ***higher write-downs in our second quarter***, a majority of which resulted from ***continuing weakness in the metro Detroit market***, we now believe net income will be between $780 million and $850 million and earnings per share will be between $4.69 and $5.16 in FY 2006. This would translate into a return on beginning equity of between 28% and 31%."  (Emphasis added.)

## May 23, 2006 Second Quarter 2006 Earnings Conference Call

**R. Toll**:  We now believe we will deliver between 9000 and 9700 homes in fiscal year '06 and produce net income of between 780 million, and $850 million and earnings per share of between $4.69 and $5.16, in fiscal year '06. This would translate into a return on beginning equity of between 28% and 31%. ***These earnings while slightly down from our most recent guidance would still be our best or second best year ever***.  (Emphasis added.)

67.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press

releases, continued to reiterate claims that Toll Brothers did not sell to speculative investors

despite the Company's abnormally high cancellation rate, which indicated otherwise.  These statements were false and misleading because Toll Brothers' policies and procedures designed to keep out speculative buyers were deficient as demonstrated by the Company's increasing cancellation rate.

**May 5, 2006 Second Quarter 2006 Preliminary Earnings Press Release**

>   **Robert I. Toll**, chairman and chief executive officer, stated: "We are entering our ninth month of slower sales in most of our markets. Looking at the market in general, I offer the following comments: Speculative buyers are no longer fueling demand; instead they're putting the homes they've recently acquired back on the market or are canceling contracts in mid-construction. Additional supply is also coming from speculative homes started by other builders, as well as from their "non-spec-buyer" cancellations. Much of the oversupply described above is now being aggressively discounted by others. Generally *we do not sell to speculators nor build spec homes, but we have certainly been impacted by the overall increase in supply*." (Emphasis added.)

**May 5, 2006 Second Quarter 2006 Preliminary Earnings Conference Call**

>   **R. Toll:**  We are entering our ninth month of slower sales in most of our markets. While we do our best not to sell to speculators and while we build very few spec homes, we have certainly been impacted by the overall increase in supply. Speaking of the market in general, it is clear that speculative buyers are no longer fueling demand, that's for sure. Instead, they're putting the homes they've recently acquired back on the market, or are canceling contracts on homes being built, turning those homes into specs. Note by the way that *our cancelation rate* were 8.5% in the second quarter which was a little higher than our historic average of approximately 7% *is still*, we believe, *the lowest among the major public home builders*. (Emphasis added.)

**May 23, 2006 Second Quarter 2006 Earnings Conference Call**

>   **R. Toll**:  While the general economy remains healthy, the new home economy is beset by an over supply of investor specs, builder specs, specs created through buyer cancellations. Generally *we do not sell to speculators* nor build spec homes, but we certainly have been impacted by the overall increase in supply in the market. We believe that once this excess inventory is absorbed, demand should once again exceed supply, and prices should start to rise again. This should increase customer confidence and improve perceptions of the markets health, then we believe the buyers that have been on the sidelines will come back to the market.

*   *   *

>   **R. Toll**:  As cancellation rates -- I think it is *have cancellation rates stabilized at 8.5%?*

> *Yes, I believe they have*.  (Emphasis added.)

68.     In the following statements, defendants R. Toll, Rassman, and Toll Brothers' press releases, addressed the recent spike in Toll Brothers' inventory write-downs.  These statements claimed that the write-downs were largely limited to Detroit, Michigan.  These statements were false and misleading, however, because Toll Brothers' write-downs were being driven by an increase in cancellation, which were, in turn, driven by speculative buyers cancelling orders for Toll Brothers' luxury properties.  Moreover, the sharp increase in write-downs during Toll Brothers' second quarter 2006, was just the beginning of an avalanche of write-downs that would eventually total over $1.7 billion.

**May 23, 2006 Second Quarter 2006 Earnings Press Release**

> **Joel H. Rassman**, chief financial officer, stated: "On May 5, 2006, when we released preliminary second quarter FY 2006 results, we adjusted our range of estimated FY 2006 home deliveries to between 9,000 and 9,700. Based on this modification, as well as our estimate of increased material and labor costs, and *higher write-downs in our second quarter*, a majority of which resulted from *continuing weakness in the metro Detroit market*, we now believe net income will be between $780 million and $850 million and earnings per share will be between $4.69 and $5.16 in FY 2006. This would translate into a return on beginning equity of between 28% and 31%." (Emphasis added.)

**May 23, 2006 Second Quarter 2006 Earnings Conference Call**

> **Rassman**:  Second quarter cost of sales at 69.7% before interest was higher than our previous guidance principally as a result of higher write-offs, write-offs were approximately $12 million compared to 2005's second quarter of $200,000, and our budgeted write-offs of 4 million a quarter. *The increased write-offs were in most part attributable to continuing weakness in the Detroit market* which accounted for approximately $8 million of the write-offs. About $2 million of the write-offs were attributable to two communities in new England and about $2 million attributable to small write-offs of predevelopment costs throughout the country.

> \* \* \*

> **Margaret Whelan, UBS, Analyst**: The $12 million in Detroit, was that an asset impairment on your balance sheet? Or was it a deposit you walked away from?

> **R. Toll**: We couldn't hear you. It is referring to the $12 million.

> **Rassman**: I didn't hear what she was asking.

> **Margaret Whelan, UBS, Analyst**: Was it a land impairment off your balance sheet or was it an option you walked away from?

**Rassman**: In Detroit we believe that the communities had slowed to such an extent that given the current market we had to take land impairment charges.

**R. Toll**: *Land impairment* is the answer.  (Emphasis added.)

69.     In summary, throughout the Relevant Period, defendants R. Toll, Rassman, and Toll Brothers' press releases continued to claim that Toll Brothers' unique business model focused upon the sale of luxury homes was insulated from the devastating effects of speculative investors and increasing interest rates.  From February 2005 to August 2005, the Individual Defendants repeatedly claimed that speculative investors were not driving demand for Toll Brothers' luxury homes—the record demand of the summer of 2005 was thus sustainable.  When demand, nevertheless, softened during August 2005, as shown by decreasing foot traffic at Toll Brothers' selling communities, the Individual Defendants claimed that it was only the result of lost consumer confidence brought on by hurricanes Katrina and Rita; and that Toll Brothers was well positioned for a quick recovery.  When Toll Brothers' cancellation rates began to increase during the fourth quarter 2005 and first quarter 2006, the Individual Defendants reiterated their claims that such increase was not attributable to speculative buyers and, in any case, the cancellation rate had plateaued at 8.5%.  These lies were proven false, however, during August 2006, when Toll Brothers' cancellation rate increased to a staggering 18%, which coincided with over $23 million in inventory write-downs compared to the previous quarter's $12 million.  At that point, the Individual Defendants could no longer conceal the truth.

## III.   THE INDIVIDUAL DEFENDANTS COULD NO LONGER CONCEAL THE TRUTH

70.     Toll Brothers' third quarter 2006 financial results showed that the Company's cancellation rates had not stabilized.  Indeed, Toll Brothers' cancellation rate more than doubled to 18%.  Moreover, Toll Brothers' land impairment issues were not largely limited to Detroit, Michigan.  During the quarter, Toll Brothers almost doubled its write-downs to $23.8 million.  Toll Brothers' fiscal 2006 earnings projections of between $780 million and $850 million were proven false during the fiscal fourth quarter when Toll Brothers reported full year net income of $687.2 million—the result of $115 million in additional write-downs during the fourth quarter.

71.     R. Toll, still not willing to admit that Toll Brothers' so-called unique business model had been brought down by speculators and interest rates, declared that the current housing slowdown was "unique" and the result of "over supply of inventory" and a "decline in confidence."  Nevertheless, Toll Brothers' dismal financial results spoke for themselves.  In the coming quarters, Toll Brothers' cancellation rates almost doubled again to 35.6% by the fourth quarter of 2007.  Toll Brothers' write-downs eventually totaled a staggering $1.7 billion by the fourth quarter of 2008—proving once and for all that the housing down-turn would not be short lived and that Toll Brothers' so-called unique business model would not shield the Company.

72.     Indeed, R. Toll did not concede that speculative buyers were driving up Toll Brothers' cancellation rates until November 7, 2006, when during a preliminary earnings conference call he admitted what he knew all along.  Speculative buyers had driven up demand for Toll Brothers' homes during 2005 and were now driving up cancellation rates and, apparently, "it should [have been] fairly easy to discern" that Toll Brothers had a speculative buyer problem.

> 24% [of cancellations] in the last six weeks that have walked have ***turned out to be investors***. Now, for ***a Company that's not supposed to be selling to investors,*** that's a huge amount and it means obviously that we've got a break down in discipline of sales and probably not a strong enough Management overlook of the sales, although ***it should be fairly easy to discern by looking at the qualification questionnaires that are filled out and by talking to the salespeople***, so ***we will strengthen that area immediately***. (Emphasis added.)

73.     Unfortunately, it was too late for any strengthening of Toll Brothers' admittedly failed policies and procedures purportedly designed to keep out speculative buyers.  Indeed, as of November 2007, Toll Brothers did not need stronger procedures—high interest rates and plummeting real estate prices were more than enough to discourage speculative buyers.  Toll Brothers needed the stronger policies and procedures in 2004 and 2005 when speculative investing had reached its zenith (and when Toll Brothers had publicly claimed it was ***not*** selling to speculative buyers).

74.     During fiscal 2007, Toll Brothers' earnings continued to shrink as a result of the massive write-downs and skyrocketing cancellation rates.  During the fourth quarter of fiscal 2007, Toll Brothers reported its first quarterly loss since 1986.

75.     The following chart details Toll Brothers' cancellation rates, which spiked beginning in the third quarter of 2006 and continue to be elevated through Toll Brothers' recent fiscal quarter:

| Period: | Cancellation Rate: |
|---|---|
| **Q4 '05:** 3 months ended 10/31/05 | 6.5% |
| **Q1 '06:** 3 months ended 1/31/07 | 8.8% |
| **Q2 '06:** 3 months ended 4/30/06 | 8.5% |
| ***Q3 '06: 3 months ended 7/31/06*** | ***18.0%*** |
| **Q4 '06:** 3 months ended 10/31/06 | 37.0% |
| **Q1 '07:** 3 months ended 1/31/07 | 30.0% |
| **Q2 '07:** 3 months ended 4/30/07 | 19.0% |
| **Q3 '07:** 3 months ended 7/31/07 | 23.2% |
| **Q4 '07:** 3 months ended 10/31/07 | 35.9% |
| **Q1 '08:** 3 months ended 1/31/08 | 28.4% |
| **Q2 '08:** 3 months ended 4/30/08 | 24.9% |
| **Q3 '08:** 3 months ended 7/31/08 | 19.4% |
| **Q4 '08:** 3 months ended 10/31/08 | 30.4% |
| **Q1 '09:** 3 months ended 01/31/09 | 37.1% |
| **Q2 '09:** 3 months ended 04/30/09 | 27.1% |
| **Q3 '09:** 3 months ended 07/31/09 | 8.5% |

76.     The following chart details Toll Brothers' land impairment related write-downs, which also spiked during the third quarter of 2006 and continue to be elevated.  During Toll Brothers' most recent fiscal quarter, the Company wrote-down $115 million.

| 3 Months Ended: | Write Down: |
|---|---|
| January 31, 2005 | $2,343,000 |
| April 30, 2005 | $211,000 |
| July 31, 2005 | $1,168,000 |
| October 31, 2005 | $1,357,000 |

| JANUARY 31, 2006 | |
|---|---|
| | $1,129,000 |
| April 30, 2006 | $12,016,000 |
| *July 31, 2006* | *$23,853,000* |
| *October 31, 2006* | *$115,047,000* |
| January 31, 2007 | $96,901,000 |
| April 30, 2007 | $119,711,000 |
| July 31, 2007 | $147,292,000 |
| October 31, 2007 | $255,612,000 |
| January 31, 2008 | $217,660,000 |
| April 30, 2008 | $203,079,000 |
| July 31, 2008 | $105,990,000 |
| October 31, 2008 | $118,262,000 |
| January 31, 2009 | $150,600,000 |
| April 30, 2009 | $119,600,000 |
| July 31, 2009 | $115,000,000 |

| Year Ended: | Write Down: |
|---|---|
| October 31, 2005 | $5,079,000 |
| October 31, 2006 | $152,045,000 |
| October 31, 2007 | $619,516,000 |
| October 31, 2008 | $644,991,000 |

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE AND CONSCIOUS DISREGARD OF TOLL BROTHERS' UNSUSTAINABLE GROWTH PREDICTIONS

77.     R. Toll was well aware of the correlation between interest rates and rampant investor speculation and the effect that correlation would have on Toll Brothers' business prospects.  Indeed, he readily admitted his understanding of this relationship throughout the Relevant Period in various Toll Brothers conference calls and press releases.  R. Toll's knowledge stemmed from his extensive experience in the real estate market, including his views of the real estate crash of 1988.  Indeed, R. Toll shared his knowledge with the economics students at the Wharton School at the University of Pennsylvania where he regularly gave talks regarding real estate.  R. Toll also spoke regularly with Susan Wachter ("Wachter"), a Wharton School real estate professor.

78.     In an interview published by *The New York Times* on October 16, 2006, R. Toll made the bold prediction that the next generation of real estate buyers "will be paying twice as much of their annual incomes; in space." R. Toll also thinks that tomorrow's real estate buyers will be getting only half as much space as the current real estate buyers. This means that the million dollar homes that Toll Brothers currently sells will one day sell for $4 million. R. Toll's prediction was based upon the real estate market in the United Kingdom, where the supply of land is tightly constrained.

79.     R. Toll's thinking on the future of the United States real estate market was not original, however. He derived it from his discussions with professor Wachter, who agreed that the widespread adoption of controls on growth and building in the United States has already pushed up real estate prices in a number of regions. Wachter also agreed that there will one day be a convergence of the United States real estate market with the European real estate market.

80.     R. Toll referred favorably to Wachter's ideas during Toll Brother's May 26, 2005 Second Quarter 2005 Earnings Conference Call. During the call, R. Toll stated:

> Professor Susan Wachter ... informs us that across 13 European countries that she surveyed, the mean ration of average home prices to average income was about 7 times, which is nearly double the U.S. Further, in the U.S. we average about 650 square feet per person, while in Europe they get about 325 feet. So they are spending more and getting about 60% less in Europe. That may be the trend that we are headed for in the United States.

81.     Professor Wachter's rosy thesis about the ***future*** real estate market (from the view of home builders) was the linchpin of R. Toll's statements throughout the Relevant Period that demographics would outweigh the negative effects of interest rates and investor speculation. But Wachter's thesis about the ***current*** real estate market was far darker; and R. Toll was well aware of it. During the same conference call, the following exchange occurred between an analyst with A.G. Edwards and R. Toll.

> **Greg Gieber, A.G. Edwards, Analyst**: I wanted to follow up on some of this pricing stuff. I find it interesting that you referenced Susan Wachter's research on the housing industry. She is one of best economic economists in this area. But yesterday –

> **R. Toll**: I will tell her you said so, that's great to hear.

**Greg Gieber, A.G. Edwards, Analyst**: she's done –

**R. Toll**: I meant it seriously.

**Greg Gieber, A.G. Edwards, Analyst**: Okay. But here is my problem I have. Is that it is kind of discontenting to hear her say yesterday on NPR that *she thought we were in a housing bubble and talked about a lot of risks out there*. (Emphasis added.)

82.     During November 2004, Wachter along with a number of other economists published a paper titled "Bank Lending and Real Estate in Asia: Market Optimism and Asset Bubbles."  The paper explored whether excessive bank lending in the Asian real estate market caused the Asian financial crisis of 1997.  The paper noted that rampant "speculation in real-estate market . . .  in many Southeast Asian economies in the early 1990s" was a major contributor to the crisis.

83.     On April 17, 2005, the *Washington Post* interviewed Wachter in an article titled "Some Economists Warn of Housing Bubble."  Professor Wachter states in the article: "One of the signs to watch out for with a bubble is *the percentage of homes being sold to investors*."

84.     On September 21, 2005, the Wharton School published an article titled "Could Risky Mortgage Lending Practices Prick the Housing Bubble?"  In the article, Wachter opined that the growing use of interest only loans was bringing the United States real estate market into "uncharted territory."  Further, Wachter attributed the price run up in the real estate market to "new exotic loans [bringing] more borrowers into the market …."  Professor Wachter believed that the contribution by these new borrowers was "considerable."

85.     Given that R. Toll was aware of Wachter's views on the convergence of the American and European real estate markets, it is reasonable to infer that he was also aware during the Relevant Period of Wachter's views on the eminent collapse of the real estate market and her rationale behind those views.

86.     As reported by CNN Money on April 18, 2005, R. Toll held weekly Monday meetings throughout the Relevant Period with Toll Brothers officers, division heads and managers.  R. Toll used these Monday meetings to discuss matters ranging from the trivial—such as the placement of a fixture in a particular home plan—to the serious—such as the activities of the "buy-and-flip" crowd.  R. Toll's concern over the "buy-and-flip" crowd confirms

that R. Toll shared Wachter's concerns about a real estate bubble generated by the activities of speculative investors.

87.     On information and belief based upon Toll Brothers' soaring cancellation rates beginning in the third quarter of 2006 and the substantial percentage of Toll Brothers' buyers using interest only mortgages, R. Toll knew that Toll Brothers' purported efforts to discourage speculative investors were not effectively preventing sales to speculators.  And, as a result, R. Toll knew or was reckless in not knowing that speculative investors were not only driving up the demand in the real estate market in general, but had been also driving up the demand for Toll Brothers' luxury homes.  Nevertheless, R. Toll continued to issue and direct Toll Brothers to issue the false and misleading statements alleged above regarding unsustainable growth predictions and to deny the impact of speculative buyers on Toll Brothers' sales.

88.     On information and belief, R. Toll shared his concerns regarding the effect that rampant speculative investing and rising interest rates would have on the Company's business prospects during one or more of the nine Board meetings that occurred during 2005 and 2006. Additionally, the Individual Defendants knew or were reckless in not knowing the following red flags, which would have alerted them to the fact that Toll Brothers' Relevant Period public statements were false and misleading:

(a)     Throughout the Relevant Period, the Federal Reserve hiked up interest rates, which would have a direct effect on the demand for luxury homes as result of the activity of speculative investors.  Between 2002 and 2005, relatively low interest rates and lax lending standards dramatically reduced the cost of lending, which in turn spurned speculative real estate investing.  Between December 2004 and August 2006, however, the Federal Reserve more than doubled interest rates from 2% to over 5% as illustrated by the following chart.  This was a red flag that alerted the Individual Defendants that during the Relevant Period, demand created by speculative investors would soon end.



(b)      Throughout the Relevant Period, several economists, in addition to Wachter, opined that the real estate market was a bubble about to burst as a result of rampant speculative investors.   For example, during May 2005, Federal Reserve Chairman Alan Greenspan commented that he saw the housing market as frothy as result of speculative investors.  R. Toll commented in an interview on PBS' Nightly Business Report that aired June 1, 2005, that he agreed with Greenspan's assessment.  In particular, R. Toll agreed that "there is a froth [and] you'll get a blow-off and the prices will drop back as the speculating investor drops out of that market  …."  As reported by the *Washington Post* on April 17, 2005, economist Robert J. Shiller, a professor of economics at Yale University, opined that "We're in a bubble, and prices could fall substantially."   William Wheaton, a professor of economics at the Massachusetts Institute of Technology concurred that "[h]ome prices have gotten out of whack with any respect to personal income and ability to pay.  Some of that is due to interest rates.  There's a considerable risk of rising interest rates that could blow it all up."  The opinions of the federal reserve chairman and other economists was a red flag to the Individual Defendants that real estate prices in general were inflated and that the peak demand during the summer of 2005 was unsustainable.

(c)     Before and during the Relevant Period, an increasing number of homes were sold to speculative investors, including luxury homes sold by Toll Brothers.  A 2005 study published by the National Association of Realtors showed that during 2004, one-quarter of all homes purchased during 2004 were purchased as an investment.  Moreover, during the Relevant Period, as disclosed by Rassman during the Second Quarter 2005 Earnings Conference Call, approximately 34% of Toll Brothers' closing involved interest only mortgages—a strong indicator that speculative investors were buying up Toll Brothers' properties despite the Individual Defendants' denial of its significance.  This 34% of interest only mortgage closings eventually translated into a 35.6% cancellation rate during the fourth quarter of 2007 because speculative investors were in fact cancelling their contracts as interest rates rose and speculative profits declined.  The rampant activity of speculative investors in combination with rising interest rates was a red flag to the Individual Defendants that Toll Brothers' Relevant Period public statements, especially denying the speculative buyer's role in Toll Brothers' sales, were false and misleading.

89.     Rather than seek to correct Toll Brothers' Relevant Period public statements, the Insider Selling Defendants sought to use that information to sell their personal holdings while Toll Brothers stock was artificially inflated.  Indeed, defendants Barzilay, Blank, and Marbach sold over 90% of their Toll Brothers holdings during the Relevant Period.  Defendants Rassman, Sicree, and Shapiro sold over 70%.  The following chart details the percentages of personal Toll Brothers holdings disposed of by the Insider Selling Defendants during the Relevant Period:

**Zvi Barzilay**

| | |
|---|---|
| Shares Sold During RP | 1,027,048 |
| Shares Remaining After Sales | 81,740 |
| Total Shares Before Sales | 1,108,788 |
| **Total Proceeds from Sales** | **$46,040,134.84** |
| **% of Total Ownership Sold During RP** | **92.63%** |

**Robert S. Blank**

| | |
|---|---|
| Shares Sold During RP | 240,000 |
| Shares Remaining After Sales | 11,192 |
| Total Shares Before Sales | 251,192 |
| **Total Proceeds from Sales** | **$10,489,918.00** |

| **% of Total Ownership Sold During RP** | **95.54%** |

**Richard J. Braemer**

| Shares Sold During RP | 70,000 |
| Shares Remaining After Sales | 94,000 |
| Total Shares Before Sales | 164,000 |
| **Total Proceeds from Sales** | **$2,676,794.50** |
| **% of Total Ownership Sold During RP** | **42.68%** |

**Roger S. Hillas**

| Shares Sold During RP | 84,000 |
| Shares Remaining After Sales | 201,233 |
| Total Shares Before Sales | 285,233 |
| **Total Proceeds from Sales** | **$3,075,711.00** |
| **% of Total Ownership Sold During RP** | **29.45%** |

**Carl B. Marbach**

| Shares Sold During RP | 169,340 |
| Shares Remaining After Sales | 20,801 |
| Total Shares Before Sales | 190,141 |
| **Total Proceeds from Sales** | **$8,148,608.65** |
| **% of Total Ownership Sold During RP** | **89.06%** |

**Joel H. Rassman**

| Shares Sold During RP | 371,200 |
| Shares Remaining After Sales | 207,710 |
| Total Shares Before Sales | 578,910 |
| **Total Proceeds from Sales** | **$16,124,895.78** |
| **% of Total Ownership Sold During RP** | **64.12%** |

**Paul E. Shapiro**

| Shares Sold During RP | 220,000 |
| Shares Remaining After Sales | 41,240 |
| Total Shares Before Sales | 261,240 |
| **Total Proceeds from Sales** | **$10,124,090.00** |
| **% of Total Ownership Sold During RP** | **84.21%** |

**Joseph R. Sicree**

| Shares Sold During RP | 49,956 |
| Shares Remaining After Sales | 19,620 |
| Total Shares Before Sales | 69,576 |
| **Total Proceeds from Sales** | **$2,237,073.45** |
| **% of Total Ownership Sold During RP** | **71.80%** |

**Bruce E. Toll**

| Shares Sold During RP | 5,062,000 |
|---|---|
| Shares Remaining After Sales | 8,520,990 |
| Total Shares Before Sales | 13,582,990 |
| **Total Proceeds from Sales** | **$216,696,088.26** |
| **% of Total Ownership Sold During RP** | **37.27%** |

**Robert I. Toll**

| Shares Sold During RP | 7,477,400 |
|---|---|
| Shares Remaining After Sales | 19,328,933 |
| Total Shares Before Sales | 26,806,333 |
| **Total Proceeds from Sales** | **$323,375,029.06** |
| **% of Total Ownership Sold During RP** | **27.89%** |

90.    Moreover, the timing of the Insider Selling Defendants' sales was highly suspicious as illustrated by the preceding graphs located in the "Parties" section, which detail how these defendants' sales coincided with the artificial inflation of Toll Brothers stock during the Relevant Period.  The Insider Selling Defendants' sales during the Relevant Period were far greater than the periods that came before and after.

91.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants overall scheme to artificially inflate Toll Brothers' stock price throughout the Relevant Period.  Specifically, the Individual Defendants directed Toll Brothers to issue false and misleading statements that claimed record demand, which was apparently corroborated by claims that Toll Brothers' unique business model focused upon luxury homes had created sustainable demand.  Moreover, the Individual Defendants directed Toll Brothers to recklessly purchase billions of dollars in high priced luxury real estate to lend credence to their claims that Toll Brothers was well positioned to continued profiting from the sustainable demand.

92.    The Insider Selling Defendants' sales attracted media attention as early as March 21, 2005.  In an article titled "What Does Robert Toll Know That the Rest of Us Don't," *The New York Sun* reported R. Toll and B. Toll sold over $241 million worth of Toll Brothers stock during February 2005, which Toll Brothers stock reached an all-time high.  When questioned, R. Toll blithely told *The New York Sun* that the sales were part of an estate planning and portfolio diversification plan.  As reported by *Forbes* on August 15, 2005, R. Toll later told reported that he and his brother sold another $441 million in stock during November 2005 because they "***have to buy food and clothing***."  (Emphasis added.)

93.     During August 2005 when demand softened, the Insider Selling Defendants attempted to conceal the illegality of their insider sales claiming that the softening demand was largely brought on by hurricanes Katrina and Rita—acts of God, which no one could predict. This ruse was later unveiled beginning in August 2006 when the Insider Selling Defendants could no longer conceal the truth in the face of an escalating cancellation rate and an avalanche of write-downs.

94.     On April 17, 2007, defendants R. Toll, B. Toll, Barzilay, Blank, Rassman, Braemer, Shapiro, Marbach, and Sicree were named as defendants in a securities class action filed on behalf of a class of Toll Brothers investors.  Shortly after that filing, and consistent with their use of Toll Brothers as a vehicle to shield themselves from liability, the Individual Defendants directed Toll Brothers to issue the statement that "[w]e believe that [the securities class action] is without merit and intend to vigorously defend against it."  Nevertheless, the securities class action survived a motion to dismiss.  Judge Giles in his opinion denying the motion, found that the class plaintiffs have pled with sufficient particularity that "Defendants made material misrepresentations and omissions of material facts that were ***knowingly unreasonable*** at the time they were made  …."  These misrepresentations included "that the demand for Toll Brothers' homes was softening, as evidenced by a decrease in traffic at active selling communities."

## THE BOARD REFUSES TO ACT TO ADDRESS THE HARM CAUSED BY THE INDIVIDUAL DEFENDANTS

95.     In the class action lawsuit captioned *City of Hialeah Employees' Retirement System Laborers Pension Trust Funds for Northern California v. Toll Brothers, Inc., et al*., No. 07-1513 (E.D. Pa.), the plaintiffs assert that Toll Brothers, and defendants R. Toll, B. Toll, Barzilay, Blank, Rassman, Braemer, Shapiro, Marbach, and Sicree, hereinafter "Class Action Defendants" defrauded stock purchasers in violation of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, and Sections 20(a) and 20A, by making false and misleading statements that the Company would achieve 20% growth for 2006 and 2007.

96.     On September 2, 2008, U.S. District Judge James T. Giles held that the securities fraud plaintiffs satisfied the rigorous pleading standards for securities fraud against the Class Action Defendants which included a majority of the current Board.

97.     Judge Giles upheld the plaintiffs' allegations that these defendants "made material representations and omissions of material fact" in connection with "future projections" for 2006 and 2007 that were "knowingly unreasonable" at the time they were made.

98.     Judge Giles held that the falsity of defendants statements about fiscal years 2006 and 2007 was alleged with particularity, and that the insider trading of the individual defendants raised a "powerful and cogent" inference of their scienter, or intent to defraud stock purchasers.

99.     Moreover, Judge Giles found that the plaintiffs had shown a causal connection between statements made on August 4th, August 25th, October 3rd, and November 8, 2005 and the subsequent drop in stock price sufficient to defeat defendants' motion to dismiss.

100.    The Board is well-aware of the allegations in the Securities Class Action, since they signed the Company's 10-K for the 2008 fiscal year, which gave as a summary of that action and because seven of the directors are named as defendants in that action. This has also given them an intimate awareness of the wrong-doing that occurred in that action. Director Defendants are also aware of their fiduciary duty to protect Toll Brothers and seek to rectify harm done to the Company. Nevertheless, in violation of their fiduciary duties, the Director Defendants consciously decided not to pursue known valuable claims against the Class Action Defendants that could significantly remedy the harm the Class Action Defendants inflicted on Toll Brothers. Rather, the Director Defendants have attempted to allow these claims to be compromised by the passage of time. This inaction has caused the Company to suffer additional costs in the form of legal fees and may have precluded the Company from ever recovering any potential damages.

## DAMAGES TO TOLL BROTHERS CAUSED BY THE INDIVIDUAL DEFENDANTS

101.    As a result of the Individual Defendants' breaches of fiduciary duty and other improprieties, Toll Brothers issued the false and misleading statements alleged above. These false and misleading statements have devastated Toll Brothers' credibility as reflected by the sharp decline in the Company's share price over the Relevant Period. Specifically, Toll Brothers'

share price has declined from over $50 per share to less than $17 per share, a staggering $5.2 billion market capitalization loss.

102.    Further, as a direct and proximate result of the Individual Defendants' action, Toll Brothers has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)    Substantial investigative and legal costs incurred in connection with discovering the full extent and nature of defendants' wrongdoing; and defending of the Company and certain of the Individual Defendants in a class action filed against Toll Brothers alleging violations of federal securities laws.  The securities class action has now survived a motion to dismiss brought by the defendants (despite their ongoing assurances that the case has "no merit").  This has exposed the Company to substantial costs to mount the Company's and several of the Individual Defendants' so-called "vigorous defense."   These consequent costs and expenses must be paid by the Company as a direct and proximate result of defendants' breach of their fiduciary duties.  Moreover, Toll Brothers has already incurred these costs and expenses and therefore the harm caused to Toll Brothers has already been realized.  These damages caused by the defendants' failure to live up  to their fiduciary duties owed to Toll Brothers are not contingent upon the outcome of the securities action;

(b)    Because the claims brought in the securities class action have been upheld against a motion to dismiss, the Company also faces a substantial threat of incurring potentially billions of dollars worth of costs, expenses, and damages arising from the securities class action. These costs, expenses, and damages include not only potential billions paid out to satisfy a judgment or settlement of the class action, but also include million of dollars worth of future costs related to the Company's defense;

(c)    Millions of dollars in costs incurred from compensation, benefits, and stock options granted to the Individual Defendants who have breached their duties to Toll Brothers.  Apparently not satisfied with this overly generous compensation, the Insider Selling Defendants engaged in illegal insider trading while misappropriating material non-public information regarding Toll Brothers' true business prospects; and

- 64 -

(d)     Billions of dollars in costs incurred in connection with Toll Brothers' reckless purchase of billions of dollars in luxury property throughout the Relevant Period.  The Individual Defendants directed the Company to purchase this property to lend credence to their false claims that Toll Brothers was well positioned to continue profiting from the unsustainable demand that characterized the summer of 2005.  This reckless purchase of land led to over $1.7 billion in inventory write-downs.

103.     Moreover, these actions have irreparably damaged Toll Brothers' corporate image and goodwill.  For at least the foreseeable future, Toll Brothers will suffer from what is known as the "liar's discount," a term applied to the stocks and limited partnership interests of companies who have been implicated in illegal behavior and have misled the investing public, such that Toll Brothers' ability to raise equity capital or debt on favorable terms in the future is now impaired.

104.     Further, the Board has consciously refused to assert claims against the wrongdoers in order to remedy the damage that they have caused.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105.     Plaintiffs bring this action derivatively in the right and for the benefit of Toll Brothers to redress injuries suffered, and to be suffered, by Toll Brothers as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by Individual Defendants.  Toll Brothers is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.     Plaintiffs will adequately and fairly represent the interests of Toll Brothers in enforcing and prosecuting its rights.

107.     Plaintiffs were shareholders at the time of the wrongdoing complained of and remain shareholders of the Company.

108.     The Board of Toll Brothers at the time of the original filing of this action consisted of the following eleven individuals: Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro.  On September 24, 2009,

Christine Garvey joined the Board.  Plaintiffs have not made a demand on the Board of Toll Brothers to institute this action because such a demand would be futile, wasteful, and useless act.

109.    As particularly alleged in paragraphs 77 through 94 above, each of the current Board member defendants listed above either knew or consciously or recklessly disregarded red flags that would have alerted them to the falsity of the public statements issued by Toll Brothers during the Relevant Period concerning the unsustainable demand for Toll Brothers' homes and the concealment of the speculative buyer's effect on Toll Brothers' sales.   Despite that knowledge, the current Board member defendants took no action to correct Toll Brothers' public statements in breach of their fiduciary duties.  These defendants face a substantial likelihood of liability for these breaches, which rise to the level of bad faith and are thus not exculpated by Toll Brothers' certificate of incorporation.  Any demand upon these defendants is futile.

110.    As particularly alleged in paragraphs 89 through 93 above, defendants R. Toll, Barzilay, Rassman, B. Toll, Shapiro, Marbach, Blank, Braemer, and Hillas sold Toll Brothers stock under highly suspicious circumstances.  Accordingly, these defendants face a substantial likelihood of liability for breach of their fiduciary duty of loyalty, which is not exculpated by Toll Brothers' certificate of incorporation.  Any demand upon these defendants is futile.

111.    Defendants Boehne, Hillas, Marbach, and Shapiro were members of the Audit Committee during the Relevant Period.  The Audit Committee's charter charges the committee with the responsibility for reviewing and discussing: (i) the integrity of the Company's financial statements; and (ii) the performance of the Company's internal audit function and independent auditor.  In particular, the Audit Committee charter provides as follows:

> The audit committee shall meet as often as it determines, but not less frequently than quarterly, and shall report regularly to the Board of Directors. The audit committee may form and delegate authority to subcommittees when appropriate, including the authority to grant preapprovals of audit and permitted non-audit services, provided that decisions of such subcommittee to grant pre-approvals shall be presented to the full audit committee at its next scheduled meeting.

* * *

> The audit committee shall meet separately with management, the internal auditors and the independent auditor in separate executive sessions periodically. The audit

committee shall also meet periodically in separate executive sessions with only members of the committee present.

The audit committee shall make regular reports to the Board. The audit committee shall annually review the audit committee's own performance.

The audit committee shall consider and act upon any matters required by law to be acted upon by them and may consider and act upon any other matters deemed appropriate by the committee.

\* \* \*

The audit committee shall (a) meet to review and discuss with management and the independent auditor (i) the Company's annual audited financial statements and quarterly financial statements, (ii) the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", (iii) the results of the independent auditor's review of the quarterly financial statements, and (iv) whether to approve the audited financial statements be included in the Company's Form 10-K; and (b) discuss earnings press releases, including the use of pro-forma or adjusted non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies, provided that such discussion of earnings press releases, financial information and earnings guidance may be general in nature, and the audit committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

Thus, the Audit Committee was responsible for overseeing and directly participating in Toll Brothers' financial reporting process, including the review of whether or not Toll Brothers was properly valuing its inventory.  From that review, in addition to the red flags alleged above, these defendants learned that Toll Brothers' Relevant Period earnings projections were unsustainable and that its Relevant Period public statements were false and misleading.  Yet, these defendants took no action to correct Toll Brothers' public statements that falsely claimed that Toll Brothers' business prospects would be unaffected by speculative buyers.  Moreover, these defendants were complicit in the Company's reckless purchase of billions of dollars worth of luxury property, which would eventually be written-down for over $1.7 billion.   Accordingly, Defendants Boehne, Hillas, Marbach, and Shapiro breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of earnings press releases and other public statements that contained false and/or misleading material information. Thus Defendants Boehne, Hillas, Marbach, and Shapiro face a substantial likelihood of liability for

their breach of fiduciary duties, which are not exculpated by Toll Brothers' certificate of incorporation. Any demand upon these defendants is futile.

112.     Defendants B. Toll and R. Toll are brothers.  Because of their familial and substantial business relationships, neither brother will take action against the other.  B. Toll and R. Toll co-founded Toll Brothers' predecessor operations in 1967.  Since 1986, both brothers have been members of the Board.  Moreover, B. Toll was a Toll Brothers executive at his brother's side until November 1998.  Accordingly, any demand upon these defendants is futile.

113.     On April 17, 2007, Toll Brothers and defendants R. Toll, B. Toll, Barzilay, Blank, Rassman, Braemer, Shapiro, and Marbach were named as defendants in a securities class action filed on behalf of Toll Brothers investors.  The securities class action survived defendants' motion to dismiss.  Judge Giles in his opinion denying the motion found that the class plaintiffs had pled with sufficient particularity that the "[d]efendants made material misrepresentations and omissions of material facts that were ***knowingly unreasonable*** at the time they were made …." (Emphasis added.)  These misrepresentations included "that the demand for Toll Brothers' homes was softening, as evidenced by a decrease in traffic at active selling communities."  Accordingly, Toll Brothers faces a significant liability in connection with claims alleged against it in the securities class action.  In addition, Toll Brothers is incurring significant expenses in defending the Securities Class Action Defendants.  Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro, know or are extremely reckless is not knowing that the Company has viable claims against these defendants that can remedy the harm they caused Toll Brothers. Nevertheless, defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro, have consciously refused to act to assert these claims.  Instead, these defendants have allowed the claims to be compromised by the passage of time.  Such a decision could not be the exercise of defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro's valid business judgment, nor could it be an action taken in good faith.  Therefore, a reasonable doubt is raised as to whether R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro can properly consider a demand

114.    Plaintiffs have not made any demand on the shareholders of Toll Brothers to institute this action because such demand would be a futile and useless act for the following reasons:

(a)    Toll Brothers is a publicly held company with over 158 million shares outstanding and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of unit holders; and

(c)    Making demand on all shareholders would force Plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

115.    Plaintiffs' claims on behalf of Toll Brothers against the Individual Defendants are not time barred because the Individual Defendants' challenged acts are so inexorably intertwined that they constitute one continuing wrong.   The Individual Defendants pursued a scheme designed to maximize their personal profits at the expense of the Company.   As alleged in paragraphs 77 through 94, the Individual Defendants knew that an economic downturn was imminent and that Toll Brothers would be taken down along with it due to speculative buyers driving up demand for the Company's homes.   As alleged in paragraphs 45 through 69, the Individual Defendants concealed the (i) softening demand for the Company's homes; (ii) declining foot traffic at Toll Brothers' selling communities; and (iii) the ineffectiveness of Toll Brothers' policies and procedures aimed at discouraging speculative buyers in order to drive up the Company's stock price at the peak of the real estate bubble.   The Individual Defendants' efforts were largely successful and Toll Brothers' stock price increased to over $55 per share during July 2005.   The Insider Selling Defendants capitalized on that stock peak by selling over $628 million of their personally held shares under suspicious circumstances as alleged in paragraphs 89 through 93.   Additionally, the Individual Defendants justified their substantial incentive compensation on the basis of the purported record results achieved by Toll Brothers in fiscal 2005.

116.    As alleged in paragraph 60 through 69, during August 2005, although Toll Brothers was forced to disclose softening demand, the Individual Defendants continued to conceal that the softening demand was the result of speculative buyers leaving Toll Brothers—choosing instead to blame hurricanes, increasing gas prices, and a loss of consumer confidence. Moreover, the Individual Defendants claimed that softened demand condition effecting Toll Brothers would be short lived.

117.    As alleged in paragraphs 70 through 76, during August 2006, the Individual Defendants could no longer conceal sharp increases in Toll Brothers' cancellation rates and real estate write-downs.  Even in the face of those devastating metrics, the Individual Defendants continued to conceal the extent to which speculative buyers were driving Toll Brothers' cancellation rates until November 7, 2006.  On that day, R. Toll belatedly conceded that speculative buyers had contributed to Toll Brother's cancellation rates and that "it should [have been] fairly easy to discern …."  The goal of the Individual Defendants deception was to keep the truth regarding Toll Brothers' business prospects hidden as long as possible to facilitate the concealment of the Insider Selling Defendants' illicit sales and to maintain the Individual Defendants' positions of control at the Company.

118.    Plaintiffs' claims on behalf of Toll Brothers are also not time barred under the doctrine of Equitable Tolling.  The Individual Defendants stood in a fiduciary relationship to Plaintiffs and Toll Brothers as officers and directors of the Company.  Plaintiffs reasonably relied upon Individual Defendants' competence and good faith and, thus, relied upon the veracity of the false and misleading statements issued by Toll Brothers alleged in paragraphs 45 through 69.  These statements claimed, among other things, that Toll Brothers had in place adequate policies and procedures designed to discourage speculative buyers, including a purported "two-page addendum" that R. Toll claimed would discourage buyers because it "asked the buyers to sign in about 8 different places to emphasize that ***thou shalt not flip***."  (Emphasis added.)  Additionally, the Individual Defendants deflected analysts' concerns regarding the high percentage of Toll Brothers buyers using interest only loans—leading analysts and shareholder to believe that they were merely savvy buyers.  On information and belief, defendants knew all

along that the use of interest-only loans was an indication that speculative buyers were, in fact, entering into purchase contracts with Toll Brothers.  As a result of Plaintiffs' reasonable reliance, Plaintiffs could not reasonably discover the truth to the Individual Defendants' deception until at least August 2006, when Toll Brothers' cancellation rates and real estate write-downs sharply increased.  The Insider Selling Defendants' sale of stock while in possession of material non-public information regarding Toll Brothers' declining business prospects amounted to acts of self-dealing.

119.     Plaintiffs' claims on behalf of Toll Brothers are also not time barred under the doctrine of Fraudulent Concealment.  Even as the Individual Defendants admitted softening demand and declining foot traffic during August 2005, they claimed that these conditions would be short lived because they were the result of a temporary decline in consumer confidence brought on by high gas prices and hurricanes Katrina and Rita—acts of God.  Additionally, the Individual Defendants went to great lengths to deny the role of speculators in Toll Brothers' reported sales by emphasizing the Company's ineffective safeguards against such speculative investors and to avoid forewarning the marketplace of the explosive write-downs they knew were coming.  And, in August 2005, the Individual Defendants knowingly and actively deflected express concerns voiced by analysts regarding the 38% of Toll Brothers buyers using interest-only loans.  That 38% eventually translated into a 35.9% cancellation rate during the fourth quarter of 2007.

120.     Accordingly, Plaintiffs' could not have exercised reasonable diligence to discover that Toll Brothers' Relevant Period statements were fraudulent until, at the earliest, August 2006 when the Company's cancellation rates and inventory write-downs more than doubled. Moreover, the true value of the property that Toll brought at bubble prices remains obscured as the Company continues to report hundreds of millions worth of write-downs.

## COUNT I

### Against All Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree for Breach of Fiduciary Duty

121.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

122.    The Individual Defendants owed and owe Toll Brothers fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Toll Brothers the highest obligation of good faith, fair dealing, loyalty, and due care.

123.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

124.    Each of the Individual Defendants knew or were reckless or grossly negligent in not knowing that they had caused the Company to issue false and misleading statements that concealed the effect that speculative buyers were having on the Company's sales and projected sales, which by their own admission, should have been readily discernable all along.  False statements issued by Toll Brothers assured shareholders that the 38% of Toll Brothers' buyers using interest only loans August 2005 was not an issue—according to the defendants, these buyers were supposedly merely savvy buyers.  And, in any case, the defendants claimed that the Company's policies and procedures were effectively discouraging speculative buyers.  The Individual Defendants failed to correct these statements, which led shareholders to believe that the record sales achieved in 2005 were sustainable in later years and that the softening demand experienced by the Company during 2006 was attributable to hurricanes Katrina, Rita, and other facts that would be short-lived.  Moreover, the Individual Defendants recklessly directed the Company to acquire over a billion dollars worth of luxury property when they knew or were reckless or grossly negligent in not knowing that demand for the Company's luxury homes would decline sharply as interest rates increased and speculative buyers stopped driving demand and later cancelled their orders.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125.    As a direct and proximate result of the failure of the Individual Defendants to perform their fiduciary obligations, Toll Brothers has sustained significant damages as described

in paragraphs 102 through 104.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

126.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

127.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the truth about how speculative buyers were driving demand for the Company's luxury homes; how Toll Brothers' record 2005 sales were unsustainable because that demand would eventually soften; and how the Company had recklessly purchased billions of dollars worth of property that would eventually be written-down.  The Insider Selling Defendants participated in the issuance of false and misleading statements that intended to drive up the Company's stock price at the peak of the real estate bubble—Toll Brothers' stock price increased to over $55 per share during July 2005.  The Insider Selling Defendants capitalized on that stock peak by selling over $600 million of their personally held shares.

128.    The Insider Selling Defendants sold Toll Brothers common stock on the basis of the false information described above before that information was revealed to the Company's shareholders during November 2006 when R. Toll admitted that speculative buyers were driving Toll Brothers' ballooning cancelation rates and inventory write-downs.

129.    The information described above was proprietary non-public information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Toll Brothers common stock.

130.    Plaintiffs' claim on behalf of Toll Brothers against the Insider Selling Defendants is not time barred under the doctrines of Equitable Tolling and Fraudulent Concealment.  The Insider Selling Defendants stood in a fiduciary relationship to Plaintiffs and Toll Brothers. Plaintiffs reasonably relied upon the Individual Defendants' competence and good faith.  As of

the dates of the last insider trade, during January 2006, the Individual Defendants had directed statements to the Company's shareholders to the effect that the decline in the Company's business prospects was largely to blame upon the hurricanes Katrina and Rita, acts of God. The Insider Selling Defendants went to great lengths to deny the role of speculators by emphasizing the Company's ineffective safeguards against such investors and to avoid the explosive write-downs they knew were coming. Accordingly, Plaintiffs could not have exercised reasonable diligence to discover that Toll Brothers' Relevant Period statements were fraudulent and that the Insider Selling Defendants' sales were actionable until August 2006 when the Company's cancellation rates and inventory write-downs more than doubled. The Insider Selling Defendants trades while in possession at material non-public information amounted to acts of self-dealing.

131. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

132. Plaintiffs on behalf of Toll Brothers have no adequate remedy at law.

### COUNT III

**Against Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro for Breach of Fiduciary Duty for Consciously Deciding Not to Act to Correct the Harm Caused to Toll Brothers**

133. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

134. By reason of their fiduciary relationships, the defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro owed and owe Toll Brothers the highest obligation of good faith, fair dealing, loyalty, and due care.

135. Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro violated and breached their fiduciary duties of loyalty and good faith.

136. Each of defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro knew or was reckless in not knowing they were

breaching their fiduciary duty of loyalty and good faith by not promptly, swiftly, and reasonably seeking to correct the defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree's breaches of their fiduciary duty.  Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro, were aware of defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree's breaches of fiduciary duty, yet have not taken the necessary steps to prevent and correct their wrongful behavior.

137.   As a direct and proximate result of defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro's failure to perform their fiduciary obligations, Toll Brothers has sustained significant damages as described in paragraphs 102 through 104.  As a result of the misconduct alleged herein, defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, and Shapiro are liable to the Company.

138.   Plaintiffs on behalf of Toll Brothers have no adequate remedy at law.

## COUNT IV

**Against Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree for Waste of Corporate Assets**

139.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

140.   Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree engaged in a wasteful scheme that involved: (i) pumping up Toll Brothers' business prospects; (ii) denying the effect of speculative buyers on the demand for the Company's products; (iii) allowing the Insider Selling defendants to sell hundreds of millions worth of their personal holdings; and (iv) recklessly purchasing billion of dollars worth of expensive real estate.  This scheme depended upon the reckless purchase of billions of dollars worth of real estate to lend credence to the false statements of defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree that the Company's access to difficult-to-acquire property differentiated it from other home builders.

Thus, according to defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree, Toll Brothers' record sales were sustainable, unlike other builders.  Moreover, unlike other builders, Toll Brothers' sales would recover in the short term.

141.   By failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Toll Brothers to waste valuable corporate assets by: (i) expending large sums defending Toll Brothers and its directors and officers in the securities class action; (ii) overpaying billions to purchase real estate that would later be written down; and (iii) paying millions of dollars worth of compensation to the Individual Defendants who breached fiduciary duties owed to the Company.

142.   As a result of the waste of corporate assets, defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree are liable to the Company.

143.   Plaintiffs on behalf of Toll Brothers have no adequate remedy at law.

## COUNT V

**Against Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree for Unjust Enrichment**

144.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

145.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Toll Brothers.  Defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree received unjust benefits from Toll Brothers from, among other things, incentive compensation abased upon Toll Brothers' false projections and the Insider Selling Defendants illegal stock sales.  As alleged above, defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree participated in a scheme centered on the issuance of false and misleading statements regarding Toll Brothers' business prospects.  These statements promised sustainable record sales.  When demand softened during August 2005, the defendants R. Toll, B.

Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree directed Toll Brothers to issue statements that falsely claimed that demand for Toll Brothers' home sales would return in the short term.  This was accomplished by attributing Toll Brothers' diminished sales to temporary causes and by hiding the true nature and scope of the speculative buyers who were entering purchase contracts with Toll Brothers.   The net effect of these statements was to present a false picture to justify the inceptive compensation of defendants R. Toll, B. Toll, Barzilay, Blank, Boehne, Braemer, Hillas, Marbach, Novick, Rassman, Shapiro, and Sicree.  These statements also served to cloak the illegality of the Insider Selling Defendants' stock sales, which were designed to cash the defendants out of their positions in Toll Brothers.

146.   Plaintiffs, as shareholders and representatives of Toll Brothers, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

147.   Plaintiffs on behalf of Toll Brothers have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Toll Brothers to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Toll Brothers and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      control and limit insider stock selling;

3.      a provision to permit the shareholders of Toll Brothers to nominate at least three candidates for election to the Board;

4.      a proposal to ensure the accuracy of the qualifications of Toll Brothers' directors, executives, and other employees;

5.      a proposal to ensure the prudent acquisition of new properties to keep Toll Brothers' inventory write-downs within budget;

6.      a proposal to strengthen the Company's procedures for detecting and accurately reporting sufficient material information to support the veracity of the Company's sales projections including, but not limited to, periodic and accurate reporting of: (i) Toll Brothers' customer demand projections; (ii) the makeup of Toll Brothers' customer base; (iii) cancellation rates; and (iv) foot traffic at Toll Brothers' selling communities;

7.      a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal controls, and auditing matters; and

8.      appropriately test and then strengthen the internal audit and control functions;

C.      Extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, and imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Toll Brothers have an effective remedy;

D.      Awarding to Toll Brothers restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October __, 2009              LEVANT, MARTIN & TAUBER P.C.
                                     ROBERT J. LEVANT

                                     _____
                                               ROBERT J. LEVANT

                                     320 North 18th Street
                                     Philadelphia, PA 19103
                                     Telephone: (215) 564-5959
                                     Facsimile: (215) 564-3939
                                     relevant@imtpc.com

                                     *Liaison Counsel for Plaintiffs*

                                     ROBBINS UMEDA LLP
                                     BRIAN J. ROBBINS
                                     FELIPE J. ARROYO *(pro hac vice)*
                                     GREGORY E. DEL GAIZO *(pro hac vice)*

                                     600 B Street, Suite 1900
                                     San Diego, CA 92101
                                     Telephone: (619) 525-3990
                                     Facsimile: (619) 525-3991
                                     brobbins@robbinsumeda.com
                                     farroyo@robbinsumeda.com
                                     gdelgaizo@robbinsumeda.com

                                     *Counsel for Plaintiff Martinez*

                                     LAW OFFICES OF RONALD A.
                                     MARRON, APLC
                                     RONALD A. MARRON *(pro hac vice)*
                                     3636 Fourth Avenue, Suite 202
                                     San Diego, CA 92103
                                     Telephone: (619) 696-9006
                                     Facsimile:  (619) 564-6665

                                     THE GUILIANO LAW FIRM, P.C.
                                     NICHOLAS J. GUILIANO
                                     230 South Broad Street, Suite 601
                                     Philadelphia, PA 19102
                                     Telephone: (215) 413-8223
                                     Facsimile: (215) 413-8225

                                     *Counsel for Plaintiff Hall*

## CERTIFICATE OF SERVICE

Alan J. Tauber, Esquire, hereby certifies that a true and correct copy of the within Consolidated Verified Derivative Complaint has been served by first class mail on this date upon the following party:

**NICHOLAS J. GUILIANO**
GUILIANO LAW FIRM
230 SOUTH BROAD STREET
SUITE 601
PHILADELPHIA, PA 19102

**RONALD A. MARRON**
LAW OFFICES OF RONALD A. MARRON, APLC
3636 FOURTH AVE STE 202
SAN DIEGO, CA 92103

**ALEXANDER BILUS**
DECHERT LLP
CIRA CENTRE
2929 ARCH STREET
#21-39
PHILADELPHIA , PA 19104

**WILLIAM F. CLARKE , JR.**
SKADDEN ARPS SLATE MEAGHER & FLOM LLP
FOUR TIMES SQUARE
NEW YORK , NY 10036-6522

**MICHAEL P. CARROLL**
DAVIS POLK & WARDWELL
450 LEXINGTON AVE.
NEW YORK, NY 10017

_____

Alan J. Tauber

DATED: _____

433741_9