UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

OLIVERIO MARTINEZ and WILLIAM
HALL, Derivatively on Behalf of TOLL
BROTHERS, INC.,

              Plaintiffs,

    vs.

ROBERT I. TOLL, BRUCE E. TOLL, ZVI
BARZILAY, JOEL RASSMAN, JOSEPH R.
SICREE, PAUL E. SHAPIRO, CARL B.
MARBACH, ROBERT S. BLANK,
RICHARD J. BRAEMER, ROGER S.
HILLAS, EDWARD G. BOEHNE, and
STEPHEN A. NOVICK,

              Defendants,

        and

TOLL BROTHERS, INC., a Delaware
corporation,

           Nominal Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action Nos. 2:09-cv-00937-CDJ
                2:09-cv-01405-CDJ


Honorable C. Darnell Jones II

## NOMINAL DEFENDANT TOLL BROTHERS, INC.'S MOTION TO DISMISS THE CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

      Nominal Defendant Toll Brothers, Inc., hereby moves this Court, pursuant to Rule 23.1

of the Federal Rules of Civil Procedure, to dismiss the Consolidated Verified Shareholder

Derivative Complaint for failure to sufficiently plead standing and demand futility.

The grounds supporting this motion are set forth in the accompanying memorandum of law.  Defendant respectfully requests oral argument on this motion.

Dated:   December 14, 2009

Respectfully submitted,

By:   s/ John K. McDonald
John K. McDonald

250 Gibraltar Road
Horsham, PA 19044
(215) 938-8295

*Attorney for Nominal Defendant Toll Brothers, Inc.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OLIVERIO MARTINEZ and WILLIAM
HALL, Derivatively on Behalf of TOLL
BROTHERS, INC.,

     Plaintiffs,

  vs.

ROBERT I. TOLL, BRUCE E. TOLL, ZVI
BARZILAY, JOEL RASSMAN, JOSEPH R.  : Civil Action Nos. 2:09-cv-00937-CDJ
SICREE, PAUL E. SHAPIRO, CARL B.          2:09-cv-01405-CDJ
MARBACH, ROBERT S. BLANK,
RICHARD J. BRAEMER, ROGER S.
HILLAS, EDWARD G. BOEHNE, and   : Honorable C. Darnell Jones II
STEPHEN A. NOVICK,

     Defendants,

   and

TOLL BROTHERS, INC., a Delaware
corporation,

     Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>ORDER</u>

   AND NOW, this _____ day of _____, 2010, upon consideration of Nominal

Defendant Toll Brothers, Inc.'s Motion to Dismiss the Consolidated Verified Shareholder

Derivative Complaint, the memorandum of law in support, plaintiffs' response, and defendants'

reply thereto, it is hereby ORDERED as follows:

   1.  The Motion is GRANTED.

   2.  The Amended Complaint is hereby DISMISSED with PREJUDICE.

   3.  The Clerk of the Court shall mark this matter as CLOSED.


          _____

          Hon. C. Darnell Jones II

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OLIVERIO MARTINEZ and WILLIAM
HALL, Derivatively on Behalf of TOLL
BROTHERS, INC.,

                Plaintiffs,

       vs.

ROBERT I. TOLL, BRUCE E. TOLL, ZVI
BARZILAY, JOEL RASSMAN, JOSEPH R.
SICREE, PAUL E. SHAPIRO, CARL B.
MARBACH, ROBERT S. BLANK,
RICHARD J. BRAEMER, ROGER S.
HILLAS, EDWARD G. BOEHNE, and
STEPHEN A. NOVICK,

            Defendants,

        and

TOLL BROTHERS, INC., a Delaware
corporation,

        Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action Nos. 2:09-cv-00937-CDJ
2:09-cv-01405-CDJ

Honorable C. Darnell Jones II

**MEMORANDUM OF LAW IN SUPPORT OF NOMINAL DEFENDANT
TOLL BROTHERS, INC.'S MOTION TO DISMISS THE CONSOLIDATED
<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Dated:  December 14, 2009

## **TABLE OF CONTENTS**

PAGE

PRELIMINARY STATEMENT ................................................................................1

SUMMARY OF CLAIMS AND DEMAND-FUTILITY ALLEGATIONS ...........................4

      A.    Procedural History ....................................................................4

      B.    The Parties ................................................................................5

      C.    Plaintiffs' Demand Futility Allegations....................................5

LEGAL STANDARD FOR PLEADING DEMAND FUTILITY .................................7

ARGUMENT ...................................................................................................10

   I     PLAINTIFFS HAVE NOT ADEQUATELY PLED STANDING UNDER
         RULE 23.1 .................................................................................10

   II.    THE OUTSIDE DIRECTORS DO NOT FACE A SUBSTANTIAL
         LIKELIHOOD OF LIABILITY ON PLAINTIFFS' CLAIM FOR BREACH
         OF FIDUCIARY DUTY UNDER COUNT I....................................11

   III.   THE OUTSIDE DIRECTORS DO NOT FACE A SUBSTANTIAL
         LIKELIHOOD OF LIABILITY ON PLAINTIFFS' CLAIM FOR INSIDER
         TRADING UNDER COUNT II ......................................................16

      A.    Plaintiffs Do Not Adequately Allege That Any Material, Non-Public
           Information Even Existed During the Relevant Period ........................17

      B.    Plaintiffs Do Not Plead Particularized Facts Showing That the
           Outside Directors Had Notice of the Alleged Material, Non-Public
           Information ............................................................................20

      C.    Plaintiffs Have Also Failed to Plead Particularized Facts Supporting
           That They Had the Requisite State of Mind ...........................................22

      D.    The Pending Securities Class Action Would Not Prevent the Outside
           Directors From Responding Appropriately to Plaintiffs' Demand.........28

   IV.   THE OUTSIDE DIRECTORS DO NOT FACE A SUBSTANTIAL
         LIKELIHOOD OF LIABILITY ON PLAINTIFFS' OTHER CLAIMS ...........29

      A.    Plaintiffs Have Failed to Show that Demand is Excused With
           Respect to their Claim That the Board Failed to Act to Correct
           Alleged Harm..........................................................................29

B.     Plaintiffs' Claim for Unjust Enrichment is Duplicative of the
       Insider Trading Claim as to the Outside Directors ................................30

C.     Plaintiffs Have Failed to Show that Demand Is Excused for Their
       Claim for Corporate Waste ..................................................................31

V.     PLAINTIFFS' REMAINING ALLEGATIONS DO NOT SHOW
       DEMAND FUTILITY ........................................................................33

CONCLUSION...............................................................................................35

# TABLE OF AUTHORITIES

### CASES

PAGE

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995)............................................................23

In re Adolor Corp. Derivative Litig.,
    No. 04-3649, 2009 WL 1325738 (E.D. Pa. May 12, 2009).....................................................21

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)............................................... passim

In re Affymetrix Derivative Litig.,
    No. C 06-0353 JW, 2008 WL 5050147 (N.D. Cal. Mar. 31, 2008) ........................................11

Amalgamated Bank v. Yost,
    No. Civ. A. 04-0972, 2005 WL 226117 (E.D. Pa. Jan. 31, 2005) ....................................30, 31

Aronson v. Lewis, 473 A.2d 805 (Del. 1984),
    overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000)....................... passim

In re Astea Int'l Sec. Litig.,
    No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007) ................................................25, 27

Boland v. Engle, 113 F.3d 706 (7th Cir. 1997)...............................................................................8

Bowers v. Curran,
    No. Civ. A. 94-1510, 1994 WL 172728 (E.D. Pa. May 6, 1994) ...........................................10

Brehm v. Eisner, 746 A.2d 244 (Del. 2000) ........................................................................ passim

Brophy v. Cities Serv. Co., 70 A.2d 5 (Del. Ch. 1949) ................................................................16

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ..............................24, 27

In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996)........................3, 12, 13

In re Citigroup S'holder Derivative Litig., 964 A.2d 106 (Del. Ch. 2009) ........................... passim

City of Hialeah Employees' Ret. Sys. v. Toll Bros., Inc.,
    No. Civ. A. 07-1513, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008)........................................28

In re Computer Sciences Corp. Derivative Litig.,
    No. Civ. 06-05288, 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007)........................................11

iii

Cuker v. Mikalauskas, 692 A.2d 1042 (Pa. 1997) ...............................................................8

Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984) ......................................................8

DiLorenzo v. Norton,
    Civ. No. 07-144, 2009 WL 2381327 (D.D.C. July 31, 2009)...................................10

In re Discovery Labs. Sec. Litig., No. 06-1820, 2007 WL 789432 (E.D. Pa. Mar. 15, 2007),
    aff'd, 276 Fed. App'x 154 (3d Cir. 2008).................................................................27

Fink v. Komansky,
    No. 03-0388 (GBD), 2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004)..........................21

In re Forest Labs., Inc. Derivative Litig., 450 F. Supp. 2d 379 (S.D.N.Y. 2006).........21

Gagliardi v. Trifoods Int'l, 683 A.2d 1049 (Del. Ch. 1996)...........................................33

Globis Partners, L.P. v. Plumtree Software, Inc.,
    Civ. No. 1577, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007)..................................13

Guttman v. Huang, 823 A.2d 492 (Del. Ch. 2003) ................................................. passim

In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574 (S.D.N.Y. 2007) .............12

In re ITT Corp. Derivative Litig., 588 F. Supp. 2d 502 (S.D.N.Y. 2008) .....................15

In re Intel Corp. Derivative Litig., 621 F. Supp. 2d 165 (D. Del. 2009) .......................15

In re Isolagen Inc., Sec. & Derivative Litig.,
    MDL No. 1741, No. 06-1302, 2007 WL 1101278 (E.D. Pa. Apr. 10, 2007) ..........33

Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377 (Del. Ch. 1999) .......................30

In re JPMorgan Chase & Co. S'holder Derivative Litig.,
    No. 08 Civ. 974 (DLC), 2008 WL 4298588 (S.D.N.Y. Sept. 19, 2008) ...................5

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991) ..................................................8

Kanter v. Barella, 489 F.3d 170 (3d Cir. 2007) .....................................................7, 8, 13

La. Municipal Police Employees Ret. Sys. v. Blankfein,
    No. 08 Civ. 7605, 2009 WL 1422868 (S.D.N.Y. May 19, 2009)............................15

La. Municipal Police Employees Ret. Sys. v. Pandit,
    No. 08 Civ. 7389, 2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009)...........................15

Loveman v. Lauder, 484 F. Supp. 2d 259 (S.D.N.Y. 2007) ...........................................33

Murdock v. Follansbee Steel Corp., 213 F.2d 570 (3d Cir. 1954)....................................................8

In re Nutrisystem, Inc. Derivative Litig.,
    No. 07-4565, 2009 WL 3443401 (E.D. Pa. Oct. 26, 2009) ............................................ passim

In re Oracle Corp. Derivative Litig., 867 A.2d 904 (Del. Ch. 2004),
    aff'd, 872 A.2d 960 (Del. 2005) .....................................................................17, 25, 27

Oran v. Stafford, 226 F.3d 275 (3d Cir. 2000) ...............................................................24

Overberger v. BT Fin. Corp., 106 F.R.D. 438 (W.D. Pa. 1985)....................................................10

In re PDI Sec. Litig.,
    No. Civ.A.02-CV-0211 (JLL), 2005 WL 2009892 (D.N.J. Aug. 17, 2005)...........................24

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ........................................................2, 8, 9

Rattner v. Bizdos,
    No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003)................................... passim

Spiegel v. Buntrock, 571 A.2d 767 (Del. 1990) ...............................................................8

Stepak v. Ross, No. 7047, 1985 WL 21137 (Del. Ch. Sept. 5, 1985)...........................................22

Stone v. Ritter, 911 A.2d 362 (Del. 2006) ....................................................3, 12, 13

White v. Panic, 783 A.2d 543 (Del. 2001)....................................................................31

Wood v. Baum, 953 A.2d 136 (Del. 2008) .................................................................16, 22

Zupnick v. Goizueta, 698 A.2d 384 (Del. Ch. 1997)....................................................31

## STATUTES & RULES

8 Del. C. § 102(b)(7)........................................................................................9, 29

8 Del. C. § 141(a).................................................................................................7

8 Del. C. § 220 ............................................................................................3, 9, 18, 20

Fed. R. Civ. P. 23.1 ....................................................................................... passim

Fed. R. Civ. P. 23.1(b)(1)....................................................................................2, 10

Fed. R. Civ. P. 23.1(b)(3)....................................................................................2, 7

Nominal Defendant Toll Brothers, Inc. ("Toll Brothers" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Consolidated Verified Shareholder Derivative Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 23.1.

## PRELIMINARY STATEMENT

This putative derivative action arises out of the recent nationwide decline in the residential real estate market.  Plaintiffs Oliverio Martinez and William Hall take issue with statements made by Toll Brothers and its management between February 2005 and November 2006 (the Complaint's "Relevant Period").  In particular, plaintiffs assert that the Company could have predicted the housing market's decline and therefore should have disclosed that it was "riding the late stages of a bubble driven by real estate speculators and bad credit risks." (Compl. ¶ 2.)  Plaintiffs further contend in a conclusory way that, in the same period, Toll Brothers purchased "billions of dollars of bubble-priced land," allegedly so that the Company could "mask the true state of the deteriorating real estate market."  (Compl. ¶ 6.)

Plaintiffs do not, however, bring this action individually as shareholders against Toll Brothers and its management, and they do not contend that they were themselves directly harmed by any of defendants' conduct.[1]  Instead, they seek to take the extraordinary step of displacing Toll Brothers' board of directors and bringing this action derivatively on behalf of the Company. And they seek to recover not only against Toll Brothers' management, but also personally against each member of Toll Brothers' board of directors.

---

[1] In this way, and as explained further in Section III.D, infra, plaintiffs' Delaware state law claims here for alleged breaches of fiduciary duty, unjust enrichment, and corporate waste are fundamentally different from – and indeed conflict with – the federal securities law claims asserted in a separate action, which is also pending in this Court, against Toll Brothers and certain of its officers and directors.  City of Hialeah Employees' Ret. Sys. v. Toll Bros., Inc., No. Civ. A. 07-1513-CDJ (E.D. Pa.).

In doing so, plaintiffs have failed to satisfy the legal predicates for a derivative action under Federal Rule of Civil Procedure 23.1 and Delaware law.  <u>First</u>, plaintiffs have not even pled that they were Toll Brothers shareholders throughout the Relevant Period and therefore have not sufficiently pled standing under Rule 23.1(b)(1).  <u>Second</u>, and more fundamentally, plaintiffs have failed to make a pre-suit demand on Toll Brothers' board to pursue the claims asserted in the Complaint.  Delaware law vests a corporation's board of directors with the statutory right to manage the affairs of a corporation, including the power to decide whether or not to pursue litigation on behalf of a corporation.  Ordinarily, a shareholder who believes a corporation has been wronged has no option but to make a demand upon the board requesting that it pursue any claims the corporation may have.  Should a plaintiff choose not to take the simple step of making such a demand because he or she claims demand is excused, Rule 23.1 and Delaware law impose a steep pleading burden.  Specifically, demand is excused only in the rare circumstance when a plaintiff alleges <u>with particularity</u>, Fed. R. Civ. P. 23.1(b)(3), that a majority of the board is incapable of "properly exercis[ing] its independent and disinterested business judgment in responding to a demand," <u>Rales v. Blasband</u>, 634 A.2d 927, 934 (Del. 1993).  Plaintiffs have failed to do so here.

There is no dispute here that a majority of Toll Brothers' board is independent.  At the time, there were eleven members of the board, including seven outside directors – Defendants Paul E. Shapiro, Carl B. Marbach, Robert S. Blank, Richard J. Braemer, Roger S. Hillas, Edward G. Boehne, and Stephen A. Novick (the "Outside Directors") – who have never held management positions at the Company.  Instead, plaintiffs allege that demand is futile because the Outside Directors face a "substantial likelihood of liability" on the claims asserted in the Complaint and are therefore "interested" with respect to those claims.  (Compl. ¶¶ 109-10.)

2

Plaintiffs have failed, however, to meet their pleading burden with the required specificity: Their demand-futility allegations are speculative, conclusory, and unsupported by the particularized facts that Rule 23.1 and Delaware law expressly require.[2]  Indeed, the Outside Directors are not alleged to have had any day-to-day involvement in the operations of the Company that are at issue in the Complaint.  Faced with similar pleading deficiencies, judges in this District and in Delaware routinely dismiss complaints for failure to make the required pre-suit demand.  See, e.g., In re Nutrisystem, Inc. Derivative Litig., No. 07-4565, 2009 WL 3443401 (E.D. Pa. Oct. 26, 2009); In re Citigroup S'holder Derivative Litig., 964 A.2d 106, 123 (Del. Ch. 2009); Guttman v. Huang, 823 A.2d 492, 505-07 (Del. Ch. 2003); Rattner v. Bizdos, No. Civ. A. 19700, 2003 WL 22284323, at *14 (Del. Ch. Oct. 7, 2003).

In this case:

- There is no basis in the Complaint to conclude that the Outside Directors face a substantial likelihood of liability on plaintiffs' failure-of-oversight claims (Counts I and III).  Delaware courts have repeatedly stated that such claims are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win judgment."  In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 967 (Del. Ch. 1996); see also Stone v. Ritter, 911 A.2d 362, 372 (Del. 2006); accord Nutrisystem, 2009 WL 3443401, at *21.  For demand to be excused, plaintiffs must allege, based on particular facts, that the directors acted with bad faith – that they "fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities."  Stone, 911 A.2d at 370.  The Complaint alleges no facts that suggest that the Outside Directors had evidence of allegedly improper disclosures or land purchases and consciously ignored that evidence in bad faith.

- Plaintiffs have failed to plead with particularity that the Outside Directors face a substantial likelihood of liability on plaintiffs' insider trading claims (Count II).  In fact, plaintiffs fail to allege any facts to support the basic predicate of the claims – that material, non-public information even existed showing that demand

---

[2] This is so even though Delaware law expressly permits a shareholder to request certain of the Company's books and records, see 8 Del. C. § 220, a step that Delaware courts have repeatedly admonished putative derivative plaintiffs to take precisely to avoid the filing of baseless complaints.  See, e.g., Guttman v. Huang, 823 A.2d 492, 504 (Del. Ch. 2003); Rattner v. Bizdos, No. Civ. A. 19700, 2003 WL 22284323, at *14 (Del. Ch. Oct. 7, 2003).  Plaintiffs chose not to make such a request here.

for Toll Brothers' homes in fact depended on speculative investors or that the Company was purchasing purportedly over-priced land.  Moreover, even assuming such information existed, plaintiffs never establish that the <u>Outside Directors</u> had notice of that alleged material, non-public information.  Finally, plaintiffs also fail to show that each of the Outside Directors' trades in Toll Brothers' stock was motivated by the purported material, non-public information.

- Plaintiffs' claim for corporate waste (Count IV) is entirely speculative and conclusory.  Plaintiffs allege that defendants were "recklessly purchasing billion[s] of dollars worth of expensive real estate" to "lend credence to the false statements of defendants."  (Compl. ¶ 140.)  Nowhere in the Complaint, however, do plaintiffs make a single allegation respecting a specific purchase of land before, during, or after the Relevant Period, much less the Outside Directors' supposed awareness of any such purchases.

- Plaintiffs' unjust enrichment claim (Count V) is based on alleged "incentive compensation," which the Outside Directors did not receive, and on "illegal stock sales," which are identical to those described in Count II.  For the same reasons discussed as to Count II, therefore, plaintiffs have not pled a substantial likelihood of liability as to the Outside Directors on Count V.

Because plaintiffs have failed to allege with particularity that a majority of the Toll Brothers board at the time – specifically, any one of the seven Outside Directors – faces a substantial likelihood of liability on any of plaintiffs' claims, the Complaint must be dismissed under Rule 23.1.

## SUMMARY OF CLAIMS AND DEMAND-FUTILITY ALLEGATIONS

### A.    Procedural History

Plaintiff Oliverio Martinez and Plaintiff William Hall filed their original complaints on March 4, 2009 and April 1, 2009, respectively.  The two complaints were verbatim replicas of

each other.[3]  The consolidated Complaint, filed more than seven months later, on October 15,

2009, is substantially identical to the original complaints.[4]

**B.**    **The Parties**

Toll Brothers is a Delaware corporation with its headquarters in Horsham, Pennsylvania.

(Compl. ¶ 17.)  Toll Brothers designs, builds, markets, and arranges financing for single family

detached and attached homes in luxury residential communities.  (Id.)

When the original complaints were filed, Toll Brothers had eleven directors, and each is

named as a defendant.  Five of the directors – Messrs. Robert Toll, Bruce Toll, Zvi Barzilay, and

Joel Rassman – are either members of management or founders of the Company.[5]  (Compl. ¶¶

18-21.)  The Company's outside directors include Messrs. Blank, Braemer, Shapiro, Marbach,

Hillas, Boehne, and Novick.  (Compl. ¶¶ 23-29.)  The Complaint alleges no facts challenging the

independence of the outside directors.

Plaintiffs claim to be shareholders of Toll Brothers.  (Compl. ¶¶ 15-16.)  Plaintiffs have

not alleged, however, when they purchased their shares of Toll Brothers stock.

**C.**    **Plaintiffs' Demand Futility Allegations**

In fiscal year 2005, Toll Brothers experienced record results based on strong demand for

its homes.  (Compl. ¶ 45.)  Throughout the fiscal year, the Company increased its projections for

net income growth over fiscal year 2004 (Compl. ¶¶ 48, 50), and the Company eventually

---

[3] Cf. In re JPMorgan Chase & Co. S'holder Derivative Litig., No. 08 Civ. 974 (DLC), 2008 WL 4298588, at *8 (S.D.N.Y. Sept. 19, 2008) ("Robbins Umeda initiated this litigation and entirely controlled it at its inception. It drafted and circulated a complaint filed in four separate lawsuits over two days purportedly by four different plaintiffs and law firms.").

[4] Some of the allegations in this complaint – namely the allegations regarding defendants – are similar to those in a putative derivative action filed in the Delaware Chancery Court.  Pfeiffer v. Toll, C.A. No. 4140-VCL (Del. Ch.).  Motions to dismiss, including for failure to plead demand futility sufficiently, are pending in that case.

[5] Defendant Joseph R. Sicree, Toll Brothers' Chief Accounting Officer, is not a member of the Company's board of directors.  (Compl. ¶ 22.)

achieved 97% growth over the prior year.  Toll Brothers also projected that it would achieve

20% net income growth in fiscal years 2006 and 2007.  (Id.)  On November 8, 2005, however,

the Company stated that certain developing issues would impact its forecasts for fiscal years

2006 and 2007.  (Compl. ¶ 62.)  The Company revised downward its expected deliveries of

homes in 2006 because Hurricane Katrina had caused a significant decline in consumer

confidence, because demand was softening in some markets, and because new communities were

taking longer to come to market because of an increasingly complex regulatory process.  (Id.)

The Company also delivered some homes in fiscal year 2005 that it had expected to deliver in

fiscal year 2006.  (Id.)

Toll Brothers' net income growth declined in fiscal year 2006 and 2007.  Contract

cancellations increased throughout fiscal year 2006, and, with the economy only worsening,

remained high through the beginning of fiscal year 2009.  (Compl. ¶ 75.)  And as the real estate

market and the broader economy declined nationwide, Toll Brothers was forced to write down

the value of its inventory of land and homes.  (Compl. ¶¶ 62, 68.)  The Complaint alleges that the

write-downs through the fourth quarter of 2008 totaled approximately $1.7 billion.  (Compl. ¶¶

71, 76.)

Plaintiffs allege that the real estate market collapsed after 2005 because the Federal

Reserve Board raised interest rates and made home purchases less attractive to speculative

investors.  (Compl. ¶ 46.)  Plaintiffs' Complaint asserts – in a conclusory way – that, throughout

the Relevant Period, defendants knew that Toll Brothers was "riding the late stages of a bubble

driven by real estate speculators" (Compl. ¶ 2); that the defendants collectively concealed this

information by issuing allegedly false and misleading statements, while at the same time selling

shares of Toll Brothers stock (Compl. ¶ 91); and that defendants somehow collectively caused

6

Toll Brothers to purchase billions of dollars of supposedly over-priced land in an effort to conceal the imminent collapse of the real estate market (id).

## **LEGAL STANDARD FOR PLEADING DEMAND FUTILITY**

Putative derivative actions in federal court are governed procedurally by Federal Rule of Civil Procedure 23.1 and substantively by the law of the company's state of incorporation – here, Delaware. Kanter v. Barella, 489 F.3d 170, 176 (3d Cir. 2007).

Federal Rule of Civil Procedure 23.1 requires a putative derivative plaintiff to "state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed R. Civ. P. 23.1(b)(3). This "demand requirement" derives from the cardinal precept of corporate law (in Delaware and elsewhere) that "directors, rather than shareholders, manage the business and affairs of the corporation." Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984) (citing 8 Del. C. § 141(a)), overruled on other grounds, Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000). A lawsuit on behalf of the corporation concerns the corporation's management and is therefore committed to the discretion of the board of directors. Spiegel v. Buntrock, 571 A.2d 767, 773 (Del. 1990). The demand requirement thus affords "the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991) (internal quotation marks omitted).

Demand is excused only under "extraordinary conditions."[6] In re Nutrisystem, Inc. Derivative Litig., No. 07-4565, 2009 WL 3443401, at *8 (E.D. Pa. Oct. 26, 2009) (applying

---

[6] By its very nature, "a derivative action impinges on the managerial freedom of directors" to choose whether to bring a lawsuit on behalf of the corporation. Spiegel, 571 A.2d at 773 (internal quotation marks and

Delaware law).  A derivative plaintiff who claims that demand is excused is "obliged to plead, with particularity, facts that establish demand futility." Kanter, 489 F.3d at 176.  Applicable state law – here, Delaware – governs whether a derivative plaintiff has pleaded particularized facts demonstrating that demand would be futile.[7] See id.

Delaware courts have developed two tests for determining when demand may be excused as futile.  When a shareholder challenges a decision of the board, the two-part test announced in Aronson applies.  473 A.2d at 814.  Under Aronson, demand is excused only if the plaintiff pleads particularized facts that raise reasonable doubt that "(1) the directors are disinterested and independent" or that "(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Id.; see also Nutrisystem, 2009 WL 3443401, at *8 ("If either prong of the Aronson test is met, then demand is excused.").  When a derivative complaint challenges alleged inaction, rather than a specific decision, by the board, the test announced in Rales v. Blasband, 634 A.2d 927 (Del. 1993), applies.  Under Rales, demand is excused only if "the particularized factual allegations . . . create a reasonable doubt that . . . the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Id. at 934.  The Rales test applies to plaintiffs' claims here because the Complaint does not challenge any specific board decisions.

---

citation omitted).  Accordingly, the United States Supreme Court has recognized that derivative actions "could, if unconstrained, undermine the basic principle of corporate governance that the decisions of a corporation – including the decision to initiate litigation – should be made by the board of directors or the majority of shareholders." Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 530 (1984).  Courts have also observed that derivative actions are prone to abuse by litigants who seek not to correct alleged wrongdoing but to obtain nuisance-value settlements from the corporation.  See, e.g., Kamen, 500 U.S. at 96; Murdock v. Follansbee Steel Corp., 213 F.2d 570, 574-75 (3d Cir. 1954); Nutrisystem, 2009 WL 3443401, at *8.

[7] Under the law of Pennsylvania and other states, demand is never excused.  See, e.g., Cuker v. Mikalauskas, 692 A.2d 1042, 1048-49 (Pa. 1997) (adopting universal demand requirement); see also Boland v. Engle, 113 F.3d 706, 712 (7th Cir. 1997) (noting that both case law and academic commentary have been moving strongly in the direction of adopting a universal demand requirement).

Under Rales, to raise reasonable doubt that the board can exercise disinterested business judgment in responding to a demand, a plaintiff must allege particularized facts that demonstrate that a majority of the board faces a "substantial likelihood" of liability. Id. at 936.[8] Directors are not considered interested if they face a "mere threat of personal liability" on a plaintiff's claims. Id. Nor are directors considered interested simply because they are being asked to sue themselves. Brehm, 746 A.2d at 257 n.34; see also Aronson, 473 A.2d at 818.

"[C]ursory contentions of wrongdoing" are not a substitute for the pleading of "particularized facts." Guttman v. Huang, 823 A.2d 492, 499 (Del. Ch. 2003). Accordingly, Delaware courts have repeatedly admonished putative derivative plaintiffs to investigate their claims before filing suit by making a request for the corporation's books and records pursuant to Section 220 of the Delaware General Corporation Law.[9] See, e.g., Rattner v. Bizdos, No. Civ. A. 19700, 2003 WL 22284323, at *14 (Del. Ch. Oct. 7, 2003) (observing that Delaware courts "have consistently advised would-be derivative plaintiffs to utilize the tools at hand," including Section 220 requests, "before filing complaints") (internal quotation marks omitted); Guttman, 823 A.2d at 504 (observing that "books and records could have provided the basis for the

---

[8] Delaware courts recognize that "the threat of liability that directors face can be influenced in a substantial way if the corporate charter contains an exculpatory provision authorized by 8 Del. C. § 102(b)(7)." Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003). Toll Brothers' certificate of incorporation contains just such a provision exculpating directors from personal liability for breaches of fiduciary duty except for:

> liability (i) for any breach of the Director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.

(McDonald Decl. Ex. 1 at 10.) Where, as here, the certificate insulates the directors from liability for breaches of the duty of care, "a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." Guttman, 823 A.2d at 501 (emphasis in original).

[9] Section 220 of the Delaware General Corporation Law provides in relevant part: "Any stockholder . . . shall . . . have the right . . . to inspect for any proper purpose, and to make copies and extracts from: (1) The corporation's stock ledger, a list of its stockholders, and its other books and records . . .." 8 Del. C. § 220.

9

pleading of particulized facts – i.e., for the filing of a complaint that meets the legally required standard" and criticizing plaintiffs for failing "to use the books and records device to gather the materials necessary to prepare a solid complaint").

As demonstrated below, plaintiffs have failed to plead that the Outside Directors – who comprise a majority of the Company's board – face a substantial likelihood of liability on any of plaintiffs' claims.  Accordingly, the Complaint must be dismissed pursuant to Rule 23.1.

## **ARGUMENT**

## **I.**

## **PLAINTIFFS HAVE NOT ADEQUATELY PLED STANDING UNDER RULE 23.1**

As an initial matter, the Complaint must be dismissed because plaintiffs have failed to plead when they purchased their Toll Brothers stock.  Under Rule 23.1, a derivative plaintiff must specifically "allege that the plaintiff was a shareholder . . . at the time of the transaction of which the plaintiff complains."  Fed. R. Civ. P. 23.1(b)(1).  To have standing to assert the purported claims in the Complaint, therefore, plaintiffs must have purchased Toll Brothers stock before February 2005, the beginning of the Complaint's Relevant Period.[10]

Plaintiffs, however, do not allege when they purchased their Toll Brothers stock.  Instead, they allege – ambiguously – that each was "a shareholder at the time of the wrongdoing complained of and remains a shareholder."  (Compl. ¶¶ 15, 16, 107).  Because the Court cannot determine whether plaintiffs were shareholders for the entire Relevant Period or just a portion of it, the Complaint must be dismissed for lack of standing.  See, e.g., DiLorenzo v. Norton, Civ. No. 07-144, 2009 WL 2381327, at *3 (D.D.C. July 31, 2009) (dismissing complaint because

---

[10] Plaintiffs must also remain shareholders throughout the pendency of the litigation because "one who loses his shareholder interest may lose any incentive to pursue the litigation adequately."  Bowers v. Curran, No. Civ. A. 94-1510, 1994 WL 172728, at *2 (E.D. Pa. May 6, 1994) (quoting Overberger v. BT Fin. Corp., 106 F.R.D. 438 (W.D. Pa. 1985)).

10

"without a specific allegation as to the date on which plaintiff became a shareholder" the plaintiff's allegation that "he 'at relevant times' was a shareholder is insufficien[t]"); In re Affymetrix Derivative Litig., No. C 06-0353 JW, 2008 WL 5050147, at *8 (N.D. Cal. Mar. 31, 2008) (dismissing derivative complaint "because Plaintiffs have not alleged when they purchased the shares and whether they continue to hold them").

In In re Computer Sciences Corp. Derivative Litigation, No. Civ. 06-05288, 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007), the putative derivative plaintiffs – represented by plaintiffs' counsel here – challenged transactions between 1996 and 2004 and alleged that each plaintiff "is, and was [a shareholder] at all times relevant to" the alleged wrongdoing. Id. at *15. Noting the ambiguity inherent in this allegation – as in the Complaint here – and after getting conflicting answers from the plaintiffs in their briefs and at oral argument concerning when they purchased their stock, the court stated that "this ongoing ambiguity as to the Plaintiffs' actual ownership of [stock] . . . is the precise reason why Plaintiffs must allege contemporaneous ownership of [stock] during all periods relevant to the 1996-2004 transactions." Id. The court concluded that "Plaintiffs lack standing for failing to do so as required under Rule 23.1." Id. In the absence of a verified pleading specifying precisely when plaintiffs acquired their Toll Brothers stock, the same conclusion applies here.

## II.

### THE OUTSIDE DIRECTORS DO NOT FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY ON PLAINTIFFS' CLAIM FOR BREACH OF FIDUCIARY DUTY UNDER COUNT I

The Complaint fails to allege with particularity facts showing that the Outside Directors face a substantial likelihood of liability for not preventing Company management from making

11

allegedly improper public statements or for not preventing Company management from allegedly purchasing "over-priced" land during the Relevant Period (Count I).[11]

Delaware courts have repeatedly stated that such failure-of-oversight claims – commonly referred to as Caremark claims – are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win judgment."  Caremark, 698 A.2d at 967; accord Stone v. Ritter, 911 A.2d 362, 372 (Del. 2006); Nutrisystem, 2009 WL 3443401, at *21.  To state a Caremark claim, Plaintiffs must show that "(a) the directors utterly failed to implement any reporting or information systems and controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations."  Stone, 911 A.2d at 370; see also Guttman, 823 A.2d at 506 (noting that to prevail on a Caremark claim plaintiffs must show "that the directors were conscious of the fact that they were not doing their jobs").  The standard requires plaintiffs to show, based on particularized factual pleadings, that the directors acted in bad faith.  Id. (explaining that "a showing of bad faith conduct . . . is essential to establish director oversight liability); In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 605 (S.D.N.Y. 2007) (emphasizing that "bad faith cannot be averred generally" but "must be supported by particularized factual pleading").  Plaintiffs must therefore allege with particularity specific facts showing that the directors "fail[ed] to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities."  Stone, 911 A.2d at 370.

Plaintiffs' allegations concerning the board's alleged failure to prevent supposedly improper public statements do not come close to establishing a substantial likelihood that the Outside Directors are liable on plaintiffs' Caremark claims.  First, this case is very different from

---

[11] As plaintiffs appear to concede in their demand futility allegations (Compl. ¶¶ 109-110), the Rales test applies to this claim because Plaintiffs make no particularized allegations of any board decision-making.  See Nutrisystem, 2009 WL 3443401, at *21; Guttman, 823 A.2d at 505-07.

a traditional <u>Caremark</u> claim, where there is usually no dispute that employees engaged in

liability-producing conduct.  <u>See</u> <u>Caremark</u>, 698 A.2d at 963 (demand <u>not</u> excused where the

company pled guilty to settle federal and state indictments for illegal referral payments made by

its employees); <u>Stone</u> 911 A.2d at 365 (demand <u>not</u> excused where employees violated federal

Bank Secrecy Act and anti-money-laundering regulations); <u>Guttman</u>, 823 A.2d at 495 (demand

<u>not</u> excused where company's financial statements were misstated).  By contrast, plaintiffs here

seek to hold the director defendants liable for failing to monitor Toll Brothers' <u>business risk</u>,

which only increases plaintiffs' already extraordinarily high burden to show oversight liability.

<u>See</u> <u>In re Citigroup S'holder Derivative Litig.</u>, 964 A.2d 106, 126 (Del. Ch. 2009) ("To the

extent that the Court allows shareholder plaintiffs to succeed on a theory that a director is liable

for failure to monitor business risk, the Court risks undermining the well settled policy of

Delaware law by inviting Courts to perform a hindsight evaluation of the reasonableness or

prudence of a directors' business decisions.").

      The Complaint contains none of the specific factual allegations that Delaware courts have

found necessary to state a <u>Caremark</u> claim.  As in the recent <u>Nutrisystem</u> case, which Judge

McLaughlin dismissed on demand futility grounds, plaintiffs have "alleged no particularized

facts to show a systemic failure of oversight at [Toll Brothers], and the outside directors

therefore do not face a substantial risk of liability on the plaintiff[s'] <u>Caremark</u> claim."

<u>Nutrisystem</u>, 2009 WL 3443401, at *21; <u>Guttman</u>, 823 A.2d at 506-07; <u>see</u> <u>Kanter</u>, 489 F.3d at

181; <u>Globis Partners, L.P. v. Plumtree Software, Inc.</u>, Civ. No. 1577, 2007 WL 4292024, at *7

(Del. Ch. Nov. 30, 2007) (dismissing <u>Caremark</u> claims because Plaintiff did "not allege either

that [the defendant] had no system of controls that would have prevented the . . . overcharges or

that there was a sustained or systematic failure of the board to exercise oversight.").

13

Plaintiffs allege in a generalized way that the board was aware of so-called "red flags," which plaintiffs claim should have alerted defendants that the public statements about Toll Brothers' reliance on speculative investors were supposedly false and misleading. (Compl. ¶¶ 88, 111.) These supposed red flags were (1) the Federal Reserve Board's gradual increase in the Federal Funds Rate beginning in 2005; (2) the opinions of some economists in 2005 that "the real estate market was a bubble about to burst"; and (3) the supposedly "rampant activity of speculative investors" in the real estate market. (Compl. ¶ 88.) Plaintiffs provide literally no detail beyond this, however, including when or whether the Outside Directors became aware of these supposed red flags; what decisions or public statements the Outside Directors should have prevented or modified as a result of this supposed knowledge; or why any action or inaction on the part of the Outside Directors was done in bad faith.

These generalized allegations of red flags are patently insufficient and precisely the sort of allegations that courts routinely reject in evaluating <u>Caremark</u> claims under Rule 23.1. Two recent cases dismissing derivative claims involving Citigroup are instructive. The Delaware Chancery Court addressed a <u>Caremark</u> derivative claim based on similar allegations of "red flags" that – as here – "amount[ed] to little more than portions of public documents that reflected worsening market conditions in the subprime mortgage market and in the economy generally." <u>Citigroup</u>, 964 A.2d at 128. The Chancery Court concluded that the fact that "the director defendants knew of signs of a deterioration in the subprime mortgage market, or even signs suggesting that conditions could decline further is not sufficient to show that the directors were or should have been aware of any wrongdoing at the Company or were consciously disregarding a duty somehow to prevent Citigroup from suffering losses." <u>Id.</u>

14

A similar result held in a similar federal action involving Citigroup. In La. Municipal
Police Employees Ret. Sys. v. Pandit, No. 08 Civ. 7389, 2009 WL 2902587 (S.D.N.Y. Sept. 10,
2009), the plaintiffs argued that the directors failed to respond to red flags that the market was
not as healthy and liquid as employees represented it to be. The Court held that the "red flags" in
question were "nothing more than signs of a continuing deterioration in the financial markets and
are insufficient to frame a substantial likelihood of liability in connection with a Caremark
claim." Id. at *8; see also La. Municipal Police Employees Ret. Sys. v. Blankfein, No. 08 Civ.
7605, 2009 WL 1422868 (S.D.N.Y. May 19, 2009).

In addition to the insufficiency of the so-called "red flags" on their face, plaintiffs have
failed to allege any facts showing what defendants' response to the red flags was and how that
response was inadequate. See In re Intel Corp. Derivative Litig., 621 F. Supp. 2d 165, 174 (D.
Del. 2009) (dismissing Caremark claims because the plaintiff did not allege that the board
"approved of red flag activity" or whether the board "was advised regarding the red flags"
(internal quotation marks omitted)); In re ITT Corp. Derivative Litig., 588 F. Supp. 2d 502, 512-
13 (S.D.N.Y. 2008) (dismissing Caremark claims because "[t]he complaint [was] devoid of
allegations regarding whether or when the information regarding these events or the relevant
misconduct was actually presented to the individual Directors and what actions, if any, they took
in response.").

The same analysis leads to the same result as to plaintiffs' allegations that the Outside
Directors failed to exercise appropriate oversight over the Company's land purchases. First,
plaintiffs have failed to identify with specificity a single purchase of land during the Relevant
Period. And, in any event, that the Company later had to write down some of its land inventory
as a result of deteriorating market conditions says nothing about the date on which that land was

acquired or the circumstances that prevailed at the time, including the market value of the land. Second, even assuming the board approved land purchases – which is not specifically alleged in the Complaint – "Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of the individual directors." Wood v. Baum, 953 A.2d 136, 142 (Del. 2008) (holding that "[t]he Board's execution of [a company's] financial reports" and "membership on the Audit Committee" are insufficient to establish that the directors face a substantial likelihood of liability for breaching their duties of oversight). Plaintiffs have provided no specific allegations about why any Outside Director should have known that any purchase was not a valid exercise of the Company's business judgment, much less how an Outside Director's failure to prevent any such purchase rises to the level of bad faith.

Caremark claims premise "liability on a showing that the directors were conscious of the fact that they were not doing their jobs." Guttman, 823 A.2d at 506. The Complaint does not include such allegations, as "it is impossible to tell anything" about the Board's processes for review and discussion from the facts pled here. Id. at 507. Without these allegations, the Complaint fails to show that the Outside Directors face a substantial likelihood of liability on plaintiffs' oversight claims, and demand is not excused.

### III.

### THE OUTSIDE DIRECTORS DO NOT FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY ON PLAINTIFFS' CLAIM FOR INSIDER TRADING UNDER COUNT II

Plaintiffs have failed to plead particularized facts demonstrating that demand is excused on their claims for insider trading (Count II).

Delaware courts have permitted state law claims for disgorgement of profits for insider trading under Brophy v. Cities Serv. Co., 70 A.2d 5 (Del. Ch. 1949). To recover under Brophy,

16

plaintiffs ultimately must show that "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." In re Oracle Corp. Derivative Litig., 867 A.2d 904, 934 (Del. Ch. 2004), aff'd, 872 A.2d 960 (Del. 2005). Delaware has recognized that "it is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." Guttman, 823 A.2d at 502. Instead, plaintiffs must plead "particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." Id.

Plaintiffs do not – and cannot – meet this heightened pleading standard for three independent reasons. First, plaintiffs fail to allege that any material, non-public information even existed when defendants sold their Toll Brothers shares. Second, plaintiffs fail to allege that the Outside Directors had notice of such information, even assuming it existed. Finally, plaintiffs fail to allege that the Outside Directors sold their Toll Brothers shares with the requisite state of mind – i.e., that the purported material, nonpublic information motivated their trades.

A.    **Plaintiffs Do Not Adequately Allege That Any Material, Non-Public Information Even Existed During the Relevant Period**

Plaintiffs cannot even establish the basic predicate of an insider trading claim because they fail to plead with the requisite particularity that any material, non-public information even existed during the Relevant Period. Plaintiffs assert that defendants sold Toll Brothers stock when information existed showing that "speculative buyers were driving demand for the Company's luxury homes" and that "the Company had recklessly purchased billions of dollars

17

worth of property that would eventually be written-down." (Compl. ¶ 127.) Plaintiffs do not, however, base their assertions on any Toll Brothers documents, reports, board minutes, or other books and records, even though that information could have been available to them on a § 220 books and records request. Instead, plaintiffs resort to conclusory allegations, implausible assumptions, and misleading quotations that fail to satisfy the particularity requirements of Rule 23.1. See Rattner, 2003 WL 22284323, at *11 ("Not one particularized allegation in the Amended Complaint explains what inside information Moore traded upon or how he gleaned such information.").

Plaintiffs' assertion that some buyers' use of interest-only mortgages was "a strong indicator that speculative investors were buying up Toll Brothers' properties" is based on nothing more than plaintiffs' say-so. (Compl. ¶ 88(c).) In fact, the Complaint itself demonstrates that the number of buyers using interest-only loans was public information. (Compl. ¶¶ 53, 59.) Moreover, plaintiffs provide no particularized allegations that would support an inference that any of the defendants – much less the Outside Directors – had any reason to believe that the mechanisms in place to prevent sales to speculators (Compl. ¶ 58) were not functioning as planned and preventing speculators from purchasing Toll homes.

Plaintiffs' central allegation on this point is not to the contrary. Plaintiffs point to the following statement by Robert Toll during the November 7, 2006 earnings conference call:

> 24% [of cancellations] in the last six weeks that have walked have turned out to be investors. Now, for a Company that's not supposed to be selling to investors, that's a huge amount and it means obviously that we've got a break down in discipline of sales and probably not a strong enough Management overlook of the sales, although it should be fairly easy to discern by looking at the qualification questionnaires that are filled out and by talking to the salespeople, so we will strengthen that area immediately.

(Compl. ¶ 72.) But Mr. Toll's statement is fundamentally consistent with the fact that defendants – including Mr. Toll – fully expected that their procedures should have prevented

18

sales to speculators and that he was surprised to learn that they might not have during the prior

six weeks. And, quite appropriately, Mr. Toll recommitted to "strengthen the area immediately"

to prevent it from occurring again. Nothing in the statement – or in any other allegation in the

Complaint – suggests that <u>any</u> defendant, much less any Outside Director, actually <u>knew</u> prior to

this time that speculative investors were a material portion of any of Toll Brothers' sales in the

Relevant Period. And in any event, the statement plaintiffs quote related only to anomalous

results from one market – Orlando – not Toll Brothers' business nationwide. Indeed, plaintiffs

omit the portion of the transcript that immediately follows, in which Mr. Rassman, Toll

Brothers' Chief Financial Officer, makes this point clear.[12]

Likewise, as explained above in Part II, plaintiffs' allegations regarding the purported

purchases of over-valued real estate have no support whatsoever in the Complaint. There is not a

single allegation anywhere in the Complaint concerning any specific purchase of land before,

---

[12] The transcript continues as follows:

> JOEL RASSMAN: Bob, if I can?
>
> ROBERT TOLL: Yes, go ahead, Joel.
>
> JOEL RASSMAN: On the investor walk aways, remember a lot came out of Orlando.
>
> ROBERT TOLL: Yes, that's right.
>
> JOEL RASSMAN: You know, that's an unusually, that's a skewed number because of that issue.
>
> [ANALYST]: Is it because of the fact you bought that Company a year ago and they did a lot more speculation than you did?
>
> JOEL RASSMAN: That's correct.
>
> ROBERT TOLL: Absolutely.
>
> JOEL RASSMAN: Many of their buyers were investors.
>
> [ANALYST]: Okay, well ex that out . . ..

(McDonald Decl. Ex. 2 at 9-10.)

during, or after the Relevant Period.  Plaintiffs have thus provided no basis for the Court to conclude that any material, non-public information even existed during the Relevant Period concerning purchases of supposedly "over-priced" land.

Accordingly, "[w]hen the case most cries out for the pleading of real facts" – on the issue of whether any material, non-public information even existed during the Relevant Period – "the complaint is at its most cursory, substituting conclusory allegations for concrete assertions of fact."[13]  Guttman, 823 A.2d at 493-94.  For this reason alone, Rule 23.1 requires dismissal of plaintiffs' insider trading claims.

**B.    Plaintiffs Do Not Plead Particularized Facts Showing That the Outside Directors Had Notice of the Alleged Material, Non-Public Information**

Even assuming the alleged material, non-public information existed, the Complaint "is entirely devoid of particularized allegations of fact demonstrating that the outside directors had actual or constructive notice of [such information]."  See Guttman, 823 A.2d at 498.

Plaintiffs' allegations of Outside Director knowledge are limited to the following:  "On information and belief, R. Toll shared his concerns regarding the effect that rampant speculative investing and rising interest rates would have on the Company's business prospects during one or more of the nine Board meetings that occurred during 2005 and 2006."  (Compl. ¶ 88.)  Such conjecture, unsupported by any specific facts, does not satisfy Rule 23.1's particularity requirement and does not support a reasonable inference that the Outside Directors were aware

---

[13] For just this reason, Delaware courts have repeatedly warned derivative plaintiffs to investigate their claims by requesting the corporation's books and records pursuant to Section 220 of the Delaware General Corporation Law.  See Guttman, 823 A.2d at 493 ("Having failed to heed the numerous admonitions by our judiciary for derivative plaintiffs to obtain books and records before filing a complaint, the plaintiffs have unsurprisingly submitted an amended complaint that lacks particularized facts compromising the impartiality of the NVIDIA board that would have acted on a demand.").

of any alleged material, non-public information.[14]  See Brehm, 746 A.2d at 254 (ruling that

plaintiff's "conclusions, opinions or speculation" are insufficient to plead demand futility);

Guttman, 823 A.2d at 503 (dismissing complaint where there were no "particularized allegations

of fact detailing the precise roles that these directors played at the company, the information that

would have come to their attention in those roles, and any indication as to why they would have

perceived the [alleged non-public information]").

　　　　Plaintiffs' conclusory assertion that the Outside Directors would have had access to

material, non-public information simply by virtue of being members of the board is equally

unavailing.  (Compl. ¶ 33.)  Indeed, Judge Surrick recently explained – evaluating another

complaint filed by the same counsel here – that "[c]ourts have flatly rejected such generalized

allegations of insider trading."  In re Adolor Corp. Derivative Litig., No. 04-3649, 2009 WL

1325738, at *9 (E.D. Pa. May 12, 2009).[15]  It is no answer to say that the alleged material, non-

public information was "core" information that the board "must have" known about.  See id.

(noting that the "core operations" inference that is sometimes applied in securities actions does

not permit "the attribution of knowledge to Outside Directors who are not alleged to be directly

involved in the day-to-day operations of the company" (citation omitted)).

---

[14] The supposed "red flags" alleged in the Complaint are also insufficient to plead that the Outside Directors were on notice of any alleged material, non-public information.  As explained above in Part II, the supposed "red flags" were all public information that was not specific to Toll Brothers and that, in any event, have nothing to do with alleged demand by speculative investors for Toll Brothers' homes.

[15] See In re Forest Labs., Inc. Derivative Litig., 450 F. Supp. 2d 379, 390 (S.D.N.Y. 2006) (rejecting demand-futility allegations on insider trading claims where the "Complaint does not identify any types of reports, studies, or analyses made available to the Board, or board meeting minutes reflecting conversations from which the Court may infer that the Outside Directors had actual knowledge" of the alleged inside information); Guttman, 823 A.2d at 503 (rejecting allegations that did not specify "the information that would have come to [the directors'] attention in those roles, and any indication as to why they would have perceived the accounting irregularities"); Rattner, 2003 WL 22284323, at *10 (rejecting demand-futility argument that "merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements"); Fink v. Komansky, No. 03-0388 (GBD), 2004 WL 2813166, at *6 (S.D.N.Y. Dec. 8, 2004) (finding that directors were not interested where plaintiff asserted that the board received adverse, non-public information, but where "plaintiff does not state what exactly was that information").

Plaintiffs' allegation that Messrs. Boehne, Hillas, Marbach, and Shapiro were members of Toll Brothers' Audit Committee is insufficient for the same reason.  Delaware courts have concluded that the mere allegation that a director is on the audit committee cannot establish that the director has actual or constructive knowledge of alleged financial reporting improprieties.  See Wood, 953 A.2d at 142-43; Rattner, 2003 WL 22284323, at *12-13; see also Citigroup, 964 A.2d at 134.  Here, there is not even an allegation that the Audit Committee reviewed the allegedly misleading statements or the supposed purchases of "over-priced" land.

For this reason, too, plaintiffs' insider trading claims must be dismissed.  See Guttman, 823 A.2d at 504 ("Nothing in the complaint provides any particularized basis to infer that these outside directors had any idea about the [alleged material, non-public information].  This is fatal to the plaintiffs' effort to show demand excusal.")

**C.    Plaintiffs Have Also Failed to Plead
Particularized Facts Supporting
That They Had the Requisite State of Mind**

Even assuming material, non-public information existed and was known by the Outside Directors, plaintiffs have failed to plead particularized facts creating an inference that the Outside Directors' knowledge of this information motivated their trades.  See Guttman, 823 A.2d at 505 (explaining that insider trading claims "depend importantly on proof that the selling defendants acted with scienter").  To plead their claims, plaintiffs are required to show "that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information."  Rattner, 2003 WL 22284323, at *11 (quoting Stepak v. Ross, No. 7047, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985)) (emphasis supplied).

The Complaint does not come close to pleading the required specificity.  Rather than allege specific facts for "each sale by each individual defendant" – including, for example, the date, quantity sold, and price for each sale – plaintiffs offer only a series of graphs purporting to

22

show certain Outside Directors' aggregate trading activity between January 2003 and October 2008.[16]  (Compl. ¶¶ 23-27.)  Plaintiffs never attempt, in the graphs or elsewhere, to match up the supposed inside information with the Outside Directors' sales.  See Rattner, 2003 WL 22284323, at *12 ("[T]he Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information.").

Indeed, the graphs do not even show, in the aggregate, the trades conducted during the Relevant Period.  Instead, the graphs purport to separately tabulate each Outside Director's sales during three periods – "pre-12/9/04," "12/9/04 – 11/7/06," and "Post-11/7/06" – but none of those periods corresponds to the Complaint's Relevant Period, which begins in February 2005.[17]  (Compl. ¶ 1.)  Accordingly, the Complaint fails in every respect to show "who is selling how much and which sales are being challenged."  Rattner, 2003 WL 22284323, at *3 n.11.

Plaintiffs do not allege particular facts regarding "each sale by each individual defendant" because those facts would destroy any inference that the Outside Directors traded with the requisite state of mind.  First, each Outside Director accused of insider trading actually sold

---

[16] Plaintiffs do not supply such a graph for either Edward G. Boehne or Stephen A. Novick, because neither is accused of insider selling.  These two Outside Directors obviously cannot face a substantial likelihood of liability for Plaintiffs' Brophy claims.  Moreover, the fact that Messrs. Boehne and Novick sold no stock during the Relevant Period weighs against an inference that the other Outside Directors traded with scienter.  Cf. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported."); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (internal quotation marks omitted).

[17] Notably, December 9, 2004 is the beginning of the proposed class period in the federal securities case that is pending before the Court, suggesting that plaintiffs here merely copied the graphs verbatim from that complaint, without regard for the differences in allegations between the two cases.

shares immediately <u>before</u> the Relevant Period began.[18]  Plaintiffs would have the Court draw

the implausible inference that the Outside Directors sold a significant number of shares <u>before</u>

they initiated a scheme to inflate Toll Brothers' stock price.  <u>Cf.</u> <u>In re PDI Sec. Litig.</u>, No.

Civ.A.02-CV-0211 (JLL), 2005 WL 2009892, at *21 n.9 (D.N.J. Aug. 17, 2005) (noting that

sales occurring over a year prior to the beginning of the class period negate an inference of

scienter in a federal securities claim).

Second, the clear majority of the Outside Directors' specific trades involved the exercise

of options that were soon to expire.  Approximately two-thirds of the Outside Directors' sales

during the Relevant Period were the result of options set to expire in December 2005 and

December 2006 – i.e., during or immediately after the Relevant Period – and approximately one-

quarter involved options set to expire in December 2007, just one year after the conclusion of the

Relevant Period.  (McDonald Decl. Exs. 3-9.)  The <u>Guttman</u> court concluded that the requisite

state of mind was not adequately pleaded on alleged insider trading claims where, as here, "the

complaint fails to address whether the directors traded because options were expiring."

<u>Guttman</u>, 823 A.2d at 504.[19]

---

[18] Mr. Blank sold 60,000 shares on November 10, 2004.  (McDonald Decl. Ex. 3.)  Mr. Braemer sold 20,000 shares on November 15, 2004, and 40,000 shares on December 15, 2004.  (McDonald Decl. Ex. 5.)  Mr. Hillas sold 8,000 shares on September 15, 2004, 16,000 shares on September 16, 2004, and 24,000 shares on January 5, 2005.  (McDonald Decl. Ex. 6.)  Mr. Marbach sold 20,000 shares on September 14, 2004, 11,540 shares on September 24, 2004, 18,000 shares on October 1, 2004, and 15,000 shares on January 13, 2005.  (McDonald Decl. Ex. 7.)  And Mr. Shapiro sold 60,000 shares on December 10, 2004.  (McDonald Decl. Ex. 9.)  These figures have been adjusted to account for the July 8, 2005 split in Toll Brothers' stock.  The Court may take judicial notice of SEC filings on a motion to dismiss.  <u>See</u> <u>Oran v. Stafford</u>, 226 F.3d 275, 289 (3d Cir. 2000); <u>Advanta</u>, 180 F.3d at 540.

[19] Likewise, in federal securities claims, the Third Circuit has declined to infer scienter where stock sale proceeds "were the result of accumulated stock options and were an intended part of [the defendant's] overall compensation package."  <u>Advanta</u>, 180 F.3d at 541; <u>see also</u> <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1424 (3d Cir. 1997) (stating that "[a] large number of today's corporate executives are compensated in terms of stock and stock options" and that "these individuals will trade those securities in the normal course of events").

24

Third, the Outside Directors' sales during the Relevant Period constituted only a small percentage of their total Toll Brothers holdings, which affirmatively negates an inference of the required state of mind.  See Oracle, 867 A.2d at 954 & n.192; Guttman, 823 A.2d at 504; Rattner, 2003 WL 22284323, at *12; cf. Advanta, 180 F.3d at 541 ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [their continued retention of large amounts of company stock] suggest[s] they had every incentive to keep [the company] profitable."); In re Astea Int'l Sec. Litig., No. 06-1467, 2007 WL 2306586, at *14 (E.D. Pa. Aug. 9, 2007) (noting that fact that defendant retained a majority of his holdings "weakens any inference of motive to commit fraud").

Plaintiffs' calculations of the percentages of "personal Toll Brothers holdings" sold by each Outside Director during the Relevant Period (Compl. ¶ 89) are both misleading and demonstrably wrong by simple reference to publicly filed information on trading, which the Court may consider on a motion to dismiss. Advanta, 180 F.3d at 540.  As noted above, plaintiffs include trading from outside the Relevant Period in their calculations.  Moreover, plaintiffs appear to have excluded vested options from the Outside Directors' holdings, which is especially misleading here because the Outside Directors held most of their interests in the Company in options.  When properly calculated, the Outside Directors' sales during the Relevant Period constitute a significantly smaller percentage of their total Toll Brothers holdings than plaintiffs represent:

| Outside Director | Total Beneficial Ownership at Beginning of Relevant Period[20] | Total Beneficial Ownership at End of Relevant Period[21] | Total Number of Shares Sold During Relevant Period | Plaintiffs' Alleged Percent of Total Shares Sold During Relevant Period (Compl. ¶ 89) | Actual Percent of Total Beneficial Ownership Sold During Relevant Period[22] |
|---|---|---|---|---|---|
| Robert S. Blank | 485,092 shares | 285,192 shares | 240,000 shares | 95.54 | 45.70 |
| Edward G. Boehne | 217,100 shares | 259,400 shares | None | 0 | 0 |
| Richard J. Braemer | 534,500 shares | 522,500 shares | 50,000 shares | 42.68 | 8.73 |
| Roger S. Hillas | 627,548 shares | 602,333 shares | 60,000 shares | 29.45 | 9.06 |
| Carl B. Marbach | 505,602 shares | 392,052 shares | 150,000 shares | 89.06 | 27.67 |
| Stephen A. Novick | 35,700 shares | 76,050 shares | None | 0 | 0 |
| Paul E. Shapiro | 537,740 shares | 418,440 shares | 160,000 | 84.21 | 27.66 |

[20] The Toll Brothers' proxy statement published on February 18, 2005 lists each Director's total beneficial holdings as of January 21, 2005, including shares issuable pursuant to options exercisable within 60 days of January 21, 2005. (McDonald Decl. Ex. 10 at 3-4.) The chart above calculates each Director's total beneficial holdings at the beginning of the Relevant Period (i.e., on February 1, 2005) by starting with the figure listed in the Proxy Statement, adding any stock acquired or options vested between January 21, 2005 and February 1, 2005 (as detailed in the relevant Form 4s), subtracting any stock sold during this same period (as detailed in the relevant Form 4s), subtracting any options that vested more than 10 days after January 21, 2005 (as detailed in the relevant Form 4s), and multiplying the resulting figure by two to account for the July 8, 2005 split in Toll Brothers' stock.

[21] The Toll Brothers' proxy statement published on February 5, 2007 lists each Director's total beneficial holdings as of January 16, 2007, including shares issuable pursuant to options exercisable within 60 days of January 16, 2007. (McDonald Decl. Ex. 12 at 2-3.) The chart above calculates each Director's total beneficial holdings at the end of the Relevant Period (i.e., on November 30, 2006) by starting with the figure listed in the Proxy Statement, adding any shares sold between November 30, 2006 and January 16, 2007, subtracting any options that vested during this same period (as detailed in the relevant Form 4s), subtracting any shares acquired during this same period (as detailed in the relevant Form 4s), and subtracting any options that vested in the 60 days following January 16, 2007 (as detailed in the relevant Form 4s).

[22] Percentage of total beneficial ownership sold is derived by the following formula: *(shares sold during Relevant Period) / (shares sold during Relevant Period + total beneficial ownership at end of Relevant Period)*.

26

The percentage of total holdings sold does not support an inference that the Outside Directors were motivated to sell their shares because they possessed material, non-public information.  In Guttman, the Delaware Chancery Court held that the sale of 32%, 20%, and 10% of three directors' respective holdings did not create an inference of scienter, even where two other directors sold 100% and 50% of their respective holdings.  823 A.2d at 504.  By analogy, federal courts in this Circuit have similarly refused to infer scienter where directors' sales were similar in size to those here.  See Astea, 2007 WL 2306586, at *14 (noting that a defendant's sale of only 18.9% of his holdings "weakens any inference of motive to commit fraud"); In re Discovery Labs. Sec. Litig., No. 06-1820, 2007 WL 789432, at *7 (E.D. Pa. Mar. 15, 2007) (noting that sales representing between half and two-thirds of an officer's total holdings "were not suspiciously large"), aff'd, 276 F. App'x 154 (3d Cir. 2008).

Given that they retained such a significant percentage of their holdings, the Outside Directors had "every incentive" to keep Toll Brothers profitable.  Cf. Advanta, 180 F.3d at 541. As the Third Circuit has noted:

> As a general matter, . . . causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation that may be tied to the long-term performance of the company . . . because these disseminations of false information (that are eventually discovered by the market) increase the volatility of the company's stock and in turn increase its risk.

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1423 n.12 (3d Cir. 1997); cf. Oracle, 867 A.2d at 955 (noting that defendant who retained most of his holdings and significant equity stake in company had incentive to avoid jeopardizing company's reputation by engaging in insider trading).

27

**D.    The Pending Securities Class Action Would Not
Prevent the Outside Directors From Responding
Appropriately to Plaintiffs' Demand**

Contrary to plaintiffs' suggestion (Compl. ¶ 113), the federal securities complaint filed

against Toll Brothers and certain of the defendants, which is also pending before the Court, <u>City

of Hialeah Employees' Ret. Sys. v. Toll Bros., Inc.</u>, No. Civ. A. 07-1513-CDJ (E.D. Pa.), does

not support an inference that Toll Brothers' Outside Directors are incapable of exercising

disinterested business judgment in responding to plaintiffs' demand.[23]  As an initial matter, even

though the federal securities complaint has survived motions to dismiss on the pleadings, there is

no basis to conclude that any defendant faces a substantial likelihood of liability in that action,

which defendants continue to believe is meritless.

Moreover, plaintiffs' claims are fundamentally different from – and even directly

contradict – the claims asserted in the federal securities action.  The plaintiffs in the securities

action allege that between December 9, 2004 and November 8, 2005, Toll Brothers and certain

officers and directors issued forecasts for growth in fiscal years 2006 and 2007 while knowing

that the forecasts were unachievable, and that Toll Brothers' stock price declined between

August 2005 and November 2005 when the market purportedly learned that the forecasts were

false at the time they were issued.  <u>See</u> <u>City of Hialeah Employees' Ret. Sys. v. Toll Bros., Inc.</u>,

No. Civ. A. 07-1513, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008).

By contrast, the Complaint's Relevant Period (February 2005 to November 2006) is

substantially longer, and plaintiffs allege that defendants "betrayed shareholders' trust by failing

forthrightly to disclose that the Company was on the verge of a major decline in earnings as the

---

[23] The Defendants named in the federal securities action are Messrs. R. Toll, B. Toll, Barzilay, Blank,
Rassman, Braemer, Shapiro, and Marbach.  Messrs. Hillas, Boehne, and Novick are not even defendants in that
action.

entire real estate market braced for downward correction." (Compl. ¶ 6.) Directly contrary to the federal securities plaintiffs, plaintiffs here allege that the decline in Toll Brothers stock at the end of 2005 was not a reaction to the disclosure of fraud, but rather the beginning of a protracted correction in the housing market that defendants should have predicted.[24]  For this reason, the merits or lack thereof of the federal securities case are of no consequence to whether the Outside Directors face a substantial likelihood of liability in this matter. For the same reason, Judge Giles' analysis of scienter in the securities action has no relevance to the analysis required here.

## IV.

### THE OUTSIDE DIRECTORS DO NOT FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY ON PLAINTIFFS' OTHER CLAIMS

**A.    Plaintiffs Have Failed to Show that Demand is Excused With Respect to their Claim That the Board Failed to Act to Correct Alleged Harm**

Plaintiffs claim in Count III that defendants breached their fiduciary duties "by not promptly, swiftly, and reasonably seeking to correct the [defendants' alleged] breaches of their fiduciary duty." (Compl. ¶ 136.) This claim is, of course, wholly circular and either restates or – at a minimum – depends entirely upon the Caremark claim asserted in Count I, on which plaintiffs have failed to plead a substantial likelihood of liability. Count III must be dismissed for the same reasons.

To the extent plaintiffs purport to assert something other than a Caremark claim in Count III, the claim is barred by Toll Brothers' certificate of incorporation. As permitted by Section 102(b)(7) of the Delaware Corporation Law, the Company's certificate of incorporation shields

---

[24] Unlike the securities plaintiffs, who contend that Toll Brothers' forecasts for fiscal years 2006 and 2007 were unachievable from the time they were issued in December 2004, plaintiffs contend that demand for Toll Brothers' homes "ended abruptly . . . during the later half of 2005 . . . ." (Compl. ¶ 46.) Plaintiffs argue that "Toll Brothers' new home sales had dropped off because speculators, which Toll Brothers downplayed as part of its customer base, were no longer purchasing the Company's homes." (Compl. ¶ 62.)

the directors from liability for breaches of fiduciary duty that do not include a breach of the duty of loyalty, bad faith, intentional misconduct, or other conduct showing a lack of good faith.  (See McDonald Decl. Ex. 1 at 10.)  As explained above in Part II, if plaintiffs allege a violation of the duty of loyalty or bad faith, they have not adequately pleaded a substantial likelihood of liability on their Caremark claims.  Insofar as plaintiffs plead some other type of fiduciary breach, plaintiffs' claims are foreclosed by the Company's certificate of incorporation.  See Guttman, 823 A.2d at 506 ("Functionally, Caremark . . . matches the liability landscape for most corporate directors, who are insulated from monetary damage awards by exculpatory charter provisions.").

**B.    Plaintiffs' Claim for Unjust Enrichment
       is Duplicative of the Insider Trading Claim as to
       the Outside Directors**

In Count V of the Complaint, plaintiffs allege that the defendants were "unjustly enriched" because they received "incentive compensation" and made "illegal stock sales."[25] (Compl. ¶ 145.)  Neither theory articulates a basis upon which the Outside Directors face a substantial likelihood of liability.  First, none of the Outside Directors received "incentive compensation" during the Relevant Period, and the Complaint does not plead with particularity that they did. [26]  Second, for the reasons explained above, plaintiffs have failed to allege that the Outside Directors engaged in any "illegal stock sales."  See Nutrisystem, 2009 WL 3443401, at *21 (dismissing unjust enrichment claim based on alleged insider trading because "the complaint's allegations of insider trading . . . are insufficient to show a substantial likelihood of liability on the part of the directors accused of such trading"); Amalgamated Bank v. Yost, No.

---

[25] Under Delaware law, unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1999).

[26] See February 18, 2005 Proxy Statement, (McDonald Decl. Ex. 10 at 8), February 1, 2006 Proxy Statement, (McDonald Decl. Ex. 11 at 7), and February 5, 2007 Proxy Statement, (McDonald Decl. Ex. 12 at 6-7) .

Civ. A. 04-0972, 2005 WL 226117, at *12-13 (E.D. Pa. Jan. 31, 2005) (finding no substantial

likelihood of liability as to unjust enrichment claim based on alleged insider trading given

inadequacy of insider trading allegations).

**C.    Plaintiffs Have Failed to Show that Demand Is
        Excused for Their Claim for Corporate Waste**

In Count IV of the Complaint, plaintiffs allege that defendants committed corporate

waste by "(i) expending large sums defending Toll Brothers and its directors and officers in the

securities class action; (ii) overpaying billions to purchase real estate that would later be written

down; and (iii) paying millions of dollars worth of compensation to the Individual Defendants

who breached fiduciary duties owed to the Company."  (Compl. ¶ 141.)  Again, plaintiffs fail to

plead with particularity any facts suggesting that the Outside Directors face a substantial

likelihood of liability on this claim.

Delaware courts emphasize that the standard for showing corporate waste is "an extreme

test, very rarely satisfied by a shareholder plaintiff."  Zupnick v. Goizueta, 698 A.2d 384, 387

(Del. Ch. 1997) (citation omitted).  A corporate waste claim requires a plaintiff to show "an

exchange of corporate assets for consideration so disproportionately small as to lie beyond the

range at which any reasonable person might be willing to trade."  Brehm, 746 A.2d at 263.

Accordingly, "to excuse demand on the ground of waste, the Complaint must allege

particularized facts that lead to a reasonable inference that the director defendants authorized an

exchange that is so one sided that no business person of ordinary, sound judgment could

conclude that the corporation has received adequate consideration."  Citigroup, 964 A.2d at 136

(internal quotation marks and citation omitted); see also White v. Panic, 783 A.2d 543, 554 n.36

(Del. 2001) ("[T]o prevail on a waste claim . . . the plaintiff must overcome the general

presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests.").

To the extent that plaintiffs premise their corporate waste claim on the alleged "purchase [of] real estate that would later be written down," plaintiffs have failed the test. (Compl. ¶ 141.) The Complaint contains no allegations about the specific real estate the Company is alleged to have purchased or the board's role in those purchases. Nor does it allege when, from whom, and at what price the Company purchased the land. Thus, plaintiffs have not alleged with any particularity that the contested transactions were "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." <u>Citigroup</u>, 964 A.2d at 136. Plaintiffs' conclusory allegations regarding the Company's purchase of real estate therefore do not establish that that the Outside Directors face a substantial likelihood of liability for plaintiffs' corporate waste claim.

To the extent that plaintiffs premise their corporate waste claim on the expenditure of "large sums defending Toll Brothers and its directors and officers in the securities class action," (Compl. ¶ 141), and the payment of "millions of dollars worth of compensation to the Individual Defendants who breached fiduciary duties owed to the Company," (<u>id.</u>) their claim is similarly deficient. As a threshold matter, plaintiffs have failed to support these allegations with particularized facts. Moreover, the Complaint's allegations, if accepted as true, demonstrate that the securities action is meritless, because the losses alleged in that action resulted not from the disclosure of fraud but from the severe market dislocations (and plaintiffs should want the Company to vigorously defend that action). In any event, any claims that the Company may have for contribution and indemnity related to the securities action are not yet ripe, and any such claims should be considered by the Toll Brothers board as it is then constituted when the claims

32

actually accrue.  See, e.g., In re Isolagen Inc., Sec. & Derivative Litig., MDL No. 1741, No. 06-1302, 2007 WL 1101278, at *2 (E.D. Pa. Apr. 10, 2007) ("Derivative shareholder suits are consistently foreclosed when they merely allege damages based on the potential costs of investigating, defending, or satisfying a judgment or settlement for what might be unlawful conduct.  Moreover, Courts routinely dismiss claims as premature if the alleged injury is contingent upon the outcome of a separate, pending lawsuit.") (citations and internal quotation marks omitted).

## V.

## PLAINTIFFS' REMAINING ALLEGATIONS DO NOT SHOW DEMAND FUTILITY

None of plaintiffs' remaining allegations supports a conclusion that demand would be futile.

Plaintiffs allege that defendants "have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert and conspired with one another in furtherance of their common plan or design."  (Compl. ¶¶ 39-44.)  However, "it is well-established that the simple expedient of naming a majority of otherwise disinterested and well motivated directors as defendants and charging them with laxity or conspiracy etc., will not itself satisfy the standards" for excusing demand.  Gagliardi v. Trifoods Int'l, 683 A.2d 1049, 1055 (Del. Ch. 1996); see also Loveman v. Lauder, 484 F. Supp. 2d 259, 264 & n. 24 (S.D.N.Y. 2007) (rejecting plaintiff's "conclusory and, in itself insufficient, allegation that all of the directors, all of whom are defendants, were parties to a conspiracy to commit the alleged wrongdoing.").  Plaintiffs have failed to elaborate with particularized facts on their conclusory allegations that defendants have "acted in concert and conspired with one another," as Rule 23.1 requires.[27]

---

[27] This also applies to plaintiffs' conclusory allegation that defendants "aided and abetted and/or assisted each other in breaching their respective duties."  (Compl. ¶ 39; see also id. ¶ 44.)

Plaintiffs also suggest that demand is excused because defendants would otherwise have to sue themselves.  (Compl. ¶ 113.)  It is well settled, however, that directors are not considered interested simply because they are being asked to sue themselves.  See Aronson, 473 A.2d at 818 (collecting cases and noting that "[t]his bootstrap argument has been made to and dismissed by other courts"); Brehm, 746 A.2d at 257 n.34.  Any rule to the contrary "would effectively abrogate Rule 23.1 and weaken the managerial power of directors."  Aronson, 473 A.2d at 818.  Thus, "[u]nless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue under Delaware corporate law."  Id.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed pursuant to Rule 23.1.

Dated:    December 14, 2009

Respectfully submitted,

By:    s/ John K. McDonald
John K. McDonald

250 Gibraltar Road
Horsham, PA 19044
(215) 938-8295

*Attorney for Nominal Defendant Toll Brothers, Inc.*

35

**CERTIFICATE OF SERVICE**

I, John K. McDonald, hereby certify that, on December 14, 2009, I caused to be filed electronically and served electronically on all counsel of record a true and correct copy of Nominal Defendant Toll Brothers, Inc.'s Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint, Proposed Order, Memorandum of Law in Support of Nominal Defendant Toll Brothers, Inc.'s Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint, and the Declaration of John K. McDonald. These documents are available for viewing and downloading from the ECF system.

s/ John K. McDonald
John K. McDonald